# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **Paris Shoots, Jonathan Bell, Maxwell, Turner, Tammy Hope, and Phillipp Ostrovsky on behalf of themselves, the Proposed Rule 23 Classes, and others similarly situated,** | **Civil No. 15-CV-563 (SRN/SER)** |
| **Plaintiffs,** | **MEMORANDUM OPINION AND ORDER** |
| **v.** | |
| **iQor Holdings US Inc.,** | |
| **Defendant**. | |

---

Timothy C. Selander, Rachhana T. Srey, Carl F. Engstrom, Ashley R. Thronson, E. Michelle Drake, and John F. Albanese, Nichols Kaster, PLLP, 80 South Eighth Street, Suite 4600, Minneapolis, Minnesota 55402; Douglas L. Micko, Vildan A. Teske, and Brian T. Rochel, Teske Micko Katz Kitzer & Rochel, PLLP, 222 South Ninth Street, Suite 4050, Minneapolis, Minnesota 55402, for Plaintiffs

Brian T. Benkstein, Gina K. Janeiro, Jackson Lewis P.C., 225 South Sixth Street, Suite 3850, Minneapolis, Minnesota 55402, Erin E. McAdams, Kevin F. Gaffney, Sari M. Alamuddin, and Stephanie L. Sweitzer, Morgan, Lewis & Bockius LLP, 77 West Wacker Drive, Chicago, Illinois 60601; Paul C. Evans, Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, Pennsylvania 19103, for Defendant.

---

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on Plaintiffs' Motion for Conditional Class

Certification and Court-Authorized Notice Pursuant to 29 U.S.C. § 216(b) [Doc. No. 79]

and Defendant iQor Holdings US Inc.'s Motion for Judgment on the Pleadings [Doc. No.

1

85].  For the reasons set forth herein, Plaintiffs' motion is granted and Defendant's motion is denied.

I.    **BACKGROUND**

On January 21, 2015, Plaintiff Paris Shoots filed this action in Hennepin County District Court on behalf of himself and a proposed Rule 23 class of call center workers employed by Defendant iQor Holdings US Inc. ("iQor").  (Compl. [Doc. No. 1-1].) Defendant removed the action to this Court on February 20, 2015 (Notice of Removal [Doc. No. 1]) and, on March 13, 2015, filed its Answer and an earlier Motion for Judgment on the Pleadings [Doc. Nos. 12 & 13].  Upon learning that Shoots intended to amend his Complaint, Defendant withdrew its motion [Doc. No. 17].

On April 3, 2015, Shoots filed a First Amended Complaint ("FAC") adding as named Plaintiffs Jonathan Bell, Maxwell Turner, Tammy Hope, and Phillip Ostrovsky. (FAC [Doc. No. 19].)[1]  In the FAC, Plaintiffs assert 23 state-law claims under the laws of Minnesota, New York, Ohio, and Arizona seeking to recover straight time and overtime wages, and a nationwide collective action claim for unpaid overtime wages pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201, et seq..

A.    **Defendant's Business**

Defendant iQor is a global provider of business process outsourcing and product support services, providing customer care outsourcing, business analytics software and

---

[1]  All references to the FAC are found at ECF Doc. No. 19.

2

services, business processing outsourcing of back-office services, accounts receivable management services, and aftermarket services.  (FAC ¶ 20; Def.'s Am. Answer ¶ 20 [Doc. No. 30].)  Incorporated in Delaware, with headquarters in New York (FAC ¶ 20), iQor operates 25 call centers (referred to by Defendant as "contact centers") throughout the United States, including call centers in Arizona, Minnesota, New York, and Ohio.  (FAC ¶ 22; Def.'s Am. Ans. ¶ 22.)  Defendant employs contact center agents ("CCAs" or "agents") in these locations and others across the country, paying them on an hourly basis.  (FAC ¶ 2.)  Although CCAs may have different job titles depending on the nature of the calls and iQor's clients' lines of business, CCAs are generally responsible for receiving incoming calls from and/or making outbound calls to clients' customers.  (FAC ¶ 29.)  Among the outsourcing services iQor provides are collections, customer service, and inbound sales.  (FAC ¶ 28.)

Prior to commencing an employment relationship, iQor sends each prospective CCA a letter offering employment at a fixed hourly wage for all hours worked.  (FAC ¶ 32.)  The letters are captioned "PERSONAL and CONFIDENTIAL Employment Agreement."  (Employment Agreements, Exs. A-E to Def.'s Am. Answer [Doc. No. 78-1].)  The Employment Agreement sets forth the start date, title, function, location, and hourly wage of each CCA.  (Id.)  In addition, the Employment Agreement contains a merger clause that provides, "This Agreement represents our mutual complete understanding of your employment terms at iQor and supersedes any prior agreement (oral or written) that you may have, but does not constitute an agreement for employment

3

for any specific period of time." (Id.)  It appears that the Employment Agreements were sent to Plaintiffs electronically, as iQor instructs the recipients to "[p]lease confirm your acceptance of this Agreement by clicking on the ["I Accept"] link below." (Id.)  Plaintiffs allege that they received these Employment Agreements and accepted employment with iQor.  (FAC ¶ 32.)

Using a system called "TimeQey," iQor tracks CCAs' work activity, including the time when they log in at the beginning of their shifts, the time they log in and out for scheduled meal and rest breaks, and the time they log out at the end of their shifts.  (FAC ¶ 3.)  Through TimeQey, iQor also tracks whether CCAs are actively using their computers.  (FAC ¶ 4.)  If a CCA's computer is idle for two minutes or more, TimeQey considers this time to be inactive or "idle" time and records the number of minutes until the CCA uses the computer again.  (Id.)   Defendant considers this idle time non-compensable.  (FAC ¶ 5.)  Plaintiffs, however, allege that time recorded as idle may include time spent performing actual work, including time spent attending a meeting, helping a coworker, taking a rest break or waiting for incoming calls.  (Id.)  Defendant pays CCAs on an hourly basis consistent with the time reported in TimeQey, which does not include any idle time, and issues pay semi-monthly.  (FAC ¶ 6, 30.)

In order to contest deductions for idle time, CCAs must submit a request for reimbursement to iQor's management.  (FAC ¶ 37.)  Plaintiffs allege that many managers refuse to grant reimbursement altogether, or only do so if the manager was personally aware of the idle time, e.g., where the CCA attended a meeting at which the manager was

present.  (Id.)  Further, Plaintiffs allege that it is iQor's policy to refuse reimbursement for time used as a rest break.  (Id.)  Additionally, Plaintiffs contend that many employees never request reimbursement because of time constraints or because of pressure from management not to request reimbursement.  (Id.)

Plaintiffs allege that in their offers of employment, iQor did not refer to the TimeQey system nor did iQor indicate that certain time would not be compensated.  (FAC ¶ 32.)  Plaintiffs also allege that iQor fails to explain the TimeQey system to new hires and fails to explain its policies on non-compensable time or employees' ability to request idle time reimbursement.  (FAC ¶ 38.)  When CCAs inquire or complain about the timekeeping system and related policies, Plaintiffs maintain that iQor instructs them not to discuss such concerns with other employees.  (Id.)  Moreover, Plaintiffs allege that even when iQor reimburses a CCA for a period of idle time, the CCA is not fully reimbursed because Defendant's policy prohibits the reimbursement time range from matching any other times previously recorded in TimeQey.  (FAC ¶ 39.)  Plaintiffs provide the following example: "If TimeQey records a CCA as idle from 2:50 P.M. to 3:00 P.M., the CCA may only request a reimbursement for the period between 2:51 P.M. to 2:59 P.M.," resulting in two minutes of uncompensated time.  (Id.)  Plaintiffs thus allege that although CCAs are scheduled to work straight time of 40 hours in a workweek, and do so, iQor's policy of deducting idle time recorded by TimeQey from their total hours worked results in them being paid for less than 40 hours of work in a week.  (FAC ¶ 40.)  Based on Defendant's idle time deductions, Plaintiffs therefore contend that they

were not paid for all of their straight time hours worked, as required by contract and statute.  (FAC ¶ 43.)

Defendant schedules some CCAs to work 40 hours in a workweek with five 8.5-hour shifts punctuated by daily half hour, unpaid meal breaks.  (FAC ¶ 31.)  In terms of break time, prior to January 1, 2015, iQor gave CCAs up to 15 minutes of rest breaks every four hours, but only compensated CCAs for five minutes of rest break time every four hours.  (FAC ¶ 41.)  In addition, although iQor compensated CCAs for a second five-minute rest break if they worked full eight-hour shifts, Plaintiffs allege that such compensation rarely occurred because the deduction of idle time made it difficult for CCAs to reach the eight-hour threshold.  (Id.)  Similarly, Plaintiffs contend, CCAs working a half day or weekend shift, which was often four hours long, were not typically compensated for any rest break time.  (Id.)  On January 1, 2015, iQor changed its policy and now requires CCAs to take two compensated 10-minute breaks per eight-hour shift.  (FAC ¶ 42.)  Based on iQor's pre-January 1, 2015 practice regarding break time deductions, Plaintiffs contend that they were not properly compensated for rest break time.  (FAC ¶ 44.)

Defendant also schedules some CCAs to work more than 40 hours in a workweek, including but not limited to longer or additional shifts.  (FAC ¶ 31.)  For certain Plaintiffs and members of proposed overtime classes who worked overtime, they allege that iQor's policies with respect to idle time and rest breaks resulted in them not being properly compensated for all overtime work.  (FAC ¶¶ 53-60.)

6

In sum, as a result of Defendant's TimeQey system and break policies, Plaintiffs assert that iQor operated a scheme to deprive them and members of the proposed Rule 23 class and nationwide FLSA collective class of proper compensation for all of their hours worked.  (FAC ¶ 45.)

### B.    Named Plaintiffs

As noted, the named Plaintiffs are current or former employees of iQor.  Plaintiff Paris Shoots is a Minnesota resident and former iQor employee.  (FAC ¶ 15.)  He was employed as a CCA in iQor's Plymouth, Minnesota call center from approximately April 2014 to July 2014.  (Id.)  Defendant agreed to pay Shoots an hourly wage of $12 per hour. (Shoots Employment Agreement, Ex. D to Def.'s Am. Answer [Doc. No. 78-1 at 11].) Shoots estimates that from the pay period beginning on May 16, 2014 and ending on May 31, 2014, and excluding time spent on bona fide meal periods of at least 30 minutes, he worked approximately 85.22 hours, for which he was paid for only 79.14 hours.  (FAC ¶ 46.)  In Count I of the FAC, Shoots, individually and on behalf of a proposed Minnesota Rule 23 class, contends that Defendant violated the Minnesota Payment of Wages Act, Minn. Stat. §§ 181.101, 181.13, 181.14, and Minn. R. 5200.0120, subpt. 1, by failing to pay all straight time worked.  (FAC ¶¶ 112-126.)

Plaintiff Jonathan Bell is a resident of the New York and former iQor employee. (FAC ¶ 16.)  Bell was employed as a CCA in iQor's Buffalo, New York call center from approximately July 2011 to May 2014.  (Id.)  Defendant agreed to pay Bell an hourly wage of $15 per hour.  (Bell Employment Agreement, Ex. A to Def.'s Am. Answer [Doc.

No. 78-1 at 2].)  For the pay period beginning on June 16, 2012 and ending on June 30, 2012, Defendant paid Bell for 77.53 hours worked.  (FAC ¶ 47.)  Bell alleges that had he been paid for all hours worked, iQor should have paid him additional straight time wages. (Id.)

Plaintiff Maxwell Turner is a current iQor employee, employed in Defendant's Buffalo, New York call center as a CCA from approximately July 2014 to the present. (FAC ¶ 17.)  Defendant agreed to pay Turner an hourly wage of $9 per hour.  (Turner Employment Agreement, Ex. E to Def.'s Am. Answer [Doc. No. 78-1 at 14].)  Turner contends that for the pay period beginning on July 16, 2014 and ending on July 31, 2014, iQor paid him for 80.36 hours of work.  (FAC ¶ 48.)  He alleges that had iQor properly paid him for all hours worked, he should have received additional straight time wages. (Id.)  In addition, Turner contends that he worked overtime hours, but was not properly compensated in overtime pay due to TimeQey's idle time deductions and iQor's pre-January 1, 2015 rest break policy.  (FAC ¶¶ 54, 55.)  He asserts that during the pay period beginning August 1, 2014 and ending on August 15, 2014, iQor paid him for 79.78 hours of straight time and 5.07 hours of overtime work.  (FAC ¶ 57.)  Turner contends that had he been properly compensated, he would have received additional straight time and overtime pay.  (Id.)

In Count II of the FAC, Bell and Turner allege, individually and on behalf of the proposed New York Rule 23 class, that Defendant violated N.Y. Lab. Law §§ 190, 191, and 29 C.F.R. § 785.18, as adopted by the State of New York, by failing to pay all

straight time worked.  (FAC ¶¶ 127-36.)  In Count III of the FAC, Turner alleges,

individually and on behalf of the proposed New York Rule 23 class, that Defendant

violated N.Y. Comp. Codes R. & Regs. Title 12, § 142-2.2,  and 29 C.F.R. §§ 790.6,

785.11, 785.15, and 785.18, as adopted by the State of New York, by failing to pay all

overtime wages.  (FAC ¶¶ 137-47.)

Plaintiff Tammy Hope is an Ohio resident and former iQor employee.  (FAC ¶ 18.)

Hope worked as a CCA at iQor's call center in Columbus, Ohio from approximately

November 2011 to November 2013.  (Id.)  Defendant agreed to pay Hope an hourly wage

of $9 per hour.  (Hope Employment Agreement, Ex. B to Def.'s Am. Answer [Doc. No.

78-1 at 5].)  She alleges that as a result of iQor's timekeeping policies, iQor failed or

refused to compensate her for approximately 30 minutes of compensable time on an

average work day.  (FAC ¶ 49.)  In Count IV of the FAC, Hope alleges, individually and

on behalf of a proposed Ohio Rule 23 class, that iQor violated the Ohio Prompt Pay Act,

Ohio Rev. Code § 4113.15, by filing to pay all straight time wages earned.  (FAC ¶¶ 148-

56.)  In addition, Hope asserts that she worked overtime and was not properly

compensated for time recorded as idle in TimeQey and for rest breaks.  (FAC ¶ 56.)  She

alleges that she worked overtime during one or more workweeks of April 2013, as she

was frequently scheduled to work 9.5-hour shifts on Mondays and Tuesdays.  (FAC ¶ 58.)

Hope contends that had iQor properly paid her, it would have paid her additional

overtime compensation.  In Count V of the FAC, Hope alleges, on her own behalf and on

behalf of a proposed Ohio Rule 23 class, that Defendant violated the Ohio Minimum Fair

Wage Standards Act, Ohio Rev. Code § 4111.03, by failing to fully pay overtime compensation.  (FAC ¶¶ 157-66.)

Plaintiff Phillipp Ostrovsky is a resident of Arizona and former iQor employee. (FAC ¶ 19.)  He worked at iQor's Tempe, Arizona call center from approximately August 2014 to October 2014.  (Id.)  Defendant agreed to pay Ostrovsky an hourly wage of $11.50 per hour.  (Ostrovsky Employment Agreement, Ex. C to Def.'s Am. Answer [Doc. No. 78-1 at 8].)  Ostrovsky contends that for the pay period beginning on October 1, 2014 and ending on October 15, 2014, iQor paid him for 80.05 hours of work.  (FAC ¶ 50.)  He alleges that had iQor properly paid him for all hours worked, iQor should have paid him additional straight time and overtime wages.  (Id.)  He asserts that for the pay period beginning on September 16, 2014 and ending on September 30, 2014, iQor paid him for 84.33 hours of straight time and .26 hours of overtime.  (FAC ¶ 59.)  Ostrovsky contends that had iQor properly compensated him for all hours worked, he would have received additional straight time and overtime wages.  (Id.)  In Count VI of the FAC, Ostrovsky alleges, on his own behalf and on behalf of a proposed Arizona Rule 23 class, that iQor violated Arizona's wage statute, Ariz. Rev. Stat. § 353, by failing to pay for all straight time and overtime work.  (FAC ¶¶ 167-78.)

Finally, as alleged in Count VII of the FAC, Plaintiffs Turner, Hope, and Ostrovsky, individually and on behalf of a proposed nationwide FLSA collective, allege that Defendant failed to properly pay its employees overtime pay, in violation of the

FLSA and related regulations.[2]  (FAC ¶¶ 179-88.)

## C.   Parties' Motions

In June 2015, Plaintiffs filed the instant motion seeking conditional certification

under 29 U.S.C. § 216(b) and Defendant filed the instant motion seeking judgment on the

pleadings.  Shortly thereafter, Plaintiffs notified Defendant of their intention to file an

amended complaint.  (See Letter from S. Sweitzer to J. Nelson at 1 (June 1, 2015) [Doc.

No. 73].)  Pursuant to a stipulation of the parties [Doc. No. 73], Plaintiffs were granted

leave to file the Second Amended Complaint ("SAC") and, because the arguments

Defendant made in the instant Motion for Judgment on the Pleadings with respect to

Counts I through VII in the FAC would apply with equal force to the claims asserted in

Counts I-VI and X of the SAC, this Court ruled that Defendant's instant motion would

not be rendered moot by the filing of the SAC.  (Order of 8/7/15 [Doc. No. 113].)  This

Court also stayed Defendant's obligation to file an answer to the SAC until 30 days

following the Court's ruling on the instant motions.  (Id.)

Because this Court's resolution of Defendant's Motion for Judgment on the

Pleadings could render moot Plaintiffs' Motion for Conditional Certification, the Court

first addresses Defendant's motion.  Defendant iQor moves for judgment on the

---

[2]  At the time of filing the FAC, Plaintiffs Shoots and Bell did not bring state or federal overtime claims because they lacked information indicating that they had worked more than forty hours in any week within the statutory period.  (Selander Aff. ¶ 2 [Doc. No. 83].)  Subsequently, Plaintiff Bell has confirmed that he had worked over forty hours and therefore he asserts an FLSA claim by filing his written consent to join in the claim. [Doc. No. 44-1].

pleadings, seeking dismissal with prejudice of all of Plaintiffs' claims.  (Def.'s Mot. for J.

on the Pleadings at 2 [Doc. No. 85].)  Regarding Plaintiffs' claims for straight time

wages, iQor argues that Plaintiffs have failed to state a claim for relief under the various

state "prompt payment of wages" statutes.  (Def.'s Mem. Supp. Mot. J. on the Pleadings

at 4-19.)  Defendant contends that the underlying state statutes do not create a substantive

right to wages, but instead govern the timing of wage payments.  (Id. at 4-7.)  While

Plaintiffs must plead an independent, substantive right to recover for straight time wages

under the state laws, iQor argues that no such rights exist, whether under a contract or any

other legal source.  (Id. at 7-14.)  Specifically, iQor contends that Plaintiffs fail to

adequately plead the requisite mutual assent and meeting of the minds necessary to

support such a right stemming from an employment contract.  (Id. at 16.)  Defendant

argues that even if a valid contractual right to payment for idle time existed, the fact that

Defendant disputes the existence of contracts or their breach forecloses a cause of action

under the state prompt payment statutes.  (Id. at 19.)  As to unpaid break time, iQor

further contends that such a claim does not give rise to an independent cause of action

under the state statutes.  (Id. at 14-16.)

　　　　With respect to both the straight time and overtime claims, iQor also asserts that

Plaintiffs' claims fail because they are insufficiently detailed regarding wages and hours.

(Id. at 8-14; 20.)  In particular, iQor claims that Plaintiffs fail to allege that they were paid

below the applicable minimum wage as to their straight time claims.  (Id. at 8-14.)  As to

Plaintiffs' overtime claims, iQor contends that Plaintiffs fail to plead facts regarding their

rate of pay, work schedules, job duties, and the job duties performed during the alleged unpaid work.  (Id. at 22.)

In response, Plaintiffs argue that the state statutes in question permit them to recover for unpaid straight time wages for every hour of work performed.  (Pls.' Opp'n Mem. to Def.'s Mot. for J. on the Pleadings at 7-17 [Doc. No. 100].)  Moreover, Plaintiffs contend that iQor was contractually required to pay Plaintiffs an hourly wage for all hours worked, including idle and rest break time.  (Id. at 17-27.)  The fact that such pay is disputed does not foreclose recovery, Plaintiffs further maintain.  (Id. at 27-29.)  Finally, Plaintiffs assert that their straight time and overtime allegations satisfy the plausibility standard for pleading such claims.  (Id. at 29-32.)

Turning to Plaintiffs' Motion for Conditional Class Certification under 29 U.S.C. § 216(b), Plaintiffs seek the Court's conditional certification of this case as a nationwide collective action as to their overtime claims under the FLSA.  (Pls.' Mem. Supp. Mot. Cond'l Cert. at 1 [Doc. No. 81].)  Plaintiffs contend that at this very early stage of litigation, the evidence demonstrates that the named Plaintiffs who assert FLSA claims, the opt-in Plaintiffs, and members of the proposed class are similarly situated.

In opposition to Plaintiffs' motion, iQor argues that Plaintiffs have not established that they and the putative class members were victims of a single, unlawful decision, policy or plan.  (Def.'s Opp'n Mem. to Pls.' Cond'l Cert. Mot. at 14-16 [Doc. No. 98].)  In addition, Defendant contends that Plaintiffs have failed to demonstrate that they are similarly situated to the putative class, making conditional certification inappropriate.

(Id. at 21-24.)  However, if the Court permits conditional certification, iQor requests that it be limited to CCAs who used TimeQey during the relevant time period.  (Id. at 25-26.)  Furthermore, iQor argues that Plaintiffs' proposed notice is unreasonable in that Plaintiffs' counsel should not be entitled to class members' dates of employment, employee identification numbers, or email addresses.  (Id. at 26.)  Finally, iQor contends that Plaintiffs' proposed notice form is defective, in that it fails to disclose the opt-in plaintiffs' possible obligations upon joining the lawsuit, among other things. (Id. at 27.)

## II.    DISCUSSION

### A.    Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that a motion for judgment on the pleadings is appropriate after the pleadings are closed.  Fed.R.Civ.P. 12(c).  A motion for judgment on the pleadings will be granted "only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." Waldron v. Boeing Co., 388 F.3d 591, 593 (8th Cir. 2004).

A motion for judgment on the pleadings is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim.  Clemons v. Crawford, 585 F.3d 1119, 1124 (8th Cir. 2009).  The Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir.1986).  The Court, however, need not accept as true wholly conclusory allegations, Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir.1999), or legal conclusions that the plaintiff draws

14

from the facts pled.  Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  Id. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).  However, at the pleading stage, the plausibility requirements of Iqbal and Twombly do not require "some general and formal level of evidentiary proof."  Whitney v. Guys, Inc., 700 F.3d 1118, 1128 (8th Cir. 2012).

When considering a motion for judgment on the pleadings, the Court must also generally ignore materials outside the pleadings.  The Court may consider the complaint, "some materials that are part of the public record or do not contradict the complaint," orders, materials embraced by the complaint, and exhibits attached to the complaint.  Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).  Here, the Court considers the FAC [Doc. No. 19].  In addition, the Court considers Plaintiffs' Employment Agreements, which iQor attached as exhibits to its Amended Answer. (Employment Agreements, Exs. A-E to Def.'s Am. Answer [Doc. No. 78-1].)  The Employment Agreements are referenced in the FAC and do not contradict it.

### 1.    Straight Time Claims

As noted, Plaintiffs assert that by failing to pay for all straight time worked for time considered idle, due to computer inactivity, and for break time, iQor violated the statutes of Minnesota, New York, Ohio, and Arizona concerning the payment of wages. At this stage of the litigation, the Court must determine whether the facts in the FAC plausibly allege a cause of action for violation of these statutes.

### a.    State Wage Payment Statutes

### i.    Minnesota

Plaintiff Shoots contends that iQor violated provisions of the Minnesota Payment of Wages Act (the "MPWA"), Minn. Stat. §§ 181.101, 181.13, and 181.14, for failing to pay straight time pay for all hours worked.  (FAC, Count I.)  Minnesota Statutes § 181.101 provides that "every employer must pay all wages earned by an employee at least once every 31 days on a regular payday."  Minn. Stat. § 181.101(a).  This statutory provision governs the timing of payment, not the substantive right to the payment itself.  See Milner v. Farmers Ins. Exchange, 748 N.W.2d 608, 617 (Minn. 2008) ("While the MFLSA addresses minimum wage and hour standards, the PWA addresses how often wages must be paid and establishes penalties for wages that are paid late."); Erdman v. Life Time Fitness, Inc., 771 N.W.2d 58, 64 (Minn. Ct. App. 2009) (citing Minn. Stat. § 181.101 and stating that "[t]he timing of payment is governed . . . by the PWA").  Because § 181.101 is a timing statute, it "does not create a substantive right to the recovery of a particular wage."  Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 837 (Minn. 2012) (interpreting Minnesota Statutes

16

§ 181.13).  Rather, an employee "must establish an independent, substantive legal right, separate and distinct from [the timing provision] to the particular wage claimed."  Id. However, if the employee establishes this right, then the employee also may maintain a cause of action for a violation of the timing statute.  See Karlen v. Jones Lang LaSalle Americas, Inc., 766 F.3d 863, 868 (8th Cir. 2014) (stating that the employer was subject to penalties for a failure to pay if it owed the employee an unpaid commission).

Similar to § 181.101, two other provisions of the MPWA require payment of wages within certain time periods: § 181.13 requires employers to pay discharged workers all wages "actually earned and unpaid" immediately upon discharge, and § 181.14 requires employers to pay employees who quit or resign all "earned and unpaid" wages on the employee's next scheduled pay day.  The Minnesota Legislature amended portions of the MPWA in 2013 to better define the meaning of wages that are earned and unpaid.  The amended language now reads:

> . . . Wages are actually earned and unpaid if the employee was not paid for all time worked at the employee's regular rate of pay or at the rate required by law, including any applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, whichever rate of pay is greater. . . .  An employee may directly seek and recover payment from an employer under this section even if the employee is not a party to a contract that requires the employer to pay the employee at the rate of pay demanded by the employee, so long as the contract or any applicable statute, regulation, rule, ordinance, government resolution or policy, or other legal authority requires payment to the employee at the particular rate of pay.  The employee shall be able to directly seek payment at the highest rate of pay provided in the contract or applicable law, and any other related remedies as provided in this section.

Minn. Stat. § 181.13 (2013); see also Minn. Stat. § 181.14, subd. 1(a), subd. 2 (containing

same language quoted above regarding work actually earned and unpaid and granting same right to seek payment as required by other contract or applicable law, at the highest rate, to employees who quit or resign).  Because violators of Minn. Stat. §§ 181.101, 181.13, and 181.14 may be subject to civil penalties, see Minn. Stat. § 181.171, subd. 1, the statute must be strictly construed.  See Brekke v. THM Biomed., Inc., 683 N.W.2d 771, 774 (Minn. 2004).

As a former employee, Shoots may allege a claim for straight time claims under either Minn. Stat. § 181.13 or § 181.14, provided he identifies a separate, substantive basis for payment at a particular rate of pay.[3]  Shoots satisfies this requirement by alleging that Defendant was required by the parties' agreement to pay for all hours worked.  (FAC ¶ 115.)  The Employment Agreement sent to Shoots identified his hourly wage as $12 per hour.  (Shoots Employment Agreement, Ex. D to Def.'s Am. Answer [Doc. No. 78-1 at 11].)

### ii.   New York

In Count II of the FAC, Plaintiffs Bell and Turner similarly seek the recovery of straight time wages for all hours worked under New York's wage statute, N.Y. Lab. Law § 190, et seq., and supporting regulations.  (FAC ¶¶ 127-136.)  As with the other Plaintiffs, they allege that iQor promised to pay them a fixed hourly wage for all hours

---

[3]   The pleading does not indicate whether Shoots was discharged or voluntarily terminated his employment with iQor, therefore it is not clear which specific provision applies to him – § 181.13 applies to discharged employees, while § 181.14 applies to employees who quit or resign.

18

worked (FAC ¶ 32) and that iQor willfully withheld wages in violation of N.Y. Lab. Law § 198(1-a).  (FAC ¶ 134.)

Section 191 "provides for the recovery of wages for all hours worked."  Gordon v. Kaleida Health, 299 F.R.D. 380, 389 (W.D.N.Y. 2014).  Under § 191(1)(d), "clerical and other workers" are to be paid "wages earned in accordance with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer."  N.Y. Lab. Law § 191.  Terminated employees are to be paid not later than the regular pay day for the pay period during which termination occurred.  N.Y. Lab. Law § 191(3).  Section 190(1) defines "wages" as "the earnings of an employee for labor or services rendered. . . ."  N.Y. Lab. Law § 190(1).

But as iQor notes, the Second Circuit Court of Appeals has observed that "New York courts have suggested that plaintiffs may not use Labor Law § 191 to seek unpaid wages to which they claim to be entitled under a statute; rather § 191 guarantees only that the wages the employer and employee have 'agreed' upon be paid in a 'timely' manner again according to the 'terms of [the employee's] employment.'"  Myers v. Hertz Corp. 624 F.3d 537, 545 n.1 (2d Cir. 2009) (citing Jara v. Strong Steel Door, Inc., No. 14643/05, 2008 WL 3823769, at *11-12 (N.Y. Sup. Ct. Aug. 15, 2008)).  Plaintiffs distinguish this authority, however, noting that in Myers, 624 F.3d at 542, 546, the plaintiff unsuccessfully attempted to use § 191 to recover overtime pay, making the claim coextensive with, and derivative of, the FLSA claim.  The court explained, in dicta, that other statutes and regulations were therefore more appropriate vehicles for recovering

19

overtime wages.  Id. at 545 n.1.  Similarly, in Jara, the court dismissed the plaintiffs' §

191 claim, finding that the plaintiffs' claim to recover prevailing wages should have been

brought under N.Y. Lab. Law § 220.  Jara, 2008 WL 3823769, at *12.  In any event, at

this stage of the litigation, the Court views the facts in the light most favorable to Bell and

Turner.  Morton, 793 F.2d at 187.  Under this standard, the Court finds that their

respective Employment Agreements, in which iQor agreed to pay Bell an hourly wage of

$15 per hour and agreed to pay Turner an hourly wage of $9 per hour, adequately support

an independent basis for their claims under New York law.  (FAC ¶ 32; Bell & Turner

Employment Agreements, Exs. A & E to Def.'s Am. Answer [Doc. No. 78-1].)

### iii.    Ohio

Plaintiff Hope seeks relief under Ohio's Prompt Pay Act in Count IV of the FAC

for her claim of unpaid straight time wages.  (FAC ¶ 148-56.)  Ohio's Prompt Pay Act

provides that an employer must "pay all its employees the wages earned by them during

the first half of the preceding month ending on the fifteenth day thereof . . . ."  Ohio Rev.

Code § 4113.15.

Defendant cites Lacy v. Reddy Elec. Co., No. 3:11-CV-52,, at *17 (S.D. Ohio July

11, 2013), and Lutz v. Huntington Bancshares Inc., No. 2:12-cv-01091, 2014 WL

2890170, at *20 (S.D. Ohio June 25, 2014), for the proposition that a plaintiff cannot

recover under Ohio's Prompt Pay Act without identifying another substantive legal right

to the claimed wages.  The Court finds the holdings in these cases narrower and arguably

confined to the facts of the cases.  In Lacy, the court denied summary judgment on the

plaintiffs' FLSA claims for minimum wage and overtime wages.  Lacy, 2013 WL

3580309, at *6-15.  Following a detailed analysis of those claims, the court noted in two

sentences that because the viability of the plaintiffs' Prompt Pay Act claim hinged on the

viability of their FLSA minimum wage and overtime claims, summary judgment was

inappropriate on the plaintiffs' Prompt Pay Act claim.  Id. at *17.  Similarly in Lutz, after

conducting a lengthy analysis and finding that the defendants were entitled to an

administrative exemption under the FLSA as to the plaintiffs' FLSA overtime claims, the

court granted the defendants' motion for summary judgment.  Lutz, 2014 WL 2890170, at

*6-20.  Because the FLSA overtime claims failed due to the administrative exemption, the

court also found that the plaintiffs' equivalent state law claim for overtime wages, for

which the plaintiffs sought relief under Ohio Rev. Stat. § 4113.15, likewise failed.  Id.

The Court does not find that these holdings mean that in all cases, a Prompt Pay

Act claim must necessarily depend upon a substantive right found elsewhere.  As one

court has observed, "Section 4113.15 is silent with respect to a minimum wage or

overtime.  It merely provides employees with a civil remedy if their employer fails to pay

them their wages due within the time-frame prescribed therein."  Monahan v. Smyth

Auto., Inc., No. 1:10-CV-00048, 2011 WL 379129, at *9 (S.D. Ohio Feb. 2, 2011).  To

the extent that an independent right is required, however, the Court finds that Hope has

sufficiently alleged that her Employment Agreement provides it.  (FAC ¶¶ 32; 151.)

### iv.    Arizona

In Count VI, Plaintiff Ostrovsky alleges that iQor violated the Arizona Wage Act

21

for failing to pay for all straight time worked.  (FAC ¶¶ 167-78.)  Under Arizona's wage

payment statute, employers are required to pay "all wages due" on regular paydays.  Ariz.

Rev. Stat. § 23-351.  Under the statute, "'hours worked' includes all time an employee is

employed,"  Ariz. Rev. Stat. § 23-350, and "wages" are defined as "nondiscretionary

compensation due an employee for labor or services rendered by an employee for which

the employee has a reasonable expectation to be paid."  Ariz. Rev. Stat. § 23-350(6).

Defendant cites Rogers v. Brauer Law Offices, PLC, No. CV-10-1693-PHX-LOA,

2012 WL 426725, at *8 (D. Ariz. Feb. 10, 2012), essentially for the proposition that a

claim brought under Arizona's wage payment statute must be based on another

independent, substantive right to the recovery of wages.  Rogers, however, does not

support such a sweeping interpretation, as there the court merely found that because

Plaintiff's overtime claims under the FLSA failed, her claims to overtime under the

Arizona Wage Act similarly failed.  Id.  Again, as with the other Plaintiffs, Ostrovsky

sufficiently alleges that his Employment Agreement, in which iQor agreed to pay him an

hourly wage of $11.50 per hour, provides an independent right to the recovery of straight

time wages.  (FAC ¶ 170; Ostrovsky Employment Agreement, Ex. C to Def.'s Am.

Answer [Doc. No. 78-1 at 8].)

### b.    Employment Contracts

Defendant disputes that its letters offering employment, self-styled by iQor as

Employment Agreements, constitute contracts, and specifically disputes whether the

letters offer payment "for all hours worked," much less whether they include language

addressing compensation for idle time or break time. (Def.'s Mem. Supp. Mot. for J. on the Pleadings at 17 [Doc. No. 87].)  The Court, however, finds Plaintiffs' pleading sufficient for purposes of a motion to dismiss, as they allege that they were not paid for all time worked at their regular rate of pay, as the Employment Agreements required. Moreover, iQor itself captioned the job-offer letters "Employment Agreements," indicated that the Employment Agreements represented the parties' mutual understanding of their employment terms, and provided the mechanism by which Plaintiffs were to accept the offer.  (See Employment Agreements, Exs. A-E to Def.'s Am. Answer [Doc. No. 78-1].)

Even absent a written agreement, at-will employment "is employment under a contract (oral or written) that is not for a fixed term and that can be terminated by either party." Darke v. Lurie Besikof Lapidus & Co., LLP, 550 F. Supp. 2d 1032, 1038 (D. Minn. 2008) (citing Walker v. Abbott Labs., 340 F.3d 471, 476 (7th Cir. 2003) ("[C]ourts have found that at-will employment, though capable of being terminated by either party at any time, is nonetheless a contractual relationship."); see also Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 262 (2d Cir. 2000) (citations omitted) (observing that an at-will employee also has a contractual relationship with employer.); Welch v. Prompt Recovery Servs., Inc., 2015 WL 5578274, at *4 (Ohio Ct. App. Sept. 23, 2015) (citation omitted) ("[A]t-will status does not necessarily preclude the existence of an employment contract.").

"Virtually every employment relationship includes, at a minimum, an agreement –

that is, a contract – that the employee will do certain work in return for certain

compensation." Darke, 550 F. Supp. 2d at 1038.  In the context of an equal rights claim

brought under 42 U.S.C. § 1981, the Eighth Circuit, applying the state law of Missouri,

found that an at-will employment agreement had "all the essential elements of a valid

contract: offer, acceptance, and bargained-for performances of services," stating:

> [The employer] Maritz offered, either implicitly or explicitly, to pay [the
> employee] Skinner for performance of services.  Skinner accepted that offer
> by performance; she worked for Maritz for nineteen years and Maritz
> presumably paid her in regular intervals for the work that she had
> completed since the previous pay period. Skinner's performance of services
> for Maritz served as consideration for Maritz's promise to pay her for her
> services.  Likewise, Maritz's promise to pay Skinner for work completed
> served as adequate consideration for her performance of her job.  The
> agreement between Skinner and Maritz served both parties for nineteen
> years, and—while not in writing—embodied the essential components of a
> valid contract.  So long as both parties fulfilled their respective duties and
> neither party terminated the agreement, as either party was legally free to do
> without cause, Skinner and Maritz shared a contractual relationship.

Skinner v. Maritz, Inc., 253 F.3d 337, 340 (8th Cir. 2001).  Again, while the language

quoted above in Skinner arose in a different context, the laws of Minnesota, New York,

Ohio, and Arizona similarly require the elements of an offer, acceptance, and

consideration to establish the formation of a contract.  See Thomas B. Olson & Assocs.,

P.A. v. Leffert, Jay & Polglaze, P.A., 756 N.W.2d 907, 918 (Minn. Ct. App. 2008)

(citations omitted); DeSouza v. Andy Frain Servs., Inc., No. 12 Civ. 1308 (WHP), 2012

WL 3245496, at *2-3 (S.D.N.Y. Aug. 6, 2012); Kostelnik v. Helper, 770 N.E.2d 58, 61

(Ohio 2002); Khedouri v. Shell Holdings, Inc., No. CV-09-315-PHX-DGX, 2010 WL

454996, at *1-6 (D. Ariz. Feb. 9, 2010).  Thus even absent a written agreement, the Court

finds that Plaintiffs have at least alleged that iQor offered them jobs, they accepted

employment with iQor at a particular rate of pay, and they performed services in

exchange for iQor's payment.  To the extent that the parties' contracts were unwritten, the

existence and terms of an oral contract are issues of fact, generally to be decided by the

fact-finder.  Rios v. Jennie-O Turkey Store, Inc., 793 N.W.2d 309, 315 (Minn. Ct. App.

2011) (citing Cherne Contracting Corp. v. Marathon Petroleum Co., 578 F.3d 735, 740

(8th Cir. 2009)).

Defendant also characterizes Plaintiffs' contract allegations as "vague," citing

cases from other jurisdictions regarding the elements required for breach of contract

claims.  (Def.'s Mem. Supp. Mot. for J. on the Pleadings at 17 [Doc. No. 87]) (citations

omitted).  But Plaintiffs do not assert breach of contract claims.  In addition, iQor argues

that other allegations in the FAC contradict the existence of any promise to pay for idle or

break time, e.g., "Defendant's policy is to refuse to reimburse employees for time that

was used as a rest break."  (Id. at 18-19) (citing FAC ¶ 39).  The Court finds no fatal

contradiction.  Rather, Plaintiffs' essential allegation is that iQor promised to pay them

for all hours worked and they performed work for iQor that went unpaid.[4]  (FAC ¶ 115,

---

[4]  In a post-briefing submission from iQor, Defendant noted a recently-filed decision of the Eighth Circuit in Acosta v. Tyson Foods, Inc., 800 F.3d 468, 472-75 (8th Cir. 2015), in which the court rejected employees' attempts to recover wages for pre- and post-shift and break time activities under the Nebraska Wage Payment and Collection Act.  Defendant argues that Acosta "supports Defendant's arguments that Plaintiffs cannot read into their offer letters a contractual obligation to pay them in accordance with the FLSA."  (Def.'s Second Supp'l Submission at 2 [Doc. No. 132].)  The Court finds Acosta inapposite here, as it involves interpretation of a Nebraska statute and analysis of Nebraska state court opinions.  Nebraska law is not at issue in this case.  Moreover, the

122, 123) (emphasis added).

Defendant further argues that Plaintiffs' Employment Agreements do not give rise to a separate and independent contractual right to wages for idle and break time because the Court cannot construe the employment offer letters as promises to pay for all hours worked in accordance with the FLSA.  (Def.'s First Supp'l Submission at 1 [Doc. No. 118].)  In support of this argument, iQor cites <u>James v. W. Nat'l Mut. Ins. Co.</u>, No. 99-cv-1566 (RHK/JMM), 2001 WL 436121, at *10-11 (D. Minn. Mar. 9, 2001), for the proposition that a promise to do something that iQor is already bound to do cannot constitute consideration.  (<u>Id.</u>)

The Court finds <u>James</u> and similar cases from other jurisdictions cited by iQor inapplicable.  Again, under the MPWA, if a former employee has a right to unpaid wages under an applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, he or she may seek to recover payment at whichever rate of pay is greater.  Minn. Stat. §§ 181.13 & 181.14 (2013).  Here, in addition to the employment agreement and Minn. R. 5200.0120, subpt. 1, Shoots points to the FLSA to define what constitutes "compensable work."  Under the FLSA regulations, time

_____

Nebraska statute in question contains language unlike the MPWA, or the other three state statutes at issue, defining wages as "compensation for labor or services rendered by an employee . . . <u>when previously agreed to</u> and conditions stipulated have been met." <u>Acosta</u>, 800 F.3d  at 472 (citing Neb. Rev. Stat. § 48-1229(6)) (emphasis in original).  In addition, as Plaintiffs note, "[U]nlike in <u>Acosta</u>, here there is a written contract under which Plaintiffs are guaranteed their regularly hourly wage for each hour of work performed – the only question is how the term 'work' is defined."  (Pls.' Reply to Def.'s Second Supp'l Submission at 2 [Doc. No. 133].)

designated by an employer as "idle" may be compensable if it occurs after an employee

commences a principal activity and before the employee performs the last principal

activity during the work day.  29 C.F.R. § 790.6(b); IBP, Inc.  v. Alvarez, 546 U.S. 21, 29

(2005).  Likewise rest breaks of under 20 minutes must be counted as hours worked under

the FLSA regulations.  29 C.F.R. § 785.18.  Moreover, as a more general matter, Shoots

cites authority for which "hours worked" is defined by the statutory minimum floor

provided for in the FLSA.  See Cannon v. Citicorp Credit Servs., Inc. (USA), No. 2:12-

cv-88, 2014 WL 1267279, at * 4 (E.D. Tenn. Mar. 26, 2014) (concluding that plaintiffs'

off-the-clock work was part of "hours worked" as compensable work under the FLSA);

Abadeer v. Tyson Foods, Inc., 975 F. Supp. 2d 890, 914 (M. D. Tenn. 2013) (finding that

donning and doffing activities were compensable under the FLSA and constituted "hours

worked").

Again, at this early stage of the litigation, the Court finds that Shoots satisfies the

minimal showing required to survive a motion for judgment on the pleadings.

Accordingly, as a former iQor employee, Shoots has stated a claim for relief seeking

payment for all unpaid wages under either Minn. Stat. § 181.13 or § 181.14.

### i.       "In Dispute"

Defendant further argues that because it disputes the existence of a viable

contractual right to unpaid idle or break time, the mere fact of this dispute forecloses a

cause of action under the state prompt payment statutes.  (Def.'s Mem. Supp. Mot. for J.

on the Pleadings at 19-20 [Doc. No. 87].)  While iQor asserts this argument in general, it

cites cases involving only Minnesota and Ohio law.  (Id.)

Defendant relies on Cosgrove v. Regents of the University of Minnesota, No. A12-1288, 2013 WL 776967 (Minn. Ct. App. Mar. 4, 2013), for the proposition that claims under the MPWA are permissible only when the wages earned and owed are "undisputed."  (Id. at 19-20.)   In Cosgrove, an employee challenged his employer's failure to pay him a termination fee pursuant to his employment contract by filing a complaint in state court alleging only that his employer had violated the version of § 181.13 then in effect.[5]  Cosgrove, 2013 WL 776967, at *2.  The Minnesota Court of Appeals concluded that "the heart of [the plaintiff's] argument is that he is entitled to payment of a termination fee under the terms of [his employment contract]," and that such a dispute "does not fall under section 181.13, which is a timing statute."  Id. at *4. Rather, the court held, "the allegation that [the plaintiff] has a right to wages that remain unpaid would need to be undisputed before [he] could maintain a section 181.13 claim for untimely payment of those wages."  Id. (emphasis added).  In other words, the plaintiff could not maintain his claim under the timing statute because he had not first established that he had an independent, substantive legal right to the wages at issue.

Although Defendant relies heavily on the Cosgrove court's use of the term "undisputed" for the proposition that claims under §§ 181.101, 181.13, and 181.14 are permissible only when the wages owed are not in dispute, this Court finds that use of that

_____

[5] Cosgrove was decided on March 4, 2013, Cosgrove, 2013 WL 776967 (case caption); the amendments to Minn. Stat. §§ 181.14 and 181.14 went into effect on April 30, 2013.

term is limited to the facts in <u>Cosgrove</u>:  when the plaintiff filed his lawsuit under

§ 181.13, he bypassed a required administrative process in which his right to payment of

the disputed wages would have been determined—i.e., would have been rendered

"undisputed."  <u>See</u> <u>Cosgrove</u>, 2013 WL 776967, at *2.  The Minnesota Supreme Court's

and the Eighth Circuit's analyses of § 181.13 claims support this limitation.  For example, in

<u>Caldas</u>, the plaintiffs claimed that they had earned a certain amount of wages pursuant to

an employment contract prior to their termination, but that the entire amount of wages had

not been paid as required under § 181.13.  820 N.W.2d at 826.  The employer disputed

that the plaintiffs were entitled to the claimed amount.  <u>See</u> <u>id.</u> at 832–35.  After

determining that the plaintiffs were not owed the claimed amount under the alleged

contract, the Minnesota Supreme Court concluded that "[the plaintiffs] have failed to

establish a separate substantive legal right to recover wages that is separate and distinct

from section 181.13, and therefore [the plaintiffs'] statutory claim fails."  <u>Id.</u> at 837.

Similarly, in <u>Karlen</u>, the Eighth Circuit stated that, "[u]nder the terms of [§ 181.13], . . . [the

employer] is only subject to penalties for failure to pay . . . if it owed [the employee] a

commission . . . at the time of his termination."  766 F.3d at 868 (citing Minn. Stat. §

181.13).  The court noted that whether the employee had earned a commission was dictated

by his employment contract.  <u>Id.</u>  The court then proceeded to analyze that contract and

concluded that no commission had been "earned" prior to the employee's termination.  <u>Id.</u>

Accordingly, the employer did not owe the employee any payment at the time of his

termination and so there was no violation of § 181.13.  <u>Id.</u> at 869.  Thus, to the extent that

29

claimed wages must be "undisputed" before a plaintiff may maintain a claim under a timing statute, the rule is simply that a plaintiff must first establish that he has an independent, substantive legal right to those wages.  If so, the plaintiff may also pursue a claim under a timing statute, as Plaintiffs do here.

As to Ohio law, Defendant cites <u>Baum v. Intertek Testing Servs.</u>, No. 1:13CV1347, 2013 WL 6492372, at *4 (N.D. Ohio Dec. 10, 2013), and <u>Lower v. Elec. Data Sys. Corp.</u>, 494 F. Supp. 2d 770, 775 (S.D. Ohio  2007), in support of the proposition that if a wage claim is in dispute, an employee may not assert a claim under Ohio Rev. Code § 4133.15(A). In <u>Baum</u> and <u>Lower</u>, the courts found that the plaintiffs' state claims for payment of wages failed because the wages were in dispute.  <u>Id.</u>  The statutory language in question provides:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employee of a claim or for sixty days beyond the date of the agreement, award, or other act making wages payable and no contest [sic] court order <u>or dispute of any wage claim</u> including the assertion of a counterclaim exists accounting for nonpayment, the employer, in addition, as liquidated damages, is liable to the employee in an amount equal to six per cent of the amount of the claim still unpaid and not in contest or disputed or two hundred dollars, whichever is greater.

Ohio Rev. Code § 4113.15(B) (emphasis added).

The Court is persuaded by the opinion in <u>Monahan</u>, 2011 WL 379129, at *9, however, that any requirement that wage claims be "undisputed" is based upon a misreading of the statute.  As the <u>Monahan</u> court explained,

> A careful reading of the statute reveals that section (B) describes only liquidated damages, which damages would be available to Plaintiffs, for example, should they be successful in their suit, as that would resolve the

> dispute accounting for nonpayment.  In contrast, section (A) provides that the
> employee is entitled to actual damages. Ohio Rev.Code § 4113.15(A).
> Section (B), the liquidated damages provision, in no way prevents Plaintiffs
> from pursuing their 4113.15 claim against Defendant.

Id.  Any contrary interpretation of the statute "would render 4113.15 impotent because any

suit under 4113.15 necessarily means that a dispute about wages exists." Id.  This Court

agrees.

### 2.   Specificity of Pleading

With respect to both straight time and overtime claims, iQor asserts that Plaintiffs fail

to sufficiently allege wages and hours worked.[6]  (Def.'s Mem. Supp. Mot. for J. on the

Pleadings at 8-14; 20 [Doc. No. 87].)  In particular, Defendant claims that Plaintiffs:  (1) fail

to allege that they were paid below the applicable minimum wage as to their straight time

claims (id. at 8-14); and (2) fail to plead facts regarding their rate of pay, work schedules, job

duties, and job duties performed during the alleged unpaid work in support of their overtime

claims.  (Id. at 22.)

### a.   Straight Time Pleadings

Defendant contends that Plaintiffs' straight time claims fail because Plaintiffs do not

allege that iQor paid them below minimum wage for straight time work, relying on Hensley

v. MacMillan Bloedel Containers, Inc., 786 F.2d 353, 357 (8th Cir. 1986); Montijo v.

Romulus Inc., No. CV-14-PHX-SMM, 2015 WL 1470128, at *8 (D. Ariz. Mar. 31, 2015);

---

[6] On a more fundamental level, iQor argues that the straight time claims fail
because there is no independent, substantive statutory right to those wages as a matter of
law.  (Id. at 8-9.)

Chuchuca v. Creative Custom Cabinets Inc., No. 13-CV-2506 (RLM), 2014 WL 6674583, at

*9 (E.D.N.Y. Nov. 25, 2014); Bojaj v. Moro Food Corp., No. 13 Civ. 9202, 2014 WL

6055771, at *3 (S.D.N.Y. Nov. 13, 2014); and LePage v. Blue Cross & Blue Shield of

Minnesota, No. 08-cv-584 (RHK), 2008 WL 2570815, at *4 (D. Minn. June 25, 2008).

(Def.'s Mem. Supp. Mot. for J. on the Pleadings at 9-10 [Doc. No. 87].)  These cases

however, involved claimed minimum wage violations of the FLSA and/or state FLSA

statutes – not the state wage payment provisions at issue here.  See Hensley, 786 F.2d at 354

(involving a claim for unpaid minimum wages under the FLSA); Montijo, 2015 WL

1470128, at *1 (describing consolidated cases brought under the FLSA against a common

employer for minimum wage violations concerning non-tipped duties); Chuchuca, 2014 WL

6674583, at *7 n.7 (noting that while plaintiff brought claims under the FLSA and New

York Labor Law, he did not assert a cause of action under N.Y. Lab. Law § 191.); Bojaj,

2014 WL 6055771, at *1,3  (involving claims under FLSA and New York Minimum Wage

Act); LePage, 2008 WL 2570815, at *1, 4 (concerning claims under the FLSA and record-

keeping provisions of the Minnesota FLSA).  (Def.'s Mem. Supp. Mot. for J. on the

Pleadings at 9-10 [Doc. No. 87].)  While these cases stand for the general proposition that a

plaintiff claiming a violation of the minimum wage requirements of the FLSA or MFLSA

must demonstrate that the wages received for the compensable activity were below the

statutory minimum wage, see, e.g., Hensley, 786 F.2d at 357; LePage, 2008 WL 2570815, at

*2, Plaintiffs here seek relief under the state wage payment statutes and the Court is unaware

of authority under these statutes that requires such pleading.  Moreover, Plaintiffs do not

claim that iQor failed to compensate them at the minimum wage - they allege that iQor failed to compensate them for all straight time hours worked, including idle time and break time. (FAC ¶¶ 43, 122, 131, 133, 153-54, 175.) The allegations here are sufficiently detailed to apprise iQor of the basis for the straight time claims.

In addition, with respect to Shoots' claims, the MPWA provides that under §§ 181.13 or 181.14, a claimant is entitled to pay at the highest rate possible under the applicable contract, rate of pay, rule, regulation, or statute, assuming that one applies. Minn. Stat. §§ 181.13 & 181.14 (2013). In addition to pointing to the contract, Shoots' claim refers to Minnesota Rule 5200.0120. (FAC ¶ 120.) Defining "hours worked," Minnesota Rule 5200.0120 provides that

> Hours worked include training time, call time, cleaning time, waiting time, or any other time when the employee must be either on the premises of the employer or involved in the performance of duties in connection with his or her employment or must remain on the premises until work is prepared or available. Rest periods of less than 20 minutes may not be deducted from total hours worked.

Minn. R. 5200.0120, subpt. 1.

This Court has previously observed that under Minnesota law, rules such as Minn. R. 5200.0120 are "as binding as a statute, provided that [they] are reasonable. Frank v. Gold'n Plump Poultry, Inc., No. 04-cv-1018 (PJS/RLE), 2007 WL 2780504, at *6 (D. Minn. Sept. 24, 2007). Defendant does not contest the reasonableness of the rule. However, Defendant notes that when this language was proposed, it was intended "to relate to enforcement determinations under the [MFLSA]. . . ." therefore, to the extent that it provides a substantive

right to recovery, it provides a right to recover minimum wage.  (Def.'s Reply Mem. in Supp. Mot. for J. on the Pleadings at 8 [Doc. No. 108]) (citing 11 Minn. Reg. 769 (Nov. 3, 1986)).  While this Court has observed that Minn. R. 5200.0120 "supplement[s]" the MFLSA, Frank, 2007 WL 2780504, at *6, under a plain reading of Minn. Stat. §§181.13 and 181.14 (2013), a former employee may recover for unpaid wages by referencing an applicable rule or regulation that requires the payment of such wages.  Minnesota Rule 5200.0120 contemplates that waiting time and break times of less than 20 minutes are included in "hours worked" and provides additional support for Plaintiff Shoots' claim under Minnesota law.

Similarly, although the New York Labor Law does not define "hours worked," courts have found that N.Y. Lab. Law §§ 190 and 191 "incorporate FLSA standards for determining whether time worked is compensable time."  Meyers v. Crouse Health Sys., Inc., 274 F.R.D. 404, 413 (N.D.N.Y. 2011);  Hamelin v. Faxton-St. Luke's Healthcare, 274 F.R.D. 385, 392 (N.D.N.Y. 2011).  Plaintiffs Bell and Turner allege that the New York Department of Labor has adopted the FLSA regulation regarding rest periods.  (FAC ¶ 132.) FLSA regulations pertaining to "Hours Worked" provide that rest periods from five to about 20 minutes "must be counted as hours worked."  29 C.F.R. § 785.18.

Particularly given the standard of review applicable on a motion for judgment on the pleadings, the Court finds that Plaintiffs have sufficiently alleged a claim for unpaid straight time wages under the state wage payment statutes.

### b.    Overtime Pleadings

Under the FLSA, an employer may not employ a person "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Where an employer violates this provision, the FLSA permits an employee to bring a private cause of action for the amount of unpaid overtime pay and an additional equal amount as liquidated damages.  29 U.S.C. § 216(b).  Plaintiffs Turner, Hope, and Ostrovsky assert overtime claims under the FLSA (FAC, Count VII) and the state laws of New York, Ohio, and Arizona.[7]  (FAC, Counts III, V, and VI.)

As with iQor's argument concerning the pleading of straight time wages claims, discussed above, iQor similarly argues that it is entitled to judgment on the pleadings on Plaintiffs' overtime compensation claims because they are vague and conclusory.  (Def.'s Mem. Supp. Mot. for J. on the Pleadings at 20-23 [Doc. No. 87].)  Specifically, iQor contends that Plaintiffs have pleaded no facts regarding their rate of pay, work schedules, job duties, and job duties performed during the alleged overtime periods.  (Id. at 23 [Doc. No. 87].)

Post-Iqbal and Twombly, the Eighth Circuit has not addressed the pleading

---

[7]  As noted earlier, at the time of the filing of the FAC, Plaintiff Bell, a New York resident, did not plead an overtime claim because it was not clear whether he had worked more than forty hours in any week within the statutory period.  (Selander Aff. ¶ 2 [Doc. No. 83].)  He subsequently confirmed that he had worked more than forty hours in at least one workweek within the statutory period and therefore submitted a written consent to join the FLSA collective.  (Id.; Bell FLSA Consent Form [Doc. No. 44-1].)

requirements in a complaint for FLSA overtime violations.  <u>Allen v. Diversicare Leasing</u> <u>Corp.</u>, No. 14-CV-1065, 2015 WL 3458176, at *1 (W.D. Ark. June 1, 2015).  District courts within the Eighth Circuit differ in the level of specificity required in such pleadings.  <u>Cf.,</u> <u>e.g.</u>, <u>Arnold v. DirecTV, Inc.</u>, No. 4:10CV00352 AGF, 2011 WL 839636, at *7 (E.D. Mo. Mar. 7, 2011) (finding that plaintiffs sufficiently pleaded FLSA overtime and minimum wage claims to survive a motion to dismiss even though the complaint did not include specific hours worked by plaintiffs) <u>with</u> <u>Bailey v. Border Foods, Inc.</u>, No. 09-cv-1230 (RHK/AJB), 2009 WL 3248305, at *2 (D. Minn. Oct. 6, 2009) (dismissing FLSA minimum wage claim where plaintiffs did not identify their hourly pay rates, amount of reimbursements, and amounts expended in making deliveries, among other things).  While there is certainly authority, such as <u>Bailey</u>, requiring a FLSA plaintiff to include details such as hourly rates in the complaint, the Court finds that the better approach is that applied by our sister court in <u>Arnold</u>.  As in <u>Arnold</u>, the Court finds that the FAC does "more than merely state a legal conclusion that [Plaintiffs] were not paid . . . for overtime as required." <u>Arnold</u>, 2011 WL 839636, at *7.  Rather, Plaintiffs have set forth factual allegations, such as iQor's alleged policies of not compensating Plaintiffs for their idle time and breaks (<u>see</u> FAC ¶¶ 33-52), to support their claims.

Defendant cites <u>Landers v. Quality Commc'ns, Inc.</u>, 771 F.3d 638, 644-46 (9th Cir. 2014), in which the Ninth Circuit Court of Appeals addressed the pleading requirements under the FLSA.  The ruling in <u>Landers</u> did not require FLSA overtime plaintiffs to detail with precision the number of overtime hours worked, as the court explained:  ". . . we

36

decline to make the approximation of overtime hours the *sine qua non* of plausibility for claims brought under the FLSA.  After all, most (if not all) of the detailed information concerning a plaintiff-employee's compensation and schedule is in the control of the defendants."  Id. at 645.  Rather, the court held that a plaintiff asserting a violation of the FLSA overtime provisions "must allege that she worked more than forty hours in a given workweek without being compensated for the hours worked in excess of forty during that week" in order to satisfy the pleading requirements of Iqbal and Twombly.  Id.  The Landers court found the plaintiff's complaint insufficient because Landers only generally alleged that he was subject to a piecework wage scale in which he worked more than 40 hours per week without being paid overtime and that if he was paid overtime, he was paid less than required by law.  Id. at 646.  Absent from his pleading were any details regarding a given workweek in which he worked over 40 hours and was not paid overtime for that work.  Id.

Landers is not controlling authority within the Eighth Circuit, but even if it were, the Court finds that Plaintiffs' overtime claims satisfy the Landers pleading requirements.  As noted, not only do Plaintiffs describe the general policies that allegedly support their overtime claims, they assert that they worked more than 40 hours in a given workweek without being compensated for those hours.  (FAC ¶ 54.)  Plaintiff Turner alleges that during the pay period beginning August 1, 2014 and ending on August 15, 2014, iQor paid him for 79.78 hours of straight time and 5.07 hours of overtime; had he been properly paid, he alleges, he would have received additional straight time and overtime wages.  (FAC ¶ 57.)  Similarly, Plaintiff Hope estimates that she worked in excess of 40 hours in one or more

workweeks in April 2013, during which time she was scheduled to work 9.5 hour shifts two days a week.  (FAC ¶ 58.)  She alleges that she was not fully compensated for her overtime work.  (Id.)  Plaintiff Ostrovsky likewise alleges that during the pay period beginning on September 16, 2014 and ending on September 30, 2014, iQor paid him for 84.33 hours of straight time and .26 hours of overtime.  (FAC ¶ 59.)  Had iQor properly compensated him, he alleges, he would have received additional straight time and overtime wages.  (Id.)  While not every Plaintiff alleged their hourly wage in the FAC, iQor is nevertheless fully aware of Plaintiffs' rate of pay, as this information is specified in the Employment Agreements which iQor attached as exhibits to its Amended Answer.  (Employment Agreements, Exs. A-E to Def.'s Am. Answer [Doc. No. 78-1].)  The Court finds that Plaintiffs' overtime allegations sufficiently satisfy the plausibility standards of Iqbal and Twombly.  As such, Defendant's motion to dismiss on this basis is denied.

### 3. Conclusion

For all of these reasons, applying a motion to dismiss standard in which this Court must accept all well-pleaded allegations in the complaint as true and draw all reasonable factual inferences from those facts in Plaintiffs' favor, the Court finds that Plaintiffs have sufficiently pleaded their claims to survive a motion for judgment on the pleadings. Accordingly, Defendant's Motion for Judgment on the Pleadings is denied.

### B. Plaintiffs' Motion for Conditional Class Certification

As noted, Plaintiffs move for conditional certification of a collective action under the FLSA, 29 U.S.C. § 216(b).  The FLSA authorizes employees to bring a collective action

against employers to recover unpaid overtime. 29 U.S.C. § 216(b). Unlike a Rule 23 class

action, under the FLSA, no employee shall be a party to a collective action unless "he gives

consent in writing to become such a party and such consent is filed in the court in which

such action is brought." Jennings v. Cellco P'ship, No. 12–cv–00293 (SRN/TNL), 2012 WL

2568146, at *3 (D. Minn. July 2, 2012) (citing Smith v. Heartland Auto. Servs., Inc., 404 F.

Supp. 2d 1144, 1149 (D. Minn. 2005)). Courts have discretion, in "appropriate cases," to

facilitate the opt-in process by conditionally certifying a class and authorizing

court-supervised notice to potential opt-in plaintiffs. Saleen v. Waste Mgmt., Inc., 649 F.

Supp. 2d 937, 939 (D. Minn. 2009) (quoting Hoffmann–La Roche Inc. v. Sperling, 493 U.S.

165, 169 (1989)).

To proceed with a collective action, plaintiffs must demonstrate that they are similarly

situated to the proposed FLSA class. Brennan v. Qwest Commc'ns Int'l, Inc., No.

07–cv–2024 (ADM/JSM), 2008 WL 819773, at *3 (D. Minn. Mar. 25, 2008). Determining

whether Plaintiffs are similarly situated to the proposed class requires a two-step inquiry.

Burch v. Qwest Commc'ns Int'l, Inc., 500 F. Supp. 2d 1181, 1186 (D. Minn. 2007) (citations

and quotations omitted). First, the court determines whether the class should be

conditionally certified for notification and discovery purposes. Id. The plaintiffs need only

establish at that time a colorable basis for their claim that the putative class members were

the victims of a single decision, policy, or plan. Id. Determination of class status at the

notice stage is granted liberally because the court has minimal evidence for analyzing the

class. Ray v. Motel 6 Operating, Ltd. Partnership, No. 3–95–828 (RHK), 1996 WL 938231,

at *2 (D. Minn. Mar. 18, 1996).

After discovery is completed, the court conducts an inquiry into several factors if there is a motion to decertify the class.  Burch, 500 F. Supp. 2d at 1186.  These factors include: (1) the extent and consequences of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant that appear to be individual to each plaintiff; and (3) other fairness and procedural considerations.  Id.  If the class is decertified, opt-in class members are dismissed without prejudice and the case proceeds only in the putative class representatives' individual capacities.  Keef v. M.A. Mortenson Co., No. 07–cv–3915 (JMR/FLN), 2008 WL 3166302, at *2 (D. Minn. Aug. 4, 2008).

Since the parties here have not completed discovery, this case is at the first step of the two-step inquiry.  Thus, the Court must only determine whether Plaintiffs have come forward with evidence establishing a colorable basis that the putative class members are victims of a single decision, policy, or plan.  Frank, 2005 WL 2240336, at *2.  At this stage, courts usually rely on the pleadings and any affidavits submitted by the plaintiff to determine whether to grant conditional certification.  See Parker v. Rowland Express, Inc., 492 F. Supp. 2d 1159, 1164 (D. Minn. 2007) (citing Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1218 (11th Cir. 2001)).  However, the Court "does not make any credibility determinations or findings of fact with respect to contrary evidence presented by the parties[.]"  Brennan, 2008 WL 819773, at *3 (citation omitted).

40

### 1.      Additional Facts Related to Conditional Certification

In addition to the facts alleged in the FAC, in support of their motion for conditional

class certification, Plaintiffs submit declarations from the following named and opt-in

Plaintiffs:  Elissa Avitbol, Debbie Bell, Jonathan Bell, Joann Blount, Brenda Brandt, Tonicia

Farmer, Amy Hoffmeyer, Tammy Hope, Michael Hurtado, Ikema Johnson, Shanta Jordan,

Kurt Kuhlman, Michael Kwiatkowski, David Little, Kareina Miller, Shakemia Monroe,

Phillipp Ostrovsky, Anissa Sanders, Deangela Smith, Daveon Thompson, Maxwell Turner,

and Lodia Ward.  (Pls.' Decls., Ex. 5 to Selander Aff. [Doc. No. 83-5].)  In general, these

declarants state that: (1) they worked as CCAs for iQor at one of its call centers in

Minnesota, New York, North Carolina, Colorado, Ohio, or Arizona; (2) iQor paid them on

an hourly basis and classified them as non-exempt; (3) they used the TimeQey system to

track time and were subject to TimeQey's idle time policy; (4) they worked over 40 hours in

a given workweek; (5) as a result of the TimeQey system, iQor did not pay them for all

hours worked, including overtime hours; and (6) to their knowledge, iQor used the TimeQey

system with other CCAs, resulting in underpayment for all hours worked.  (See, e.g.,

Avitbol Decl. ¶¶ 2-10 [Doc. No. 83-5 at 2-4].)  Plaintiffs contend that they and the putative

class members are similarly situated employees and are subject to iQor's policy and practice

to exclude purported idle time from their hours worked.  (Pls.' Mem. Supp. Mot. for Cond'l

Cert. at 2 [Doc. No. 81].)  Accordingly, they seek conditional certification as a collective

action and request authorization to disseminate notice to putative members of the action.

(Id.)

In opposition to Plaintiffs' motion, iQor submits declarations from iQor employees. (Def.'s Decls., Exs. A & B to Sweitzer Decl. [Doc. Nos. 99-1–99-2].)  Defendant's Chief HR Officer Mason Argiropoulos states that iQor uses various alternative timekeeping systems – not just TimeQey – at its call centers.  (Argiropoulos Decl. ¶ 7 [Doc. No. 99-1].) With respect to TimeQey, Argiropoulos attests that prior to January 1, 2015, for those employees using TimeQey for timekeeping purposes, TimeQey changed CCAs' status from paid to unpaid after two minutes of keyboard and mouse inactivity, i.e., "idle" mode.  (Id. ¶ 8.)  In order to correct the unpaid time entry, iQor instructed its CCAs to either manually enter an exception into TimeQey to be paid for the time or to ask their managers to enter an exception on their behalf.  (Id.)  As of January 1, 2015, however, iQor's policy changed and TimeQey no longer records idle time as unpaid.[8]  (Id. ¶ 9.)

Defendant submits declarations from 24 employees who attest to a number of factual matters, including that certain employees rarely, if ever, make or receive calls, and have no experience with idle time.  (Def.'s Opp'n Mem. to Pls.' Mot. for Cond'l Cert. at 7 [Doc. No. 98]) (citing Espinoza Decl. ¶¶ 1-2, Ex. B-5 to Sweitzer Decl. [Doc. No. 99-2 at 22]; Willis Decl. ¶ 5, Ex. B-23 to Sweitzer Decl. [Doc. No. 99-2 at 107].)  Also reflected in iQor's declarations, of those employees who use TimeQey, some employees report that they routinely and easily received adjustments for idle time.  (See, e.g., Espinoza Decl. ¶ 5, Ex. B-

_____

[8] In Defendant's Answer, iQor admitted to changing its rest break policy as of January 1, 2015.  (Def.'s Answer ¶ 42 [Doc. No. 30].)  The fact that iQor ceased to use TimeQey's idle mode function as of that same date appears for the first time in the Argiropoulos Declaration.

5 to Sweitzer Decl. [Doc. No. 99-2 at 22], Bromley Decl. ¶¶ 6-8, Ex. B-1 to Sweitzer Decl.

[Doc. No. 99-2 at 4].)  Still others were able to "creatively" circumvent idle time altogether

by moving a computer mouse at all times, selecting a meeting code, or lodging a penny in

the computer keyboard to keep the keys depressed.  (McCray Decl. ¶ 13, Ex. B-10 to

Sweitzer Decl. [Doc. No. 99-2 at 48]; Rivers Decl. ¶ 5, Ex. B-17 to Sweitzer Decl. [Doc. No.

99-2 at 79]; Willis Decl. ¶ 10, Ex. B-23 to Sweitzer Decl. [Doc. No. 99-2 at 107].)  Further,

for CCAs who predominately work on the phone, Defendant's declarants indicate that

variations in the types of clients serviced and calls handled could affect the amount of idle

time experienced.  (See, e.g., Espinoza Decl. ¶ 6, Ex. B-5 to Sweitzer Decl. [Doc. No. 99-2

at 23]; McCray Decl. ¶ 14, Ex. B-10 to Sweitzer Decl. [Doc. No. 99-2 at 48].)  Based on all

of these differences, Defendant argues that Plaintiffs fail to provide a colorable basis for their

claim and fail to demonstrate that they are subject to a common policy and practice of

excluding purported idle time from their hours worked. (Def.'s Opp'n Mem. to Pls.' Mot. for

Class Cert. at 14 [Doc. No. 98].)

Plaintiffs, however, urge the Court to focus on Plaintiffs' submissions, as opposed to

the "happy camper" declarations from a hand-selected group of iQor employees.  (Pls.'

Reply Mem. in Supp. Mot. for Cond'l Cert. at 3 [Doc. No. 109].)  Plaintiffs also argue that

employees performing non-phone work are still subject to the TimeQey timekeeping system

and idle time deductions and should be included in the putative class.  (Id. at 9) (citing Def.'s

Decls., Ex. B to Sweitzer Aff. [Doc. No. 99-2].)  Finally, as a general proposition, Plaintiffs

note that because conditional certification precedes discovery, the Court can revisit the

certification determination at the second stage if discovery fails to fully support certification

and Plaintiffs' allegations.  (Id. at 5.)

### 2.  Similarly Situated Putative Class Members

Although the term "similarly situated" is not defined by the FLSA, it "typically

requires a showing that an employer's commonly applied decision, policy, or plan similarly

affects the potential class members, and inflicts a common injury on plaintiffs and the

putative class."  Keef, 2008 WL 3166302, at *2 (citation and quotation omitted).

Determining whether Plaintiffs' showing meets this standard "lies within the Court's sound

discretion."  Id.

Plaintiff asserts that members of the proposed class are similarly situated because:

"they performed the same basic job duties, were subject to the same TimeQey system, and

were not paid for the "idle" time recorded by TimeQey, resulting in an underpayment of

overtime wages in at least one workweek within the last three years."  (Pls.' Mem. Supp.

Mot. for Cond'l Cert. at 12 [Doc. No. 81].)

The 22 employee declarations submitted by Plaintiffs provide a colorable basis for

the Court to conclude, for purposes of the first stage of conditional certification, that (1)

while their specific job titles may have varied, Plaintiffs are similarly situated to putative

class members because of the uniformity of CCAs' job duties, and (2) Defendant's former

idle time policy under its TimeQey timekeeping system inflicted a common injury on

Plaintiffs and the putative class.[9]  Therefore, the Court finds that Plaintiffs adequately

demonstrate that the members of the class are similarly situated.  See Parker, 492 F. Supp.2d

at 1164 (explaining that courts usually rely on a plaintiff's pleadings and affidavits to

determine whether to grant conditional certification at first stage of the proceedings).

Essentially, CCAs receive incoming calls or make outbound calls to customers of companies

that contract with iQor to provide outsourcing services.  (See, e.g., Pls.' Decls. ¶ 3, Ex. 5 to

Selander Aff. [Doc. No. 83].)  They are paid on an hourly basis and Defendant classifies

them as non-exempt.  (See, e.g., id. ¶ 4.)  While they may work in different locations around

the country and sometimes bear different titles, Plaintiffs' declarations demonstrate that

CCAs perform substantially similar work.  See In re RBC Dain Rauscher Overtime

Litigation, 703 F. Supp. 2d 910, 964–65 (D. Minn. 2010) (granting conditional certification

based partially on job descriptions and titles that indicated that the putative class members

were similarly situated).

Furthermore, Plaintiffs' declarants allege that due to iQor's TimeQey system and

policy to not pay its CCAs for time recorded by TimeQey as idle, Defendant failed to pay

them for all hours worked, including overtime.  (Pls.' Decls. ¶ 9, Ex. 5 to Selander Aff. [Doc.

No. 83].)  National uniformity among CCAs using TimeQey for timekeeping purposes

appears to be present because collectively, Plaintiffs' declarants work or worked in at least

six different states.  (See id. ¶ 2.)   The Court therefore finds no reason to limit the

---

[9]  The docket of this case also reflects that over 200 current and former CCAs have
opted to join this action by filing consent forms with the Court.

certification geographically.  Prior to January 1, 2015, all CCAs using TimeQey for

timekeeping purposes were subject to the same policy and all putative class members

perform similar job duties.

Defendant argues that because it uses different timekeeping systems in some

locations, the proposed collective class is not sufficiently similar and conditional certification

should therefore be denied.  (Def.'s Opp'n Mem. to Pls.' Mot. for Cond'l Cert. at 27 [Doc.

No. 98].)  The Court disagrees.  While other employees may have used different systems, at

this first stage of certification, Plaintiffs' declarations establish that at least as to these

declarants, they used TimeQey for timekeeping purposes during the period when Defendant

maintained the idle mode function.  Plaintiffs urge the Court to disregard Defendant's

declarations altogether, noting that, at this stage of certification, some courts refuse to give

weight to employers' declarations. (Pls.' Reply Mem. in Supp. Mot. for Cond'l Cert. at 3-4

[Doc. No. 109]) (citing Bilskey v. Bluff City Ice, Inc., No. 1:13-cv-62 SNLJ, 2014 WL

320568, at *3 (E.D. Mo. Jan. 29, 2014) (refusing to consider current employees' affidavits

submitted by the defendant because "courts have afforded such 'happy camper' affidavits no

weight in similar FLSA suits at this early stage."); Creely v. HCR ManorCare, Inc., 789 F.

Supp. 2d 819, 840 (N.D. Ohio 2011) (declining to consider defendant's "happy camper"

affidavits containing "individualized facts from employees hand-picked by [defendant]" at

the conditional certification stage); Sliger v. Prospect Mortg., LLC, No. CIV. S–11–465

LKK/EFB, 2011 WL 3747947, at *3 (E.D. Cal. Aug. 24, 2011) (finding that defendant's

declarations were "beside the point" at the notice stage because the defendant would later

have an opportunity to demonstrate the merits of its affirmative defenses at the second

stage)).  The Court does not reject Defendant's declarations out of hand, but has instead

considered all of the evidence.  See In re RBC Dain Rauscher, 703 F. Supp. at 964 (noting

that the court must consider all of the evidence to determine whether it should facilitate

notice and expand the scope of litigation) (citing Saleen, 2009 WL 1664451, at *8).

However, as noted earlier, at this stage, the Court makes no credibility determinations or

factual findings.  Brennan, 2008 WL 819773, at *3.  Given the lenient standard at this first

stage of certification, the Court finds that Plaintiffs' allegations and evidence sufficiently

establish that Plaintiffs and putative class members are similarly situated.

As to common injury from a common policy, a party seeking conditional certification

must generally "show[ ] that an employer's commonly applied decision, policy, or plan

similarly affects the potential class members, and inflicts a common injury on plaintiffs and

the putative class." Jennings, 2012 WL 2568146, at *5.  Defendant argues, however, that the

identified single decision, policy or plan of the employer must be unlawful.  (Def.'s Opp'n

Mem. to Pls.' Mot. for Cond'l Cert. at 19-20 [Doc. No. 98]) (citing Saleen, 649 F. Supp. 2d

at 940) (stating that the putative class members must be harmed by an unlawful

companywide policy).  Defendant specifically contends that Plaintiffs cannot satisfy this

requirement because its actions were not unlawful.  (Id.)  Among other things, iQor points to

facts demonstrating that employees or their managers were able to enter exceptions for the

idle time deductions in order to be compensated or reimbursed for such time.  (Id. at 24

[Doc. No. 98]) (citing Rivers Decl. ¶ 5, Ex. B-17 to Sweitzer Decl. [Doc. No. 99-2 at 79];

Mills Decl. ¶ 4, Ex. B-12 to Sweitzer Decl. [Doc. No. 99-2 at 56]; Simon Decl. ¶ 4, Ex. B-21

to Sweitzer Decl. [Doc. No. 99-2 at 99]; Resendez Decl. ¶ 9, Ex. B-16 to Sweitzer Decl.

[Doc. No. 99-2 at 74; Miller Decl. ¶ 4, Ex. B-11 to Sweitzer Decl. [Doc. No. 99-2 at 52];

Horton Decl. ¶ 6, Ex. B-6 to Sweitzer Decl. [Doc. No. 99-2 at 26-27]; Parada Decl. ¶ 10, Ex.

B-13 to Sweitzer Decl. [Doc. No. 99-2 at 61-62]).)

    The Court finds, however, that Plaintiffs satisfy the requirement of demonstrating a

common injury from a common policy.  First, Plaintiffs' declarations corroborate their

allegations in the FAC (cf. Pls.' Decls. ¶¶ 6-10, Ex. 5 to Selander Aff. [Doc. No. 83] with

FAC ¶¶ 5, 33-39) that iQor did not pay them for computer idle time because of a decision to

not pay employees for such time.  See Thompson v. Speedway SuperAmerica, LLC, No. 08-

1107, 2009 WL 130069, at *13 (D. Minn. Jan. 20, 2009) (denying conditional certification

where the plaintiffs failed to show that the reason why employees were not compensated was

due to the employer's decision).  Second, regarding any required "unlawfulness" of the

common plan or practice, Plaintiffs allege that Defendant's conduct was unlawful.  (FAC ¶¶

14; 76; 87; 97; 145; 165; 174.)  Specifically, they contend that many managers refused to

grant reimbursements for idle time altogether or that the employees felt pressured, either by

time or managers' attitudes, from seeking reimbursement.  (FAC ¶ 37.)  In addition, they

contend that iQor did not explain the non-compensable idle time policy, or the purported

ability to seek reimbursement, to new hires.  (FAC ¶ 38.)  Moreover, Plaintiffs allege that

even when iQor "fully" reimbursed a CCA for a period of idle time, the time was not

actually fully reimbursed due to iQor's policy of prohibiting a reimbursement time range

48

from matching any other times previously logged in TimeQey.  (FAC ¶ 39.)  As noted, at this stage of certification, the Court makes no factual determinations with respect to contrary evidence presented by the parties.  <u>Brennan</u>, 2008 WL 819773, at *3.  Based on Plaintiffs' pleadings and declarations, the Court finds that Plaintiffs have sufficiently demonstrated that they have a colorable basis for their claim and that the putative class members were the victims of a single decision, policy, or plan.  Conditional certification under 29 U.S.C. § 216(b) is therefore warranted.

### 3.      Judicial Notice

District courts have discretion in appropriate cases to implement 29 U.S.C. § 216(b) by facilitating notice to potential plaintiffs.  <u>Hoffmann-La Roche</u>, 493 U.S. at 169.  "Because trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement early, at the point of the initial notice, rather than at some later time."  <u>Id.</u> at 171.  "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative.  Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed.  This procedure may avoid the need to cancel consents obtained in an improper manner."  <u>Id.</u> at 172.  "Court authorization of notice serves the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action."  <u>Id.</u>

In addition to seeking an order conditionally certifying Plaintiffs' case as a nationwide collective action pursuant to 29 U.S.C. § 216(b), Plaintiffs request that the

Court's order include the following:  (1) a 60-day notice period; (2) approval of the form of

Plaintiffs' proposed notice (see Pls.' Proposed Notice, Ex. 1 to Selander Aff. [Doc. No. 83-

]); (3) authorization for Plaintiffs' counsel to mail and email the notice at the beginning of

the 60-day notice period (see Pls.' Proposed Email Message, Ex. 2 to Selander Aff. [Doc.

No. 83-2]); (4) authorization for Plaintiffs' counsel to mail and email a reminder notice at the

45th day of the notice period (see Pls.' Proposed Reminder Letter, Ex. 3 to Selander Aff.

[Doc. No. 83-3]); (5) requiring Defendant to post the Court-approved notice in a

conspicuous location in all break/lunch rooms in all of Defendant's contact centers in the

United States; and (6) ordering Defendant to produce a list of all persons employed by iQor

as a CCA in the United States, at any time from January 21, 2012 to the present, including

each person's name, last known mailing address, last known email address (whether work or

personal), dates of employment, and employee identification number.  (Pls.' Mot. for Cond'l

Cert. at 1 [Doc. No. 79].)  Defendant opposes many of the elements of Plaintiffs' request, as

discussed below.

### a.    Scope of the Class and Relevant Time Period

While Plaintiffs seek to give notice to all current and former iQor CCAs during the

relevant time period, Defendant argues that notice should be limited to current and former

iQor agents who used TimeQey for timekeeping purposes.  (Def.'s Opp'n Mem. to Pls.'

Mot. for Cond'l Cert. at 31 [Doc. No. 98].)  Plaintiffs contend that iQor's declarations show

that CCAs on alternative timekeeping systems are still subject to the TimeQey system

because after their time is initially tracked on an alternative system, the time is subsequently

50

transferred to the TimeQey system.  (Pls.' Reply Mem. in Supp. Mot. for Cond'l Cert at 8

[Doc. No. 109]) (citing Def.'s Decls., Ex. B to Sweitzer Decl. [Doc. No. 99-2].)

It is true that many of Defendant's declarants indicate that while they use an

alternative timekeeping system to log their daily hours, they subsequently use TimeQey to

review the time they entered the previous day.  (T. Brown Decl. ¶ 13, Ex. B-3 to Sweitzer

Decl. [Doc. No. 99-2 at 14]; Kennedy Decl. ¶ 12, Ex. B-7 to Sweitzer Decl. [Doc. No. 99-2

at 32 ]; Knowles Decl. ¶¶ 13-14, Ex. B-9 to Sweitzer Decl. [Doc. No. 99-2 at 42]; McCray

Decl. ¶¶ 8, 10, Ex. B-10 to Sweitzer Decl. [Doc. No. 99-2 at 47]; Rodriguez Decl. ¶¶ 8, 12,

Ex. B-18 to Sweitzer Decl. [Doc. No. 99-2 at 84-85]; Simmons Decl. ¶¶ 10-11, Ex. B-20 to

Sweitzer Decl. [Doc. No. 99-2 at 93-94]; Wheeler Decl. ¶¶ 4, 6, Ex. B-22 to Sweitzer Decl.

[Doc. No. 99-2 at 102-03].)  Defendant states that TimeQey has two functions:  it serves as a

timekeeping system, for which it is used by some CCAs, and it serves as a payroll system,

apparently after time has been entered.  (See Letter of 8/11/15 from S. Alamuddin to J.

Nelson at 2 [Doc. No. 118].)  Although iQor does not provide a sworn statement to this

effect, Defense counsel explains that "[a]gent time from [alternative timekeeping systems]

transfers into TimeQey for payroll purposes."  (Def.'s Opp'n Mem. to Pl.'s Mot. for Cond'l

Cert. at 12 [Doc. No. 98].)

Because TimeQey's idle time function forms the basis for Plaintiffs' claims,

(See FAC ¶¶ 3-5; 33-42; 183), the Court adopts the limitation proposed by iQor, i.e., all

current or former iQor contact center agents who used TimeQey for timekeeping purposes at

any time during the relevant period.  However, should evidence obtained in discovery

demonstrate that the idle time function is involved in a broader use of TimeQey, Plaintiffs may seek relief to enlarge the scope of the action as originally proposed.

As to the relevant period, under the FLSA, a claim must be brought "within two years after the cause of action accrued," or within three years if the violation was willful.  29 U.S.C. § 255(a).  In the case of a collective action, a lawsuit is "commenced" by an "individual claimant":

> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>
> (b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced.

Id. § 256.  Plaintiffs allege that Defendant's conduct was willful.  (FAC ¶¶ 14; 110; 145; 176; 187.)

Many courts around the country require the provision of notice only to persons employed by the defendant within three years of the notice or of the court order approving such notice.  Harris v. Chipotle Mexican Grill, Inc., 49 F. Supp. 3d 564, 581 (D. Minn. 2014) (citing Whitehorn v. Wolfgang's Steakhouse, Inc., 767 F. Supp. 2d 445, 451 (S.D.N.Y. 2011)); Tolentino v. C & J Spec–Rent Servs. Inc., 716 F. Supp. 2d 642, 654 (S.D. Tex. 2010);  Camp v. Progressive Corp., No. Civ.A. 01–2680, 2002 WL 31496661, at *6 (E.D. La.  Nov. 8, 2002)).  Defendant agrees with the starting point of this three-year period, stating that "any FLSA claim accruing more than three years before the date of this Court's ruling on conditional certification is time-barred . . . ." (Def.'s Opp'n Mem. to Pls.' Mot. for

Cond'l Cert. at 32 [Doc. No. 98].)  Plaintiffs likewise agree that the starting point for notice

is three years back from the date of the order approving conditional certification.  (Pls.'

Reply Mem. to Mot. for Cond'l Cert. at 18 [Doc. No. 109].)  Based on all of the above, the

Court finds that the notice period shall begin three years before the date of this ruling on

conditional certification.

However, iQor contends that the notice period should end on December 31, 2014 –

the last date on which iQor asserts that the idle time function in TimeQey was used.  (Def.'s

Opp'n Mem. to Pls.' Mot. for Cond'l Cert. at 32 [Doc. No. 98].)   As noted, in the

Argiropoulos Declaration, iQor's Chief HR Officer attests that the idle time function in

TimeQey ceased to be in use as of January 1, 2015.  (Argiropoulos Decl. ¶¶ 8-9 [Doc. No.

99-1].)  While Plaintiffs do not respond to Defendant's proposed modification to the relevant

time period, their proposed notice includes an end date of "to the present."  (Proposed Notice

at 1-2, Ex. 1 to Selander Aff. [Doc. No. 83-1].)  The Court agrees with Defendant that, given

the allegations in the FAC, the relevant period applies to when the idle time function was in

use.  Since iQor contends that TimeQey ceased to use the idle time feature as of January 1,

2015, it was in use through December 31, 2014.  Again, should evidence in discovery reveal

that TimeQey's idle time function was used beyond December 31, 2014, Plaintiffs are free to

seek leave to enlarge the scope of the relevant time period accordingly.  Consistent with this

ruling, Plaintiffs' proposed notice (Ex. 1 to Selander Aff. [Doc. No. 83-1 at 2]) shall be

amended directly under the caption to read:

**TO:   ALL CURRENT AND FORMER iQOR CONTACT CENTER**

**AGENTS WHO USED TIMEQEY FOR TIMEKEEPING PURPOSES
AT ANY TIME FROM OCTOBER 19, 2012 TO DECEMBER 31, 2014**.

Likewise, on the second page of the proposed notice (id. [Doc. No. 83-1 at 3]), under the

bold-faced section captioned **HOW TO PARTICIPATE IN THIS LAWSUIT**, the

language shall be amended to read:

> You may participate in this lawsuit if:
>
> 1.  You worked for iQor as a CCA in the United States and used TimeQey for
> timekeeping purposes at any time from **October 19, 2012** to **December 31,
> 2014**; and
>
> 2.  During that time period, you worked more than 40 hours in at least one work week
> but were not paid for all of your overtime hours worked.

Similarly, Plaintiffs' proposed consent form (id. [Doc. No. 83-1 at 5]; see also Ex. 3

to Selander Aff. [Doc. No. 83-3 at 3]) shall be amended in the second paragraph to read:

> 2.      At any time during the period from October 19, 2012 to
> December 31, 2014, I worked over 40 hours in at least one
> week as a contact center agent (also referred to as collections
> and/or customer service representatives), or similar job title for
> iQor, used TimeQey for timekeeping purposes, and did not
> receive proper compensation for all of my overtime hours
> worked.

### b.      Objections to Proposed Notice as Deficient or Unnecessary

Defendant also objects to several other aspects of Plaintiffs' proposed notice as

deficient or unnecessary.  As Plaintiffs note, while reasonable amendments may be

considered, "those that are 'unduly argumentative, meant to discourage participation in the

lawsuit, or are unnecessary or misleading' should be rejected."  Whitehorn, 767 F. Supp. 2d

at 450 (S.D.N.Y. 2011) (quoting In re Milos Litig., No. 08 Civ. 6666 (LBS), 2010 WL

199688, at *2 (S.D.N.Y. Jan. 11, 2010)).

### i.      Requested Forms of Notice and Information

As noted, Plaintiffs request that the Court set a 60-day notice period and order that notice be disseminated by mail, email, and posted copy in all break/lunch rooms in Defendant's contact centers.  (Pls.' Mem. Supp. Mot. for Cond'l Cert. at 15 [Doc. No. 81].) In addition, Plaintiffs ask that the Court permit the dissemination of a reminder letter on the 45th day of the 60-day notice period.  (Id. at 16; see Pls.' Proposed Reminder Letter, Ex. 3 to Selander Aff. [Doc. No. 83-3].)

Defendant does not appear to contest the 60-day and 45-day time periods.  The Court finds that a 60-day notice period is reasonable.  See Chin v. Tile Shop, 57 F. Supp. 3d 1075, 1094 (2014) (approving 90-day notice opt-in period); Rebischke v. Tile Shop, LLC, No. 14-cv-624 (MJD/SER), 2015 WL 321667, at *5 (D. Minn. Jan. 26, 2015) (same); Jennings, 2012 WL 2568146, at *6 (same).

Defendant contends, however, that Plaintiffs' proposal to send four forms of notice – first-class mail, a reminder letter, email, and a posted notice – is excessive.  (Def.'s Opp'n Mem. to Pl.'s Mot. for Cond'l Cert. at 34 [Doc. No. 98].)  Defendant asserts that Plaintiffs have not demonstrated that it will be difficult to reach putative members of the collective action via first-class mail.  (Id.)  Courts have frequently required the dissemination of notice in three forms to ensure that potential plaintiffs receive notice in a timely and efficient manner.  See Harris, 49 F. Supp.3d at 582-83 (permitting the plaintiff to email and mail judicial notice and requiring the defendant to post notice in an appropriate, conspicuous

place in its business); see also Atkinson v. TeleTech Holdings, Inc., No. 3:14-CV-253, 2015 WL 853234, at *5 (S.D. Ohio Feb. 26, 2015) (noting a current nationwide trend toward emailing judicial notice in FLSA cases and permitting the sending of notice via mail and email); Rhodes v. Truman Med Ctr., No. 4:13-CV-990-NKL, 2014 WL 4722285, at *5 (W.D. Mo. Sept. 23, 2014) (noting that email provides an efficient and cost-effective means of disseminating notice); Jennings, 2012 WL 2568146, at *7 (requiring the defendant to post judicial notice in all break and lunch rooms in its call center).  The Court finds Plaintiffs' request reasonable here for similar reasons, particularly as it advances the remedial purpose of the FLSA by increasing the likelihood that all potential opt-in plaintiffs will receive notice.  The Court therefore permits notice via mail, email and conspicuously placed lunch/break room posting.  Accordingly, Plaintiffs' proposed email message, Exhibit 2 to the Selander Affidavit [Doc. No. 83-2], is approved.

Similarly, this Court has authorized the use of reminder letters in other FLSA cases. See Chin, 57 F. Supp. 3d at 1094; Jennings, 2012 WL 2568146, at *6.  As Plaintiffs note, a reminder letter gives notice to putative plaintiffs who do not receive, open, or view the initial letter; it also helps putative plaintiffs who misplace or forget about the initial letter.  (Pls.' Mem. Supp. Mot. for Cond'l Cert. at 16 [Doc. No. 81].)  Here, the Court finds that sending one reminder letter at the 45-day point is reasonable.  See Ortiz-Alvarado v. Gomez, No. 14-cv-209 (MJD/SER), 2014 WL 3952434, at *6 (D. Minn. Aug. 13, 2014) (finding that one reminder notice was a reasonable way to ensure that potential class members received notice and, if they chose to do so, filed a timely opt-in form).  Plaintiffs' proposed reminder letter,

Exhibit 3 to the Selander Affidavit [Doc. No. 83-3], is therefore approved.

As a related matter, Plaintiffs request the production of a list of CCAs, with names and contact information, in order to facilitate notice.  (Pls.' Mem. Supp. Mot. for Cond'l Cert. at 17 [Doc. No. 81].)  Specifically, they seek the production of the list in Microsoft Excel format to Plaintiffs' counsel within 10 calendar days of the issuance of this Order. (Id.)  They request that the list contain the following information:

> All persons employed by Defendant as a CCA in the United States, at any time from January 21, 2012 to the present, including each individual's (1) name, (2) last known mailing address, (3) last known email address (whether work or personal), (4) dates of employment, and (5) employee identification number.

(Id.)  Defendant argues that Plaintiffs' requests for putative members' dates of employment, identification numbers, and email addresses should be denied.

As Plaintiffs note, however, courts in this Circuit have frequently ordered the production of similar information when granting conditional certification.  See Rebischke, 2015 WL 321667, at *5 (requiring the production of a list of all store managers within 10 days of the certification ruling to include the last known address, telephone number, dates of employment, location of employment, last four digits of each manager's social security number, and date of birth); Chin, 57 F. Supp. 3d at 1095 (requiring the defendant to produce within 10 days of the conditional certification ruling a list of all relevant employees, including the employees' name, address, and dates of employment); Bilskey v. Bluff City Ice, Inc., No. 1:13-cv-62 SNLJ, 2014 WL 1664893, at *1 (E.D. Mo. April 25, 2014) (noting, in an order compelling production, that the court had previously required defendants to

produce the full names, addresses, phone numbers, email addresses, and dates of

employment for each class member to facilitate notice to potential plaintiffs); Denney v.

Lester's, LLC, No. 4:12CV377 JCH, 2012 WL 3854466, at *4 (E.D. Mo. Sept. 5, 2012)

(granting conditional certification and requiring defendants to produce within 14 days of the

ruling a list of all potential class members, including their names, last known mailing

addresses, dates of employment, and email addresses, if known); Nobles v. State Farm Mut.

Auto Ins. Co., No. 2:10-CV-04175-NKL, 2011 WL 5563444, at *2 (W.D. Mo. Nov. 15,

2011) (ordering the defendant to produce the last four social security number digits, email

addresses and home telephone numbers of putative plaintiffs, as well as email addresses to

aid plaintiffs in locating putative class members and to help upload consent forms);

McKinzie v. Westlake Hardware, Inc., No. 09-796-CV-W-FJG, 2010 WL 2426310, at *5

(W.D. Mo. June 11, 2010) (granting conditional certification and ordering defendant to

provide a list of the relevant employees with their last known residential address, home and

cellular phone numbers, email addresses, and dates of employment.); Edwards v. Multiband

Corp., No. 10-cv-2826 (MJD/JJK), 2011 WL 117232, at *5 (D. Minn. Jan. 13, 2011)

(requiring, within five days of the conditional certification ruling, the production of name,

job title, last known address and telephone number, last known work or personal email

address, dates of employment, location of employment, employee number and social security

number for all potential opt-in plaintiffs and an electronic list of all potential opt-in plaintiffs

employed by defendant).  However, depending on the case, such information may not be

necessary.  See Fast v. Applebee's Int'l, Inc., 243 F.R.D. 360, 364 (W.D. Mo. 2007) (finding

the request for job titles to ask for "too much.").  Here, the Court finds that the requested

information may prove necessary in order to facilitate notice of a potentially large number of

putative class members.  The information to be produced, however, is modified, consistent

with this Court's ruling above, as follows:

> All persons employed by Defendant as a CCA in the United States, at any
> time from October 19, 2012 to December 31, 2014, who used TimeQey for
> timekeeping purposes, including each individual's (1) name, (2) last known
> mailing address, (3) last known email address (whether work or personal), (4)
> dates of employment, and (5) employee identification number.

Defendant shall produce the requested information in Microsoft Excel format within 10 days

of this ruling.

### ii.        Miscellaneous Alleged Deficiencies

Defendant also contends that certain information in the proposed notice to potential

members of the collective action is deficient.  (Def.'s Opp'n Mem. to Pls.' Mot. for Cond'l

Cert. at 33-34 [Doc. No. 98].)  Defendant therefore suggests various modifications.  (Id.)

First, iQor contends that the proposed notice fails to disclose putative members'

obligations should they elect to join the lawsuit.  (Id. at 33.)  Specifically, Defendant notes

that the proposed notice fails to describe obligations such as responding to written discovery

requests, appearing for depositions, and giving testimony at trial.  (Id.) (citing Ahle v.

Veracity Research Co., No. 09cv-42 (ADM/RLE), 2009 WL 3103852, at *6 (D. Minn. Sept.

23, 2009) (modifying proposed notice to include language informing putative class members

that they may be "asked to respond to written questions, appear for a deposition, and testify

at trial."); Knaak v. Armour-Eckrich Meats, LLC, 991 F. Supp. 2d 1052, 1061 (D. Minn.

2014) (requiring that notice be revised to "include defendant's proposed discovery

participation warning.")).  Plaintiffs agree to the inclusion of language warning potential

plaintiffs that they may be required to testify or appear for a deposition. (Pls.' Reply Mem. to

Mot. for Cond'l Cert. at 18 [Doc. No. 109].)  The Court finds that including some general

language regarding the obligations of class members is acceptable.  Accordingly, the notice

shall be amended to include, on the second page, in a third paragraph under the section

labeled **<u>EFFECT OF JOINING OR NOT JOINING THIS ACTION</u>** (Ex. 1 to Selander

Aff. [Doc. No. 83-1 at 3]), the following: "If you choose to join this lawsuit, you may be

required to provide information, have your deposition taken, and testify in court."

    Second, Defendant argues that the proposed notice is deficient in that it "fails to

disclose that Plaintiffs and opt-in plaintiffs may be responsible for iQor's costs if iQor

prevails in the lawsuit."  (Def.'s Opp'n Mem. to Pl.'s Mot. for Cond'l Cert. at 33 [Doc. No.

98].)  However, Defendant cites no authority in support of its request for the inclusion of the

defense costs language.  Plaintiffs oppose the inclusion of any such language.  (Pls.' Reply

Mem. to Mot. for Cond'l Cert. at 18 [Doc. No. 109].)  The Court agrees with the authority

cited by Plaintiffs that:  (1) the threat of payment of defense costs to absent class members if

iQor prevails is out of proportion to the risk; and (2) including such a warning could have a

chilling effect on participation in the collective action.  <u>See</u> <u>Case v. Canos & Curole Marine</u>

<u>Contractors, LLC</u>, Nos. 14-cv-2775, 14-cv-2976, 2015 WL 1978653, at *8 (E.D. La. May 4,

2015) (citing <u>Guzman v. VLM, Inc.</u>, No. 07-CV-1126 (JG) (RER), 2007 WL 2994278, at *8

(E.D.N.Y. Oct. 11, 2007) ("Given the remote possibility that such costs for absent class

members would be other than de minimis . . . such language is inappropriate."); see also Hart v. U.S. Bank NA, No. CV 12-2471-PHX-JAT, 2013 WL 5965637, at *7 (D. Ariz. Nov. 8, 2013) ("The Court is unconvinced that including language regarding potential costs of unsuccessful litigation would accomplish anything other than chilling an interested plaintiff from seeking more information."); Williams v. U.S. Bank Nat'l Ass'n, 290 F.R.D. 600, 613 (E.D. Cal. 2013) (same).  Defendant's request to modify the proposed language in this regard is therefore denied.

Third, Defendant seeks to modify the proposed notice to include language informing potential plaintiffs that they may select counsel of their choice.  (Def.'s Opp'n Mem. to Pls.' Mot. for Cond'l Cert. at 33 [Doc. No. 98].)   The language in Plaintiffs' proposed notice indicates that if a potential plaintiff joins the collective action, they will be represented by Plaintiffs' current counsel.  (Proposed Notice at 3 [Doc. No. 83-1].)  Plaintiffs, however, do not oppose modifying the language.  (Pls.' Reply Mem. in Supp. Mot. for Cond'l Cert. at 19 [Doc. No. 109].)  Accordingly, Defendant's request for modification is granted.  The proposed notice shall be modified by inserting a third paragraph under the heading **<u>YOUR LEGAL REPRESENTATION IF YOU JOIN</u>**, and above the boldfaced and capitalized disclosure (Ex. 1 to Selander Aff. [83-1 at 4]).  Here, Plaintiffs shall add the following language:  "You are not obligated to hire Plaintiffs' counsel to pursue your claim against Defendant iQor Holdings US Inc.  You also have the option of hiring your own counsel and pursuing your claim in a separate lawsuit."

Fourth, iQor seeks to modify the proposed notice to include a separate position statement setting forth its position on Plaintiffs' allegations, including its position that Plaintiffs were properly paid, that it opposed conditional certification, and that it will move to decertify the class at the appropriate time.  (Def.'s Opp'n Mem. to Pl.'s Mot. for Cond'l Cert. at 34 [Doc. No. 98].)  Defendant cites no legal authority in support of its request, nor does it indicate the purpose of such a position statement.  Plaintiffs oppose this request.  As one court has observed, "inclusion of a lengthy position statement is likely to create an unnecessarily long document that confuses potential plaintiffs about the role of the notice." Blakes v. Ill. Bell Tel. Co., No. 11 CV 336, 2011 WL 2446598, at *9 (N.D. Ill. June 15, 2011).  This Court agrees.  Defendant's request to include a position statement is therefore denied.

Accordingly, as set forth above, the Court exercises its discretion to facilitate notice in this case.  Such facilitated notice will assist in preventing the expiration of claims based on the running of the statute of limitations.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     Plaintiffs' Motion for Conditional Class Certification and Court-Authorized Notice Pursuant to 29 U.S.C. § 216(b) [Doc. No. 79] is **GRANTED** and this matter is conditionally certified as a collective action;

2.     Plaintiffs' proposed Judicial Notice of Lawsuit is approved to the extent that it is amended to comply with this Order;

3.      Plaintiffs' proposed Consent Form is approved to the extent that it is amended

to comply with this Order;

4.      The collective action is conditionally certified as:  ALL CURRENT AND

FORMER iQOR CONTACT CENTER AGENTS WHO USED TIMEQEY

FOR TIMEKEEPING PURPOSES AT ANY TIME FROM OCTOBER 19,

2012 TO DECEMBER 31, 2014;

5.      Named Plaintiffs Turner, Hope, and Ostrovsky are appointed as conditional

collective action class representatives;

6.      The notice period is 60 days.  During this notice period, Plaintiffs' counsel

may mail and email the notice at the beginning of the 60-day period and send

a reminder notice on the 45th day of the notice period;

7.      Defendant shall post the notice in a conspicuous location in all break/lunch

rooms in all of its contact centers in the United States;

8.      Defendant shall produce a list of employees and related information as set

forth herein and in the format so specified within 10 days of the issuance of

this Order;

9.      Defendant iQor Holdings US Inc.'s Motion for Judgment on the Pleadings

[Doc. No. 85] is **DENIED**;

10.     Pursuant to the stipulation of the parties and this Court's Order of August 7,

2015 [Doc. No. 113], Defendant shall respond to Plaintiffs' Second Amended

Complaint within 30 days of this ruling.


Dated:    October 19, 2015

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge