# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Paris Shoots, Jonathan Bell, Maxwell
Turner, Tammy Hope, Phillipp
Ostrovsky, Brenda Brandt, Anissa
Sanders, Najai McCutcheon,
and Leticia Rodriguez, on behalf of
themselves, the Proposed Rule 23 Classes,
and others similarly situated,

                    Plaintiffs,

     v.

iQor Holdings US Inc.,

                    Defendant.

Court File No. 0:15-cv-00563-SRN-SER

**DEFENDANT'S MEMORANDUM IN
SUPPORT OF MOTION TO
DECERTIFY THE FLSA CLASS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

ARGUMENT ...................................................................................................... 10

I.    PLAINTIFFS MUST SATISFY A HEIGHTENED STANDARD AT THIS STAGE ...................................................................................................... 10

II.   DISPARATE FACTUAL ISSUES DOMINATE BECAUSE NO COMMON POLICY WILL BE DETERMINATIVE ........................................... 11

    A.    iQor's Written Policies Require Payment for All Time Worked ................ 11

    B.    Alleged Failures by *Some* Managers to Approve *Some* Payments for Productive Idle Time to *Some* Agents Do Not Evidence a Similarly Situated Class ................................................................................... 12

    C.    Individual Agent Failures to Seek Payment for Productive Idle Time Is Neither a Common Issue Nor a Basis for Liability ................................ 14

    D.    Whether Any Unpaid Rest Break Time Was Compensable Turns on Individual Factors ................................................................................. 16

        1.    Compensability of Any Rest Break Requires a Fact-Intensive Inquiry ................................................................................... 16

        2.    Even Plaintiffs Do Not Contend Any Blanket Rule Governs Longer Breaks ....................................................................... 21

    E.    Varying Employment Settings Further Complicate the Inquiries ............... 23

III.   IQOR'S INDIVIDUALIZED DEFENSES RENDER COLLECTIVE ACTION INAPPROPRIATE ................................................................................ 27

    A.    Whether Any Agent Was Wrongly Denied Payment for Compensable Idle Time Requires Individual Inquiries ............................... 27

    B.    Credibility Determinations Necessitate Decertification ............................ 29

    C.    Whether iQor Suffered or Permitted Opt-In Plaintiffs to Perform Unpaid Work Requires an Individualized Assessment .............................. 32

IV.   FAIRNESS AND PROCEDURAL CONCERNS ALSO RENDER THE CASE INAPPROPRIATE FOR COLLECTIVE ACTION TREATMENT ......... 33

CONCLUSION .................................................................................................. 35

## INTRODUCTION

Plaintiffs cannot meet their "onerous" burden to show that the conditionally certified FLSA overtime class is similarly situated because multiple individual inquiries are required to fairly adjudicate plaintiffs' claims that iQor denied call-center agents pay for work time deemed "idle" under the company's computerized "TimeQey" system. The more developed record at this stage shows that iQor's policy required Agents to report and be compensated for all time in "idle" mode spent actually working. The evidence also refutes any suggestion that iQor maintained an unofficial practice to deny payment for such work, given that managers routinely granted—in many cases, *always* granted—TimeQey adjustments, and that Agents were collectively compensated for hundreds of thousands of hours and millions of dollars in wages precisely for these activities.

At most, the evidence shows *some* Agents *sometimes* failed to initiate the appropriate process to report such time, that in *some* instances there was a legitimate dispute between Agent and manager over the compensability of idle time; and that perhaps on *some* occasions a particular manager denied an arguably legitimate adjustment request. Each scenario requires instance-by-instance determinations—a circumstance that courts consistently find cannot survive second-stage FLSA certification scrutiny.

Although not cited by the Court as a basis for conditional certification, plaintiffs also cite a 1961 regulation to contend that rest breaks under 20 minutes must categorically be deemed compensable. But courts within the Eighth Circuit have

declined to adopt any such bright-line rule and instead find the compensability of such breaks depends on whether they benefit the employer or employee, thus putting at issue the nature of each break taken each day by each Agent.

Moreover, a significant portion of the idle time for which plaintiffs seek compensation were breaks of 20 to 30 minutes (and even longer), to which no bright-line rule even arguably applies.  Additionally, there is no evidence that any bathroom or other rest-break periods systematically or even regularly brought plaintiffs over 40 hours worked in a single week—and in any event, such claims must also be evaluated as to each particular plaintiff.

iQor's system was consistent with the law and reflected an equitable and innovative effort to benefit employees through increased hourly wages, flexible breaks, and accurate timekeeping.  Although some Agents might be able to establish idiosyncratic instances where individual managers failed to follow iQor's express policy to compensate for all time worked, or that some time counted as breaks should be compensable, these claims are permeated by individual workplace circumstances, job demands, interpersonal relationships, particularized defenses, and credibility determinations.

Even plaintiffs' expert has been unable to accurately determine alleged damages (or liability) under their theory of the case from TimeQey records alone.  Collective treatment would be unwieldy, would not provide any systemic benefit, nor could any form of representative action adequately safeguard iQor's due-process right to defend each claim fully.

## FACTUAL BACKGROUND

**iQor's TimeQey System.**   iQor provides customer support and outsourcing solutions to companies in a multitude of industries. *See* iQor 30(b)(6) Dep. Tr. (Nov. 22, 2016 Testimony of Mason Argiropoulos) ("iQor Dep.") at 21:18-22:16.[1]   It addresses customer care, tech support, accounts debt collection, service activation, even pizza orders for its customers. *Id.* at 20:11-19, 21:22-22:16.

Beginning in 2009, iQor implemented "TimeQey," an innovative system to comprehensively track work time in iQor's call centers.  iQor Dep. 113:16-114:24.  This timekeeping tool promoted Agent satisfaction through two core features.  First, it allowed iQor to increase Agents' wages initially by $1.50-$2.00 per hour worked.  Argiropoulos Decl. ¶ 7.[2]   Second, TimeQey permitted Agents to take additional unscheduled breaks, with manager approval, for any purpose, for any duration, on or off premises, whether to attend to personal matters or run errands. *Id.*

TimeQey's flexibility thus accommodated and benefitted employees with differing desires and needs—both those who sought to maximize compensation through efficient use of scheduled work time, as well as those who valued autonomy in scheduling the timing, frequency, and duration of breaks.

---

[1]    Deposition transcripts are attached alphabetically to the Declaration of Shon Morgan ("Morgan Declaration") in Exhibit D.

[2]    Attached as Exhibit A to Morgan Declaration.

**The Court's Conditional Certification Order.** On October 19, 2015, the Court conditionally certified plaintiffs' FLSA overtime class, crediting plaintiffs' contention that five purported "common policies" justified group treatment:

- "iQor did not pay [Agents] for computer idle time because of a decision to not pay employees for such time" (Dkt. # 142 at 48);

- "iQor did not explain the non-compensable idle time policy, or the purported ability to seek reimbursement, to new hires" (*id.*);

- "many managers refused to grant reimbursements for idle time altogether" (*id.*);

- "even when iQor fully reimbursed a CCA for a period of idle time, the time was not actually fully reimbursed due to iQor's policy of prohibiting a reimbursement time range from matching any other times previously logged in TimeQey" (*id.* at 48-49);

- "employees felt pressured, either by time or managers' attitudes, from seeking reimbursement" (*id.* at 48).[3]

**iQor's Policy Was to Pay for All Hours Worked, Including When TimeQey Was in "Idle" Mode.** Contrary to plaintiffs' contention, iQor's policies mandate pay for all time worked. Argiropoulos Decl. ¶ 10. iQor prohibits off-the-clock work. *Id.* For Agents who used TimeQey, it is accurate that, after two minutes of keyboard and mouse inactivity, an Agent's computer went into "idle" mode. *Id.* ¶ 8. But idle mode did not mean Agents would not be paid for work performed during that time. Instead, iQor instructed Agents to manually enter any work time during idle mode into TimeQey or ask their managers to enter an adjustment on their behalf. *Id.* Compensable activities included (non-exhaustively) training, coaching, team huddles, town halls, focus groups,

---

[3] Of the 14,792 Agents notified of the FLSA action, only 3,585 chose to participate. Morgan Decl. ¶ 3.

and uncoded time when not working due to client or iQor system issues or power outages. *Id.*

Agents testified their managers routinely approved time entries for such idle time activities. *See, e.g.*, Bromley Decl. (July 6, 2015)[4] ¶ 8 ("From day 1, every time I have made an adjustment, it has been approved."); Willis Decl. ¶ 13 ("My AVP always approves my exceptions[.]"); Mills Decl. ¶ 7 (supervisor usually approved the exception "within a day or two, but always before the end of the pay period"); Miller Decl. ¶ 4 ("My supervisor always submitted and approved my exceptions"); Williams Dep. 35:5-15 (exception requests always approved).[5] ***Not one opt-in plaintiff deposed testified that iQor had a policy against paying for any activities during computer "idle" time.***

**Agents Understood How To be Paid for Compensable Idle Time.**   In the transition to TimeQey, existing Agents were given documented presentations that explained Agents would be paid not only for active computer time but also for activities such as training, coaching, team huddles, town halls, and focus groups, as well as "downtime" where an Agent was "asked to remain available whether due to client or iQor system issues or power outages."   Argiropoulos Decl. ¶ 13 & Ex. A-3 at IQOR_00000196.  The document further instructed Agents how to account for such time in the payroll system. *Id.*  Once TimeQey was implemented, orientation sessions for new

---

[4]  Employee declarations are attached alphabetically to the Morgan Declaration in Exhibit C.

[5]  *See also* Ada Decl. ¶ 9; Agyarey Decl. ¶ 8; Brevard Decl. ¶ 9; L. Brown Decl. ¶ 4; T. Brown Decl. ¶ 10; Collins Decl. ¶ 6; Espinoza Decl. ¶ 5; Guillen Decl. ¶ 9; Horton Decl. ¶ 7; Keshmiri Decl. ¶ 7; Kravik Decl. ¶ 9; Miller Decl. ¶ 4; Peterson Decl. ¶ 4; Reeves Decl. ¶ 9; Resendez Decl. ¶ 9; Rivers Decl. ¶¶ 5-6; Rojas Decl. ¶ 9; Sanchez Decl. ¶ 8; Sewards Decl. ¶ 8; White Decl. ¶ 8; Worthy Decl. ¶ 10.

hires included a Powerpoint with similar explanations. *Id.* ¶ 14 & Ex. A-4. These explanations were complemented by the iQor Code of Conduct, which provided that Agents must "[a]ccurately record time [they] spend working and any breaks or other time off work." *Id.* ¶ 11; Ex. A-2 at 3.

iQor regularly reinforced these policies through trainings, updates, and informal meetings with managers. *See, e.g.*, *id.* ¶ 12; Knowles Decl. ¶ 10; Bromley Decl. (July 6, 2015) ¶ 10. Agents confirmed they were informed at orientation, trainings, or otherwise understood that working or productive idle time was compensable by policy and practice. *See, e.g.*, Williams Dep. at 21:2-27:21 (understood categories of paid work and was told to track downtime adjustments); Bell Dep. at 31:19-32:1, 43:12-44:22 (payment for working idle time was "common knowledge among employees" and was explained at orientation); Blomquist Dep. at 25:1-13 (manual adjustment process explained at TimeQey implementation meeting); Ada Decl. ¶ 4; Agyarey Decl. ¶ 4; Brevard Decl. ¶ 4; Bromley Decl. (May 25, 2017) ¶ 4; L. Brown Decl. ¶ 4; Erwin Decl. ¶ 4; Espinoza Decl. ¶ 5; Guillen Decl. ¶ 4; Jones Decl. ¶ 4; McDaniel Decl. ¶ 6; Mills Decl. ¶ 5; Morris Decl. ¶ 4; Reeves Decl. ¶ 4; Rockwell Decl. ¶ 4; Rojas Decl. ¶ 4; Sanchez Decl. ¶ 4; Sewards Decl. ¶ 4; White Decl. ¶¶ 3-4; Worthy Decl. ¶ 12.

Even apart from orientation sessions, Agents fully understood they could and should be paid for productive idle time. *See* Dorsey Dep. at 34:9-35:17 (cannot remember specific training but understood what she was paid for); McCants Dep. at 14:14-19, 22:21-24:25 (understood would be paid for working idle time); Pryor Dep. at 29:24-31:17, 64:13-17 (same).

In all the post-conditional certification testimony, ***no Agent testified she lacked an understanding of the process to be paid for working idle time.***

**Consistent With Policy, Managers Regularly Approved Payment for Idle Time Work Activities.**   Discovery also failed to bear out plaintiffs' contention that "many" managers failed to approve payment for productive idle time.  Many Agents were unequivocal that managers approved ***all*** such requests.[6]  Others testified requests were "generally," "usually," or "routinely" approved.[7]

Activities paid through the adjustment process included not only traditional work duties such as meetings or training, but also log-in delays (Bell Dep. at 60:1-11; Husby Dep. at 45:5-46:17; Pryor Dep. at 35:6-13, 89:20-90:2); issues verifying fingerprints (Bell Dep. at 80:6-81:6); other "glitches" and system outages (*id.* at 84:8-16, 31:7-23; Pryor Dep. at 39:23-41:5); and changing seating arrangements (Evenski Dep. at 85:23-86:16; Ward Dep. at 77:6-25).

Although most adjustments were approved, some were not, based on myriad reasons.  For example, Eve Williams said exceptions might initially be denied if an Agent failed to enter a supervisor's name or provide "a valid reason," but could not recall any

---

[6]   *See* Williams Dep. at 35:5-15; McCants Dep. at 22:21-24:25; Ada Decl. ¶ 9; Agyarey Decl. ¶ 8; Brevard Decl. ¶ 9; L. Brown Decl. ¶ 4; T. Brown Decl. ¶ 10; Collins Decl. ¶ 6; Espinoza Decl. ¶ 5; Guillen Decl. ¶ 9; Horton Decl. ¶ 7; Keshmiri Decl. ¶ 7; Kravik Decl. ¶ 9; Miller Decl. ¶ 4; Peterson Decl. ¶ 4; Reeves Decl. ¶ 9; Resendez Decl. ¶ 9; Rivers Decl. ¶¶ 5-6; Rojas Decl. ¶ 9; Sanchez Decl. ¶ 8; Sewards Decl. ¶ 8; White Decl. ¶ 8; Worthy Decl. ¶ 10.
[7]   *See* Evenski Dep. at 81:16-19; McDaniel Decl. ¶ 12; Erwin Decl. ¶ 9; Morris Decl. ¶ 8; Rockwell Decl. ¶ 8.

specific denials.   Williams Dep. at 68:25-69:18; *see also* Bell Dep. at 77:6-14 (adjustments denied for "a wide variety of reasons").

Of Agents with multiple managers, some testified they all approved every request, *see* Resendez Decl. ¶ 9 ("I have worked for several supervisors since joining iQor, and I cannot recall a time when any of them denied my requests[.]") *and* Ward Dep. at 72:11-73:11 (all supervisors approved valid adjustment requests),[8] while other Agents testified managers differed in evaluating requests.   Plaintiff Bell said some managers were more apt to approve adjustments (Bell Dep. at 33:15-34:4) and that managers had differing "prove-up" requirements (*id.* at 34:5-20; Pryor Dep. at 81:14-82:15).   *See also* Evenski Dep. at 80:16-81:5 (certain supervisors asked what you were doing, others did not); McCants Dep. at 64:25-65:15 (supervisors varied in treating exception requests); Blomquist Dep. at 33:16-19 (some managers "better than others in terms of approving your adjustment requests").

As to the opt-in FLSA plaintiffs here, iQor approved and paid for over a million hours in manual adjustments for training, meetings, downtime, non-voice work, core adjustments, and other reasons.   White Decl. ¶ 6(a).[9]

**Agents Were Paid Down to the Minute.**   Plaintiffs' allegation that Agents "lost" one minute of paid time because of the way the system rounded partial minutes has also proved demonstrably incorrect.   Agents were free to seek adjustments that accounted for

---

[8]   Plaintiff Ward herself became a manager, and in that role approved any request that was not "bogus."   Ward Dep. at 82:8-19.

[9]   Attached as Exhibit B to Morgan Declaration.

the full duration, and there is no evidence of a policy or practical impediment to seeking full adjustments. *See, e.g.*, Bell Dep. at 60:12-18 (paid for a one-minute interval); Dorsey Dep. at 59:12-17 (could make one-minute adjustment); Williams Dep. at 42:1-5 (same); Pryor Dep. at 65:7-18 (could adjust time to the minute); Evenski Dep. at 88:6-20 (could request downtime payment regardless of number of minutes); Gonzalez Dep. at 76:2-9 (adjustments of a few minutes approved).[10]

**No Evidence Suggests Agents Felt Dissuaded from Seeking Payment for Working Time.**   Agents did not identify lack of time as a factor that ever caused them to under-report working idle time. "It is a pretty easy system, and my manager approves my idle time exceptions pretty quickly." Espinoza Decl. ¶ 5. Another Agent agreed this process was "just a matter of clicks of the mouse and short explanations." Bromley Decl. (July 6, 2015) ¶ 8. Many Agents characterized the process as quick and "easy."[11]   Even time spent requesting adjustments was paid.  Pryor Dep. at 63:5-9.

Similarly, the testimony showed no supposed "pressure" to forego reporting time or other managerial dissuasion.  *See* Williams Dep. at 35:16-36:10 (far from being discouraged, she was encouraged to track exceptions every day as they occurred, when "it's still fresh in your mind"); Bell Dep. at 77:15-25 (always felt free to seek exceptions); Evenski Dep. at 81:6-15 (supervisors did not try to dissuade him from

---

[10]   One Agent understood short exceptions would not be approved, though she could not recall how she formed that impression.  McCants Dep. at 29:15-30:16.

[11]   *See* Evenski Dep. at 78:7-23 (adjustment process easy); L. Brown Decl. ¶ 7; Espinoza Decl. ¶ 5; Horton Decl. ¶¶ 5-6; Keshmiri Decl. ¶ 5; Mills Decl. ¶ 4; Resendez Decl. ¶ 8; Rivers Decl. ¶ 5; Simon Decl. ¶ 4; Willis Decl. ¶ 13; Worthy Decl. ¶ 10.

manual adjustments); Dorsey Dep. at 58:1-3; McCants Dep. at 42:11-13; Pryor Dep. 64:18-25; Bromley Decl. (July 6, 2015) ¶ 14; L. Brown Decl. ¶ 10; T. Brown Decl. ¶ 19; Collins Decl. ¶ 7; Espinoza Decl. ¶ 10; Horton Decl. ¶ 9; Keshmiri Decl. ¶ 12; Miller Decl. ¶ 9; Mills Decl. ¶ 8; Parada Decl. ¶ 10; Resendez Decl. ¶ 9; Rivers Decl. ¶ 8; Shine Decl. ¶ 8; Simon Decl. ¶ 8; Willis Decl. ¶¶ 13, 17; Worthy Decl. ¶ 18.

## ARGUMENT

## I.   PLAINTIFFS MUST SATISFY A HEIGHTENED STANDARD AT THIS STANDARD

The Court's inquiry at decertification drastically changes from the lenient standard governing initial conditional certification.  Mere allegations no longer suffice; instead, plaintiffs face a "stricter" or "more onerous" burden to show class members are in fact similarly situated.  *Smith v. Heartland Auto. Servs.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) ("The defendant's motion to decertify is analyzed under a stricter post-discovery standard."); *Lyons v. Ameriprise Fin., Inc.*, 2010 WL 3733565, at *2 (D. Minn. Sep. 20, 2010) ("a stricter standard" applies at second stage); *Holaway v. Stratasys, Inc.*, 2013 WL 5787476, at *2 (D. Minn. Oct. 28, 2013) (burden is "more onerous" at decertification stage).

The Court considers three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Smith*, 404 F. Supp. 2d at 1150.  "Decertification is then mandated if the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy

or practice." *Brechler v. Quest Commc'ns Int'l, Inc.*, 2009 WL 692329, at *1 (D. Ariz. Mar. 17, 2009) (quotations omitted).

Here, the evidence overwhelmingly shows highly particularized work experiences and individualized defenses not susceptible to common proof, mandating decertification of the conditional class. *See, e.g., Seward v. Int'l Bus. Mach. Corp.*, 2012 WL 860363, at *1 (S.D.N.Y. Mar. 9, 2012) (decertifying FLSA class of call-center employees where no "sufficiently uniform and pervasive policy requiring off-the-clock work" and defenses were "highly fact specific") (quotations omitted).[12]

## II.   DISPARATE FACTUAL ISSUES DOMINATE BECAUSE NO COMMON POLICY WILL BE DETERMINATIVE

### A.   iQor's Written Policies Require Payment for All Time Worked

Plaintiffs cannot demonstrate they were "victims of a single decision, policy or plan" to violate the FLSA. *Wacker v. Personal Touch Home Care, Inc.*, 2008 WL 4838146, at *2 (E.D. Mo. Nov. 6, 2008). In fact, the relevant written policies mandated that Agents be paid for all time worked and prohibited off-the-clock work. Argiropoulos

---

[12] *See also Bell v. Reading Hosp. & Med. Ctr.*, 2016 WL 3902938, at *4, 9-12 (E.D. Pa. July 19, 2016) (decertifying FLSA class where timekeeping system could be overridden at employee's request with supervisor approval; decentralized training created individualized defenses, and individual inquiries necessary as to purported "policy of discouragement" for requesting exceptions and supervisors' knowledge); *Solsol v. Scrub, Inc.*, 2017 WL 2285822, at *4-8 (N.D. Ill. May 23, 2017) (decertifying FLSA class where plaintiffs' shifts and offices varied, they reported to different supervisors, and defenses would vary); *Dilts v. Penske Logistics, LLC*, 315 F.R.D. 591, 595 (S.D. Cal. 2016) (decertifying FLSA class because evidence that "some supervisors at some locations on some shifts may not have complied with the law regarding provision of meal breaks does not constitute a uniform policy for all class members"); *Thind v. Healthfirst Mgmt. Servs., LLC*, 2016 WL 7187627, at *3 (S.D.N.Y. Dec. 9, 2016) (decertifying FLSA class because plaintiffs fell into "two discrete groups—those who were explicitly told to work off the clock and those who were not").

Decl. ¶ 10.   iQor's idle time policy was to pay for work activities such as training, coaching, team huddles, town halls, and focus groups, as well as when an Agent was not working due to system issues or power outages.   Argiropoulos Decl. ¶ 8 and Exs. A-3 & A-4.   Moreover, plaintiffs' supervisors even entered adjustments for them to ensure payment for all time worked in accordance with iQor's express policy.   Hayes Dep. at 52:13-16.

Multiple opt-in plaintiffs testified they were informed of the timekeeping policy upon hiring, orientation, or otherwise understood it.   *See, e.g.*, Williams Dep. at 21:2-27:12 (understood categories of paid work, and was told to track downtime); McCants Dep. at 14:14-19, 22:21-24:25 (understood paid for working idle time); Pryor Dep. at 29:24-31:17, 64:13-17 (understood Agents paid for all time worked and exception process); Ada Decl. ¶ 4; Agyarey Decl. ¶ 4; Brevard Decl. ¶ 4; Bromley Decl. (May 25, 2017) ¶ 4; L. Brown Decl. ¶ 4; Erwin Decl. ¶ 4; Espinoza Decl. ¶ 5; Guillen Decl. ¶ 4; Jones Decl. ¶ 4; McDaniel Decl. ¶ 6; Mills Decl. ¶ 5; Morris Decl. ¶ 4; Reeves Decl. ¶ 4; Rockwell Decl. ¶ 4; Rojas Decl. ¶ 4; Sanchez Decl. ¶ 4; Sewards Decl. ¶ 4; White Decl. ¶¶ 3-4; Worthy Decl. ¶ 12.

### B.   Alleged Failures by *Some* Managers to Approve *Some* Payments for Productive Idle Time to *Some* Agents Do Not Evidence a Similarly Situated Class

Because no policy requires Agents to perform unpaid work, plaintiffs instead contend "many" iQor managers refused compensation for idle time activities.   But discovery did not reveal a pervasive manager-level refusal to approve such payments. Instead, as plaintiff Bell aptly conceded, these claims turn on why "a particular manager

on a particular day reject[ed] a specific manual adjustment."  Bell Dep. at 96:2-7; *see also* Evenski Dep. at 89:22-90:13 (to determine why a particular adjustment request was rejected, you would have to ask the manager on a day-by-day, request-by-request basis); Gonzalez Dep. at 77:21-25 (same).

Some Agents testified the scrutiny of adjustment requests varied with the length of the break.  Dorsey Dep. at 54:16-55:6 (her manager generally questioned only breaks longer than 30 minutes; shorter breaks were easily approved).  Ms. Dorsey's testimony also showed such disagreements were particularized; she worked at home as a personal preference and was often unable to connect to iQor's system.  Although Ms. Dorsey faults iQor's system, her manager suspected it was Ms. Dorsey's Internet connection. Dorsey Dep. at 24:14-25.  Regardless where the problem resided (and that answer might vary by day), this issue was entirely idiosyncratic to Ms. Dorsey.

Even the same manager varied in assessing requests by different Agents.  Agent Deonesha Pryor felt some requests were rejected "because my supervisor didn't like me . . . So he would, like, treat me different from other people on the team."  Pryor Dep. at 48:10-20.  Other managers regularly approved her requests.  *Id.* 50:18-21; *see also id.* at 93:22-25 (approval "[d]epends on the supervisor").

Isolated denials, the legitimacy of which remains in dispute, by select managers cannot establish a common policy.  For example, in *Zulauf v. Amerisave Mortgage Corp.*, call center employees alleged certain managers instructed employees to underreport hours.  911 F. Supp. 2d 1266, 1274-75 (N.D. Ga. 2012).  In decertifying, the court reasoned such evidence "shows only, at most, that some, but not all, SMP-managers

instituted or encouraged a FLSA-violating policy" and did not "result[] in a similarly situated class of SMPs generally." *Id.*

A recent example from within the Eighth Circuit, *Davenport v. Charter Communications, LLC*, 2017 WL 878029 (E.D. Mo, Mar. 6, 2017), also involved call center agents. *Id.* at *2. As here, the agents used both a system that automatically recorded time and one that did not. *Id.* at *3. And as here, the plaintiffs alleged that despite a company policy to pay for all hours worked, the agents were pressured not to seek payment for working time not recorded by the automated system. *Id.* The *Davenport* court decertified the FLSA class, finding that disparate circumstances and motivations for not reporting such time precluded class treatment. *Id.* at *9. *See also Tanner v. TPUSA, Inc.*, 2015 WL 6940118, at *5 (M.D. Ga. Nov. 9, 2015) (similar).

Because the FLSA overtime claims here fundamentally turn on the actions and justifications of a particular manager on a particular day under particular facts, the "differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected" and the class cannot fairly be deemed similarly situated. *Arnold v. DirectTV, LLC*, 2017 WL 1251033, at *2, 4-7, 10 (E.D. Mo. Mar. 31, 2017) (decertifying FLSA overtime class because the "purported unlawful policy impacts Plaintiffs in different and individual ways").

## C. <u>Individual Agent Failures to Seek Payment for Productive Idle Time Is Neither a Common Issue Nor a Basis for Liability</u>

An employer who "establishes a reasonable process for an employee to report uncompensated work time" is not liable if the employee fails to follow the established

process.  *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012).

Here, Agents conceded, their participation ensured timekeeping accuracy.  The system "is

as accurate as I make it, and it is my responsibility to make sure I am accurately putting

in my [time]."   Peterson Decl. ¶ 6; *see also* Rivers Decl. ¶ 6 ("I know that it is my

responsibility to make sure TimeQey is accurate, and I have never had issues with it.");

Williams Dep. at 37:3-6 (understood that iQor wanted agents to put in exceptions to

ensure payment for all working time).[13]

Some Agents admitted failing to input time they believed was compensable.  *See*

Williams Dep. at 67:15-68:24 (as "acting supervisor" had idle time when helping other

employees, yet did not seek adjustments and could not provide a reason); Gonzalez Dep.

at 51:4-7 (sometimes requested adjustments for down time, sometimes not); Blomquist

Dep. at 35:2-10 (if spoke with another agent on work-related and non-work-related items,

he sometimes would not request an adjustment); Dorsey Dep. at 88:21-89:6.  Moreover,

despite iQor policy encouraging Agents to report time inaccuracies, some Agents failed

to escalate concerns.  *See, e.g.,* McCants Dep. at 55:23-56:1; Bell Dep. at 93:23-94:7.

In contrast, many Agents used the system as instructed and were fully

compensated.  *See, e.g.*, Ada Decl. ¶ 10; Agyarey Decl. ¶ 9; Brevard Decl. ¶ 10; L.

Brown Decl. ¶ 10; T. Brown Decl. ¶ 19; Collins Decl. ¶ 7; Espinoza Decl. ¶ 10; Guillen

---

[13]   Although the amount of self-reported working time varied, it was modest in comparison with the time automatically recorded.  For example, Agents Kennedy and Shine testified they ***never experienced idle time***.  Kennedy Decl. ¶ 8; Shine Decl. ¶ 3.  Derrick Rivers said idle time was "rare," and that "I might not even experience it every week."  Rivers Decl. ¶ 5; *see also* Williams Dep. at 36:15-21 (exceptions didn't happen every day); Keshmiri Decl. ¶ 5 (idle time no more than five minutes a day).

Decl. ¶ 10; Horton Decl. ¶ 9; Keshmiri Decl. ¶ 11; Kravik Decl. ¶ 10; McDaniel Decl. ¶ 13; Miller Decl. ¶ 9; Mills Decl. ¶ 8; Morris Decl. ¶ 9; Parada Decl. ¶¶ 14-15; Reeves Decl. ¶ 10; Rivers Decl. ¶ 8; Rockwell Decl. ¶ 9; Sanchez Decl. ¶ 9; Sewards Decl. ¶ 9; Shine Decl. ¶¶ 7-8; Simon Decl. ¶ 8; White Decl. ¶¶ 8-9.

### D.  Whether Any Unpaid Rest Break Time Was Compensable Turns on Individual Factors

Plaintiffs also challenge iQor's rest break policy, seeking compensation for non-meal breaks of any duration (and even meal breaks less than 30 minutes).  iQor's break policies were not identified by the Court as justifying conditional certification but further complicate collective treatment for multiple reasons.

### 1.  Compensability of Any Rest Break Requires a Fact-Intensive Inquiry

Under Supreme Court and Eighth Circuit precedents, compensability turns on the purpose of the break—a fact-intensive inquiry that bars group treatment on the record here.  *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("Whether time is spent predominantly for the employer's benefit" and is therefore compensable "is a question dependent upon all the circumstances of the case."); *Henson v. Pulaski Cnty. Sheriff Dep't*, 6 F.3d 531, 535 (8th Cir. 1993) (regarding compensability, "the Supreme Court[] direct[s] that courts take a practical approach based on the unique facts of each case").  And critically, although the FLSA does not mandate rest breaks at all, iQor's Agents were indisputably given *paid* breaks (as described below).  Thus the question is how to assess *additional* or *longer* employee-initiated breaks.  Furthermore, there is no allegation

iQor sought to circumvent minimum wage rules—in fact, iQor increased the wage for an hour worked.

Rest breaks are not mandated under the FLSA, and compensable work is limited to activity performed "predominantly" or "primarily for the benefit of the employer." *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944); *see also Lopez v. Tyson Foods, Inc.*, 690 F.3d 869, 874 (8th Cir. 2012); *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir. 2001); *Henson*, 6 F.3d at 534-35; *Marti v. Grey Eagle Distribs., Inc.*, 937 F. Supp. 845, 851 (E.D. Mo. 1996) (stating that "the Eighth Circuit held that the 'predominantly for the benefit of the employer' standard is the recognized test for determining compensability of meal periods" and that "this same standard [is] applicable to the issue of compensability of break periods").

Plaintiffs will contend a 1961 regulation makes breaks under 20 minutes automatically compensable. *See* 29 C.F.R. § 785.18. But DOL statements of general policy only provide a "practical guide for employer and employees" and "[t]he ultimate decisions on interpretations of the act are made by the courts." 29 C.F.R. § 785.2. The case cited in the regulation itself states that courts should consider "whether idle time is spent predominantly for the employer's or employee's benefit." *Mitchell v. Greinetz*, 235 F.2d 621, 623 (10th Cir. 1956).[14]

---

[14]  Even after the regulation was promulgated, the Ninth Circuit continued assessing compensability of rest periods under the standard of whether the break was "primarily for the benefit of the employer." *Aeromotive Metal Prods., Inc. v. Wirtz*, 312 F.2d 728, 729 (9th Cir. 1963).

Courts within the Eighth Circuit to consider § 785.18 in any depth have declined to adopt a bright-line rule.[15]  In *Benton v. Labels Direct, Inc.*, 2014 WL 4724696, at *7 (E.D. Mo. Sept. 23, 2014), the plaintiffs argued two fifteen-minute breaks should have been recompensed under § 785.18, but the court reasoned DOL regulations "are not controlling law in the Eighth Circuit, and do not stand for the strict rules of application argued by Plaintiffs."  *Id.*, at *7 (denying plaintiffs' motion for summary judgment and stating that "the Eighth Circuit has indicated its reluctance to determine the compensability of breaks by adopting or applying a standard contained in a single regulation"); *see also Spiteri v. AT&T Holdings, Inc.*, 40 F. Supp. 3d 869, 879 (E.D. Mich. 2014) ("Plaintiff misinterprets 29 C.F.R. § 785.18 when he suggests that it permits an employee to take an unlimited number of personal rest breaks during the day and be compensated for all such breaks, as long as they are less than 20 minutes in duration.").

*Henson* is instructive.  There, the plaintiffs argued that § 785.19 required an employee be "completely relieved from duty" during a meal break for it to be noncompensable.  6 F.3d at 533.  The Eighth Circuit disagreed; the proper determination was whether the break was predominantly for the benefit of the employer or for the employee's own benefit.  *Id.* at 533-34.  The court noted the Wage and Hour Division's regulations "do not bind us" and § 785.19 was "inconsistent with the Supreme Court's longstanding interpretation of the Act and would mandate the application of a rigid rule

---

[15]   Some Eighth Circuit district courts have summarily considered breaks under 20 minutes compensable, citing § 785.18, without analysis whether it is a bright-line test.  *See, e.g.*, *Brown v. L & P Indus., LLC*, 2005 WL 3503637, at *6 (E.D. Ark. Dec. 21, 2005) (no analysis for alternative holding that breaks under 20 minutes "must be counted as hours worked").

in the face of the Supreme Court's direction that courts take a practical approach based on the unique facts of each case." *Id.* at 535.[16]

Likewise, in *Marti*, the district court applied the "predominantly for the benefit of employer" standard and recognized it is plaintiff's burden to demonstrate break time was devoted to work-related activities. 937 F. Supp. at 852. The *Marti* court noted that "[a]ll the regulations [§ 785.16] have required is that such break periods be long enough to enable him [the employee] to use the time effectively for his own purposes" and that inquiry "depends upon all of the facts and circumstances of the case." *Id.* (quotation omitted); *see also Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 783-84 (8th Cir. 2009) (requiring plaintiffs to show employees' time during meal breaks was spent "primarily for the benefit of the employer" for such breaks to be compensable, and noting "a claim for unpaid mealtime work is no different than other overtime claims").[17]

Here, iQor *did* indisputably provide a paid break for a minimum of five minutes every four hours (and paid Agents regardless whether they took the break). This paid break allowed Agents to use the restroom and get coffee or a snack. These compensated

---

[16]   Courts outside the Eighth Circuit also reject the DOL's inclination towards bright-line tests. *See Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 535-36 (2d Cir. 2015) (rejecting DOL test for when interns must be treated as employees as "too rigid for our precedent to withstand, we do not find it persuasive, and we will not defer to it") (citation omitted); *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1208-09 (11th Cir. 2015) (similar).

[17]   Embracing the principle that rest break compensability depends on who benefits (and not its duration), Congress amended the FLSA to require employers to provide short breaks to express breast milk without compensation because the breaks are clearly for the employee's benefit. *See* Affordable Care Act, 29 U.S.C. § 207(r). This contradicts a bright-line test or any presumption that breaks of 20 minutes or less by their nature cannot be long enough to be for the employee's benefit.

breaks were intended to "promote the efficiency of the employee" and therefore benefit iQor under § 785.18.  As to any *additional* or *longer* rest breaks, Agents had flexibility and control over the timing, frequency, and duration—including whether Agents took them at all.  *See* Evenski Dep. at 62:11-20 (had ability to take breaks "whenever you wanted to," and observed other employees doing so); *id.* at 76:25-77:11 ("the fact that you could go out on a break whenever you wanted to and engage in personal activities" was "a good thing"); Dorsey Dep. at 32:2-23 (took additional breaks outside the scheduled breaks).

Many Agents admit being fully relieved from work duties during breaks.  *See, e.g.*, Blomquist Dep. at 75:16-22 (no work during meal and rest breaks); Muwwakkil Dep. at 67:20-68:16 (relieved from work duties during meal and other breaks); Bell Dep. at 73:5-10 (break time had "nothing to do with" work); Evenski Dep. at 57:19-24 (during meal periods, was free from work); Ward Dep. at 65:7-9 (during meal periods, not required to perform iQor work); Gonzalez Dep. at 60:16-21 (during meal breaks, free to do what she wanted).  During breaks, Agents frequently went outside to smoke, to a nearby store, caught up on Facebook or other social media, surfed the Internet, made personal calls, and visited with co-workers.  *See, e.g.*, Williams Dep. at 46:14-47:21 (would "run up to the store"; never worked during breaks; other Agents did the same); Blomquist Dep. at 76:23-77:8 (break activities included getting snacks, smoking, playing with cell phone, making calls); Evenski Dep. at 70:14-71:22 (break activities included going outside, talking to co-workers, or looking at cell phone); Gonzalez Dep. at 60:22-61:11, 63:2-8 (would eat, converse with friends, make personal calls); Rose Dep. at 50:16-22, 51:16-21

(would go to Walgreens or bank across the street).[18]   And to the extent duration of the break tends to reflect who benefited, the data shows the bulk of the breaks were longer in nature.   Gaps between 10 and 20 minutes, measured by dollar value of the claimed unpaid overtime, represent approximately 40% of the claims at issue whereas shorter gaps represent only about 20%.   White Decl. ¶ 6(b).

### 2.   Even Plaintiffs Do Not Contend Any Blanket Rule Governs Longer Breaks

The record further shows Agents did not treat 20 minutes as some magic dividing line in the purpose of their breaks.   Agent McCants, for example, would sometimes take non-meal breaks shorter than 20 minutes, sometimes longer.   But the purpose was always the same—to read books, look at the Internet, and make calls.   She never worked during these breaks.   McCants Dep. at 46:4-18, 47:5-9, 48:11-13.   Similarly, Agent Evenski testified that if he needed to take a longer break, he may have been taking a phone call from his wife, figuring something out on his phone, or attending to personal matters such as his bank account.   Evenski Dep. at 74:23-76:3.

---

[18]   *See also* Reeves Decl. ¶ 6 ("I was free to do what I wanted which was usually use my phone to talk or text with my mother and daughter."); Sewards Decl. ¶ 5 (was "free to do what [she] wanted" and "could leave the building," including to "do a quick errand"); White Decl. ¶ 5 (on her breaks, she would "mak[e] personal calls to friends or family, do personal business such as check [her] banking accounts, go outside to [her] car, socialize with co-workers in the break room and every so often do a quick errand"); Sanchez Decl. ¶ 5 (she might "go to a convenience store, the CircleK, across the street to get coffee"); Brevard Decl. ¶ 5 (breaks could include "going to the convenience store across the street"); Ada Decl. ¶ 5 ("I was free to do what I wanted, which was usually smoke in a designated area outside the building, occasionally go to a convenience store, the CircleK, across the street, from time to time pick up ordered food or take or make a personal call."); Agyarey Decl. ¶ 5; Bromley Decl. ¶ 5 (May 25, 2017); Guillen Decl. ¶ 5; Erwin Decl. ¶ 5; Jones Decl. ¶ 5; Kravik Decl. ¶ 6; McDaniel Decl. ¶ 10; Rockwell ¶ 5; Rojas Decl. ¶ 5; Worthy Decl. ¶ 16.

The nature of these longer breaks is critical when the Court assesses the propriety of certification. Plaintiffs seek payment for all breaks of less than 30 minutes—even meal breaks, which should not be compensable.[19] Measured by dollar value of the claimed unpaid overtime, gaps between 20-30 minutes represent 37% of the claims at issue. White Decl. ¶ 6(b). Thus, a central focus of any litigation would be the Agent-by-Agent nature of the activities undertaken during these longer periods recorded as a break, to which even plaintiffs do not contend any bright-line test applies. *See Gessele v. Jack in the Box, Inc.*, 2013 WL 1326563, at *28 (D. Or. Jan. 28, 2013) (FLSA collective could not be certified because "[e]ach employee's action and each supervisor's action are essential to determining any FLSA violation with respect to unpaid breaks" between 20 and 30 minutes, which is an "individualized inquiry"), *report and recommendation adopted*, 2013 WL 1326538 (D. Or. Apr. 1, 2013); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873, at *10 (W.D. Pa. Dec. 20, 2011) (decertifying FLSA collective action due to "myriad of individualized inquiries required for collective action recovery" where defendant did not pay for breaks between 20 and 30 minutes).

Courts correctly recognize that "payment for non-productive time is not a right that is protected by the FLSA." *Spiteri*, 40 F. Supp. 3d at 876 (quotations omitted) (breaks to walk or stretch for back pain took "him completely off of his employer's work and benefits only the Plaintiff" and therefore it was "not objectively reasonable" to

---

[19]   The record shows examples of meal breaks less than 30 minutes. *See, e.g.,* Evenski Dep. at 70:4-8 (26-minute break period on one day was likely his meal period); Muwwakkil Dep. at 62:14-21 (there were "a lot of different possibilities" as to purpose of a 26-minute break).

believe those were compensable).[20]   Here, iQor paid reasonable five-minute human necessity and restorative breaks—which were not required at all under the FLSA—and the record shows Agents used additional break time for myriad, primarily personal purposes.   Agents drew no uniform distinction in the type of activities they engaged in whether their breaks were under 20 minutes or longer.   No basis in law or the facts here exists to construct an arbitrary analytical distinction at 20 minutes.   The compensability of additional unpaid break time must be assessed on an instance-by-instance basis not susceptible to class adjudication.

### E.   Varying Employment Settings Further Complicate the Inquiries

The opt-in plaintiffs are further dissimilar because their work practices and experiences with TimeQey varied in meaningful ways based on locations, supervisors, project and team assignments, and numerous other factors.   *See Hamilton v. Diversicare Leasing Corp.*, 2014 WL 4955799, at *3 (W.D. Ark. Oct. 1, 2014) ("Courts consider such factors as location, job duties, supervision, and salaries in analyzing Plaintiffs factual and employment settings.").   Here, multiple disparate variables relating the employment setting affect the claims of individual Agents:

- **Different Offices, Managers, and Work Duties.**  Agents were employed in more than 20 call centers throughout the United States.   iQor Dep. at 64:6-14; Argiropoulos Decl. ¶ 5.   Each Agent was assigned to a team dedicated to one or more of

---

[20]  *See* Rockwell Decl. at ¶ 5 (during breaks was "free to do what [he] wanted," and his activities included "walk[ing] around the building for exercise").

the several hundred clients iQor serviced.  *Id.* ¶ 6.  Projects typically were broken into various teams or specialties, consisting of up to 14 Agents who report directly to an Assistant Vice President.  *Id.*  Each AVP reported to either a Managing AVP or a Vice President.  *Id.*

Not all Agents work on the phone.  Some spend most or all their time performing administrative tasks, including data entry, call-quality analysis, compiling statistics about Agents' call performance, and processing customer orders.  Some Agents have "floor support" duties, meaning they assist other Agents with questions.  *See, e.g.*, Worthy Decl. ¶ 5; T. Brown Decl. ¶ 6.  Even among agents who do mostly phone work, some handle only inbound calls, some only outbound calls, and others both types.  Because Agents control the initiation of outbound calls, these programs typically involve substantially less unoccupied time.

iQor employed hundreds of AVPs and VPs over the putative class period who were responsible for communicating and enforcing the Company's compensation policies, new hire orientation, and approval of manual time entries.  Argiropoulos Decl. ¶ 6.  Although the record shows all managers consistently approved most exception requests, the record is replete with examples of different managers in different call centers giving varied scrutiny to such requests.  *See* Blomquist Dep. at 91:14-92:25 (does not remember two managers ever denying a valid adjustment request, but "had issues" with a third because she was unconfident in her position); Evenski Dep. at 80:16-81:5 (certain supervisors would approve without questions; others not); McCants Dep. at 64:25-65:15 (supervisors varied in their treatment of exception requests).

- **Different Individual Timekeeping Practices.**   Where timekeeping practices vary by individual, the plaintiffs cannot demonstrate a systemic violation of the FLSA. *See Amerisave*, 911 F. Supp. 2d at 1274-75.   Here, individual variances in timekeeping practices were pervasive, even within the same call center.   For example, although many Agents reported all their time and were fully compensated,[21] others failed, for differing reasons, to submit all time allegedly worked. *See* Bromley Decl. (July 6, 2015) ¶ 8 (some Agents did not report all time); Williams Dep. at 67:15-68:24 (occasions when she performed work while in idle mode but did not seek adjustments).

In terms of how individual Agents tracked idle-time activities, "everybody did it differently." Bell Dep. at 29:22-30:6. Some Agents recorded working idle time minute-by-minute, every day. Stephanie Dorsey, for example, kept meticulous track of her downtime in "a whole three or four books" of notes. Dorsey Dep. at 42:19-43:4. Similarly, Eric Evenski recorded working idle time on a post-it note. Evenski Dep. at 52:23-54:16.

Other Agents addressed time adjustments on an aggregate basis and at less regular intervals. *See, e.g.*, Ward Dep. at 67:20-68:8, 68:21-69:4 (some agents would wait until the end of the week to request manual adjustments); Gonzalez Dep. at 49:17-50:19 (would write down when she had downtime, but sometimes did not, and could not

---

[21]   *See, e.g.*, Ada Decl. ¶ 10; Agyarey Decl. ¶ 9; Brevard Decl. ¶ 10; L. Brown Decl. ¶ 10; T. Brown Decl. ¶ 19; Collins Decl. ¶ 7; Espinoza Decl. ¶ 10; Guillen Decl. ¶ 10; Horton Decl. ¶ 9; Keshmiri Decl. ¶ 11; Kravik Decl. ¶ 10; McDaniel Decl. ¶ 13; Miller Decl. ¶ 9; Mills Decl. ¶ 8; Morris Decl. ¶ 9; Parada Decl. ¶¶ 14-15; Reeves Decl. ¶ 10; Rivers Decl. ¶ 8; Rockwell Decl. ¶ 9; Sanchez Decl. ¶ 9; Sewards Decl. ¶ 9; Shine Decl. ¶¶ 7-8; Simon Decl. ¶ 8; White Decl. ¶¶ 8-9.

remember what the downtime was for when she would check TimeQey at the end of week).

Some Agents' practices changed over time.  Plaintiff Bell initially lumped all downtime into one entry; later he submitted exception requests on a task-by-task basis. Bell Dep. at 63:9-64:1.[22]  These differences in recording practices make representative testimony inappropriate.

• **Different Subjective Responses to Management.**  The record did not reveal any evidence that Agents pervasively felt pressured by managers not to record working idle time.  Even should plaintiffs produce a few anecdotal accounts of Agents who subjectively felt pressure, those sporadic reports cannot establish the requisite commonality.[23]  And what a given person perceives as coercive will necessarily vary, as well as the reasonableness of that perception and response.  Such individuality requires decertification.  *See Griffith v. Wells Fargo Bank, N.A.*, 2012 WL 3985093, at *5 (S.D. Tex. Sept. 12, 2012) (denying even conditional certification based on alleged pressure by managers to violate FLSA); *Steger v. Life Time Fitness, Inc.*, 2016 WL 245899, at *3 (N.D. Ill. Jan. 21, 2016) (denying conditional certification because "[t]he pressure that

---

[22]   These timekeeping variations are further reflected in the following testimony.  T. Brown Decl. ¶ 10; Collins Decl. ¶¶ 4,6; Espinoza Decl. ¶ 9; Horton Decl. ¶ 7; Keshmiri Decl. ¶ 11; Miller Decl. ¶ 5; Mills Decl. ¶ 7; Peterson Decl. ¶ 4; Resendez Decl. ¶ 10; Rivers Decl. ¶ 6; Shine Decl. ¶ 6; Simon Decl. ¶ 7; Willis Decl. ¶ 15.

[23]   The following examples illustrate the limited extent to which any Agents arguably felt inhibited from making exception requests. Blomquist Dep. at 35:2-36:8 (sometimes did not seek adjustments because managers did not like inputting them because it took time); Gonzalez Dep. at 51:4-21 (would not put in adjustment requests for a couple minutes because "I didn't want to hear from the supervisors saying, okay, for reals for a minute?  For reals for two minutes?  For a couple seconds?  Yeah, so I would just leave it alone."); *see also id.* at 68:23-71:7.

each [class member] felt to work off-the-clock" required "a highly individualized analysis"); *see also Brechler*, 2009 WL 692329, at *3 (decertifying class because "Plaintiffs' case relies on a subtler system of pressure and coercion that, ultimately, appears to have to have been backed or not by the individual managers" and concluding that "Plaintiffs were not affected equally or in the same manner by this system").

## III.   IQOR'S INDIVIDUALIZED DEFENSES RENDER COLLECTIVE ACTION INAPPROPRIATE

In determining whether plaintiffs satisfied their more stringent, second-stage burden, the Court must consider whether the defenses available to iQor are individual to each plaintiff. *Smith*, 404 F. Supp. 2d at 1150.   Here, all key aspects of iQor's defense turn on instance-by-instance, Agent-by-Agent fact-finding not susceptible to group adjudication.

### A.   Whether Any Agent Was Wrongly Denied Payment for Compensable Idle Time Requires Individual Inquiries

Courts have recognized an employee's failure to follow established procedures to report uncompensated time and to correct any errors in their time records creates individualized inquiries that defeat any utility of a collective action. *See Brewer v. Gen. Nutrition Corp.*, 2014 WL 5877695, at *16 (N.D. Cal. Nov. 12, 2014) ("GNC could assert defenses barring liability on account of the employees' failure to follow established procedures for correcting their time records, their verification of weekly time records that did not reflect these hours, and/or the *de minimis* amount of overtime that went uncompensated.").

iQor will present evidence at trial that many purported failures to properly compensate were because Agents never initiated the payment process.  For example, Stephanie Dorsey conceded she would not always input downtime even though she understood it was her responsibility, but her reasons differed.  Sometimes she just forgot.  Sometimes she assumed it would be denied without even asking.  Sometimes she contends she asked in advance and her manager declined to approve it.  Dorsey Dep. at 88:21-89:7.  Similarly, another agent testified that, for reasons she could not articulate, she failed to report some working idle time spent helping other employees.  Williams Dep. at 67:15-68:24.

Plaintiffs' expert has been unable to accurately determine alleged damages from TimeQey records alone.  Plaintiffs' expert admits it is unclear from the TimeQey records whether a manual adjustment appearing at the beginning or end of the day reflects work time (such as attendance at a meeting or training), or if the adjustment was intended to credit the Agent for a break or gap during the day.  *See, e.g.*, Stewart Dep. at 85:5-87:1, 89:17-96:8.  Plaintiffs' damages analysis double-counts unpaid time to the extent it includes breaks or gaps already paid through an adjustment.  The adjustment requests sometimes include notes about the reason, which would need to be evaluated individually.  Even then, in many instances testimony from the Agent and/or supervisor would be needed to establish the purpose of the adjustment.

Similarly, it is possible an adjustment for one day or week might have been incorrectly recorded in another day or week, which might have caused the employee's time for that day or week to incorrectly appear as though it exceeded the overtime

threshold.  These issues create challenges in using expert analysis to determine liability and damages classwide because experts will not be able to determine which time period any particular adjustment is meant to address, and iQor would not be liable for overtime damages if an employee recorded, for example, 41 hours in one week, but one of those hours actually belonged in a different week where the employee worked 39 or fewer hours.[24]

### B.  Credibility Determinations Necessitate Decertification

The necessary individual fact determinations are also not susceptible to trial by formula or representative testimony because they are rife with credibility issues. Plaintiffs supported their conditional certification request with numerous fill-in-the-blank, cookie-cutter, class-member declarations.[25]  Where nearly identical declarations are provided, courts logically question their credibility.  *See Augustyniak v. Lowe's Home Ctr., LLC*, 2016 WL 462346, at *4 (W.D.N.Y. Feb. 8, 2016) ("While the mere fact that the declarations submitted by Plaintiff are virtually identical does not *ipso facto* render them incompetent, it severely undercuts their persuasive value.") (internal citations

---

[24]  *See Perez v. Wells Fargo & Co.*, 75 F. Supp. 3d 1184, 1192 (N.D. Cal. 2014) (Even if breaks less than 20 minutes are compensable, "that does not mean that such unpaid breaks can form the basis of an FLSA claim during a non-overtime week.  Put another way, time may be 'compensable,' but that does not mean the failure to pay for those breaks is 'actionable' where the plaintiff has not worked 40 hours (apart from the unpaid break times) in that same week" because "the FLSA does not include a provision authorizing an employee to bring a civil action for failure to provide paid rest breaks.").  Further, what might have brought a particular plaintiff over 40 hours in a week could have been an adjustment that particular plaintiff failed to request.

[25]  In contrast, the employee declarations collected by iQor provided details about each individual, including how they used their breaks and whether they took unscheduled breaks.

omitted); *Desert Sun Net LLC v. Kepler*, 2006 WL 3091170, at *6 (W.D. Wash. Oct. 27, 2006) ("The Court gives little weight to such 'cookie cutter' declarations[.]'").

More significantly, once subjected to live examination at deposition, numerous opt-in plaintiffs testified inconsistently with their other sworn statements. For example, plaintiff Jonathan Bell testified in an interrogatory response that he "was told by his trainer that he would only be paid for time spent on his computer and that break periods would be unpaid." Response to Interrogatory No. 1.[26] Yet Bell conceded at deposition that he understood during orientation that he could ask a manager to adjust time if his computer became inactive. Bell Dep. at 18:1-8. Additionally, Bell said in an interrogatory response he felt discouraged by some managers about seeking adjustments (Response to Interrogatory No. 5) yet testified at deposition he always felt free to seek adjustments and that no manager ever discouraged him. Bell Dep. at 77:15-25.

Similarly, Agent McCants stated in a sworn interrogatory response she was "*told by her supervisors* that she should only request time adjustments for increments of, for example, five or ten minutes, rather than a single minute adjustment." Response to Interrogatory No. 4 (emphasis added).[27] Yet at deposition, she testified merely that it was her belief that short exceptions would not be approved, and that she could not recall how she informed that impression. McCants Dep. at 29:15-30:16.

---

[26] Bell's Interrogatory Responses are attached to the Morgan Declaration as Exhibit E.

[27] McCants's Interrogatory Responses are attached to the Morgan Declaration as Exhibit F.

These contradictions in plaintiffs' declarations, interrogatory responses, and deposition testimony were uncovered from a mere *fraction* of the more than 3,500 opt-in plaintiffs.  iQor is entitled to cross-examine every claimant to test their veracity, and no form of common proof is capable of confirming the accuracy of plaintiffs' alleged individual work experiences.   Such individualized inquiries "destroy the efficiency sought to be gained through a collective action." *Martin v. Citizens Fin. Group, Inc.*, 2013 WL 1234081, at *6-8 (E.D. Pa. Mar. 27, 2013) (decertifying in part because "if a successful cross examination left a trier of fact questioning one Plaintiff's veracity, the same juror would have little sense as to whether the hundreds of other Plaintiffs were truthful in claiming that they were denied overtime"). *See also Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 964-65 (W.D. Mich. 2009) (contradictions between affidavits and deposition testimony "show the importance of cross-examination of each plaintiff and suggest the need for separate mini-trials to resolve each individual's claim") (quotations omitted).

In addition, Agents testified that although they at one time had contemporaneous documents reflecting their adjustment time, those documents no longer exist, making memory an issue.  *See* McCants Dep. at 37:13-38:8 (she would record exception time on a dry erase board, then erase it after it was requested); Dorsey Dep. at 42:19-43:4 (claims she kept meticulous track of her downtime and had "a whole three or four books" of notes but did not retain them).   And some Agents would not enter exceptions into the system but rather would just tell their managers, so there would be no record of these requests at all.  McCants Dep. at 36:3-12.

### C. Whether iQor Suffered or Permitted Opt-In Plaintiffs to Perform Unpaid Work Requires an Individualized Assessment

As a matter of law, iQor cannot be held liable for uncompensated work unless it "suffered or permitted" that work to be performed. 29 C.F.R. § 785.11. However, iQor cannot suffer or permit an employee to perform services unless it knew or had reason to know of the work. *Id.*; *see also Ellis v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC*, 2012 WL 1004848, at *9 (E.D.N.Y. Mar. 23, 2012). That determination is an individualized inquiry necessarily requiring person-by-person analysis. *See Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 673-74 (6th Cir. 2012) (affirming decertification of collective action).

Here, whether any particular manager was aware (or should have been aware) that a particular Agent was not being paid for a particular work period during a particular day, and that these unpaid periods cumulatively triggered an overtime obligation for a particular pay period, cannot possibly be shown on a collective basis. The awareness any particular manager had (or should have had) will vary depending on the physical layout of each facility; the number of Agents being supervised; the type of project being engaged in; the level of variability in idle time from project to project and day to day; varying management styles; the extent to which a given manager approved or rejected manually entered time requests; and myriad other factors incapable of classwide proof. *See Wood. v. Mid-America Mgmt. Corp.*, 192 F. App'x 378, 381 (6th Cir. 2006) ("At the end of the day, an employee must show that the employer knew or should have known that he was working overtime or, better yet, he should report the overtime hours himself.

. . .  An employer cannot satisfy an obligation that it has no reason to think exists."); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 352 (N.D. Ill. 2012) ("[D]etermining whether Defendants had actual knowledge would require, at a minimum, proof specific to each hospital, and probably to each Plaintiff.  As outlined above, the Plaintiffs worked in eight different hospitals and in 198 different departments within those hospitals.  Within those different departments, they also worked different shifts and reported to over 200 different supervisors. . . .  As a result, determining what supervisors may have been aware of nurses working through meals without compensation will require a fact-specific inquiry based on the specific working conditions each Plaintiff encountered.").

Many Agents testified that they did not believe they were denied any due wages or overtime payment.  *See* cites at 14 & 21 n.22, *supra*.  Indeed, even one declarant who claimed that his time was initially entered incorrectly acknowledged that his manager corrected the issue promptly when notified, within the same pay cycle.  Rockwell Decl. ¶ 9.  Managers of such Agents could credibly testify that they had no reason to know that *other* Agents, perhaps even on the same project team, believed they were entitled to unpaid overtime.  Such disputes again put individual credibility issues at the fore in any trial of this matter.

## IV.    FAIRNESS AND PROCEDURAL CONCERNS ALSO RENDER THE CASE INAPPROPRIATE FOR COLLECTIVE ACTION TREATMENT

Fairness and procedural considerations also weigh heavily in favor of decertification.  The Supreme Court recognizes that a primary objective of a collective

action is to *enhance* judicial efficiency by resolving common issues of law and fact arising from the same unlawful conduct. *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). That objective cannot be achieved where, as here, parties must litigate multiple individualized issues. "The Court finds that an attempt to collectively try this action would be not only inefficient, but also violate Defendants' procedural and constitutional rights. Defendants cannot be expected to come up with representative proof when the plaintiffs cannot reasonably be said to be representative of each other." *White v. 14051 Manchester, Inc.*, 301 F.R.D. 368, 378 (E.D. Mo. 2014) (quotations omitted).

Neither the judicial system nor the parties would benefit from having this matter proceed as a collective action. Jurors would be predictably overwhelmed by the numerous individualized issues presented by each class member. *Id.* at 378 ("It is obvious from the discovery presented that this 'policy' and its effects are neither homogenous nor lend themselves to collective inquiry"). Collective adjudication would also undoubtedly infringe upon iQor's due process right to individually cross-examine each opt-in. *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 371-73 (D.N.J. 1987); *Gatewood v. Koch Foods of Miss., LLC*, 2009 WL 8642001, at *21 (S.D. Miss. Oct. 20, 2009) (decertifying class due to "serious fairness issues.").

In contrast, decertifying the class would not unfairly disadvantage plaintiffs or the class members. They would retain the right to pursue claims individually and recover attorneys' fees. *See, e.g.*, *Avants v. Prospect Mortgage, LLC*, 2014 WL 10741662 (D.N.M. Oct. 30, 2014) (Memorandum in Support of Joint Motion for Approval of

Settlement Agreement and Dismissal of Law Suit, filed by Nichols Kaster, LLP (plaintiffs' counsel in this case), reporting that a number of individual actions were filed after decertification and that "all plaintiffs are represented by counsel from Nichols Kaster"); *Ackerman v. KFC Corp.*, 2007 WL 4589168 (D. Minn. Aug. 30, 2007) (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Stay Proceedings Pending a Decision by the Judicial Panel for Multidistrict Litigation, filed by Nichols Kaster, LLP; similar); *Ullman v. HSBC Mortgage Corp. USA*, 2010 WL 4822677 (E.D.N.Y. Nov. 17, 2010) (Complaint for Damages, filed by Nichols Kaster, LLP on behalf of 16 individual plaintiffs following decertification of FLSA collective action). And, to the extent any class members have credible claims, they would likely benefit from having their claims tried separately from those class members with non-meritorious claims. No particular plaintiff can identify any prejudice by decertification.

## **CONCLUSION**

For the foregoing reasons, iQor respectfully requests that the Court decertify the previously conditionally certified collective action, and that the claims of all opt-in plaintiffs be dismissed without prejudice.

Dated: August 18, 2017.          JACKSON LEWIS P.C.

                                 *s/ Brian T. Benkstein*
                                 Gina K. Janeiro (#0345337)
                                 Brian T. Benkstein (#0325545)
                                 150 South Fifth Street
                                 Suite 3500
                                 Minneapolis, Minnesota  55402
                                 Tel:  612-341-8131
                                 Fax:  612-341-0609
                                 JaneiroG@jacksonlewis.com
                                 Brian.Benkstein@jacksonlewis.com

                                 Shon Morgan
                                 Viola Trebicka
                                 QUINN EMANUEL URQUHART & SULLIVAN,
                                 LLP
                                 865 South Figueroa Street, 10th Floor
                                 Los Angeles, California 90017-2543
                                 Telephone:  (213) 443-3000
                                 Facsimile:  (213) 443-3100
                                 shonmorgan@quinnemanuel.com
                                 violatrebicka@quinnemanuel.com

                                 ATTORNEYS    FOR    DEFENDANT    IQOR
                                 HOLDINGS US INC.

4849-4579-7709, v. 1