# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Paris Shoots, Jonathan Bell, Maxwell
Turner, Tammy Hope, Phillipp
Ostrovsky, Brenda Brandt, Anissa
Sanders, Najai McCutcheon,
and Leticia Rodriguez, on behalf of
themselves, the Proposed Rule 23 Classes,
and others similarly situated,

               Plaintiffs,

   v.

iQor Holdings US Inc.,

               Defendant.

Court File No. 0:15-cv-00563-SRN-SER

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION PURSUANT TO
FED. R. CIV. P 23**

## **INTRODUCTION**

Substituting hyperbole and unsworn anecdotes for the substantial classwide evidence required under *Dukes*, plaintiffs cavalierly accuse iQor of systematic "theft" of wages from more than 15,000 employees working for several hundred different supervisors in more than 20 locations under eight states' differing laws. Plaintiffs ignore that the majority of class members who offered testimony on the pending motions stated under oath they were paid for all straight time and overtime. (Decert. Motion at 15-16). Plaintiffs also ignore that when iQor implemented TimeQey, supposedly to perpetrate this "theft," it actually *raised* hourly wages by $1.50-2.00 and offered Agents substantial bonuses.

There is a reason plaintiffs base their motion chiefly on email snippets rather than sworn testimony. There is a reason nearly 75% of Agents chose *not* to join plaintiffs' FLSA claims. That reason is that iQor's comprehensive system worked remarkably well to accurately compensate Agents in almost all instances for the work activities they agreed would be compensable. The record shows that any occasions that arguably did not result in proper payment were based on particularized, often disputed circumstances not capable of class resolution.

The experience of one named plaintiff, Jonathan Bell, illustrates the impossibility of meaningful and fair class adjudication here. First, as this Court previously recognized and plaintiffs concede, the employment terms between iQor and each Agent were determined by contract, and the parties were generally free to agree which activities are compensable. Bell testified he understood and agreed he would not necessarily be paid from shift start to end:

Q. That rate that you were going to be paid, $15 an hour, you understood that was to compensate you for your productive work time, correct?

A. Correct.

Q. And that you wouldn't be compensated for your break time?

A. Correct.

Q. And you knew that when you accepted employment, correct?

A. Correct.

Bell Dep. at 87:7-17.[1]

If Bell, the only named plaintiff deposed, is "typical" of other Agents—as plaintiffs contend—that means other Agents shared his view that rest breaks and certain additional activities were excluded by the compensation agreement. If other Agents contend they understood they would be paid for a broader range of activities, the facts supporting their different interpretation of the agreement must be assessed individually. Additionally, given that many Agents testified that they came to understand iQor's view of compensable activities shortly after accepting employment and yet chose to continue working, such course-of-performance evidence bearing on contract meaning would also need to be evaluated individually by the jury.

Compounding these threshold but critical fact-dependent contract determinations, Bell also conceded that assessing if any Agent was improperly denied payment for a given unpaid period would also require break-by-break resolutions for each Agent, each day

---

[1]     Declaration of Shon Morgan in Support of Opposition to Plaintiffs' Motion for Class Certification ("Morgan Opp. Decl."), Ex. 1. Except where noted otherwise, deposition excerpts are attached as Exhibit D to the Declaration of Shon Morgan in Support of iQor's Motion to Decertify the FLSA Class ("Morgan Decert. Decl."), Dkt. 351.

employed. As Bell agreed, the jury would have to evaluate the reasons "a particular manager on a particular day reject[ed] a specific manual adjustment." Bell Dep. at 96:2-7. The record amply supports this observation, and shows that where adjustment requests were denied, the reasons and circumstances varied by Agent, their particular manager, and the explanation proffered for the disputed time period.

It is also well-settled that credibility determinations cannot be extrapolated from one class member to another, and thus class treatment is inappropriate where a jury must assess a class member's truthfulness. Bell's testimony highlights the centrality of credibility here because, despite his unambiguous concessions at deposition about his compensation agreement, he later tried to retreat in his attorney-crafted interrogatory responses and contended iQor "agreed to pay Plaintiff for all of hours worked as required and defined by law" (Response to Interrogatory No. 8),[2] which plaintiffs contend would include breaks.

Jonathan Bell is of course not some outlier cherry-picked by iQor, but rather an Agent held out by *plaintiffs* as representative of the broader classes. However, Bell's testimony is "representative" only in demonstrating that any conclusions about Bell's employment circumstances and claims will not meaningfully aid in resolving the claims of any other Agent in plaintiffs' eight proposed Rule 23 classes.

In addition to the Gordian knot of fact determinations implicated by each Agent's individual claim for straight-time pay and overtime, plaintiffs further ask the jury to assess these claims against the backdrop of eight states' differing laws. Certified litigation classes

---

[2]  Morgan Decert. Decl., Ex. E.

that include more than a few states' laws are exceedingly rare.  Rather, courts sensibly conclude it would overtax a jury's reasonable capabilities to apply varied legal rules to a complex fact record, which this case indisputably presents.

For these and additional reasons presented in both pending motions, plaintiffs' request for Rule 23 certification should be denied.

## FACTUAL BACKGROUND

**iQor's TimeQey System.**  As discussed more fully in iQor's Memorandum in Support of Motion to Decertify the FLSA Class (Dkt. 350) ("Decert. Motion"), iQor began its rollout of TimeQey in 2009, which allowed iQor to provide a flexible work environment and increase its call-center Agents' hourly wages.  *Id.* at 3.  TimeQey automatically recorded the time Agents spent on core work activities—working on the phone or their computers, or waiting for a call.  For other work—such as training, coaching, town halls, focus groups, or time spent waiting for system issues or power outages to be resolved— Agents were instructed to enter a manual adjustment into TimeQey or ask their managers to do so.  *Id.* at 4-5.  This process ensured Agents were paid for all work time.

Through orientation, training, mentoring, or the intuitive nature of the system, Agents understood how to be paid for all work time.  *Id.* at 5-6.  Managers routinely approved Agents' manual adjustments, with many Agents testifying that all adjustment requests were approved.  *Id.* at 5, 7.  Some adjustment requests were not approved, based on various reasons such as a failure to enter a supervisor's name or to provide a valid justification.  *Id.* at 7-8.  Agents testified they were never pressured to forego submitting

adjustment requests (*id.* at 9-10), although a couple said they sometimes hesitated because they felt their managers did not like to input them (*id.* at 26 n.23).

iQor paid Agents for all work time and provided a paid break for a minimum of five minutes (more in certain states) every four hours, which was paid automatically regardless whether an Agent actually took the break.  *Id.* at 19.  Agents were permitted to take additional or longer breaks for any purpose, with manager approval, on or off premises. *Id.* at 3, 20; Declaration of Mason Argiropoulos in Support of Decert. Motion,[3] Ex. A-3 at 196 (policy that "Agents may take as many breaks as they want at any time they wish for as long as they choose, after securing permission from their Supervisor").  Agents were fully relieved from work duties during breaks, so any additional break time beyond the paid five minutes was unpaid.  Decert. Motion at 20-21.  Although plaintiffs suggest Agents were unable to take longer breaks because of a focus on performance metrics that keeps them on the phone (Cert. Motion at 9-10), this conflicts with the break data and testimony of Agents who took long breaks, and many examples plaintiffs reference relate to Agents who did not use the TimeQey system.  For example, plaintiffs cite an electronic "Note" to Agent Anissa Sanders stating that she was 4 minutes over her break time (*id.* at 10 (citing Ex. 14 at IQOR00000315)), but Ms. Sanders did not use TimeQey at the time the note was created.  Declaration of Mason Argiropoulos in Support of Opposition ("Argiropoulos Decl."), ¶ 4.  Indeed, almost 15 percent of the notes regarding scheduling adherence and

---

[3]   Morgan Decert. Decl., Ex. A.

performance in plaintiffs' Exhibits 13 and 14 concern Agents who were not using TimeQey.  *Id.*

If an Agent ceased computer or phone activity for more than two minutes, the Agent's computer would enter "idle" mode and TimeQey would treat the "idle" time as a break.  Decert. Motion at 4.  If the Agent was actually performing work rather than taking a break, she would simply request a manual adjustment to be paid for that time.  *Id.*  Many Agents testified they were fully compensated for all work time.  *Id.* at 15-16; *see, e.g.*, Ada Decl.[4] ¶ 10 ("During [the relevant] period, there was no occasion when I believed that I worked time that was not recorded or paid or that I worked overtime that was not paid.").

**Different Offices, Managers, Work Duties, and Use of TimeQey.**  Agents worked at many different locations—more than 20 call centers throughout the country.  Decert. Motion at 23.  Plaintiffs' expert has calculated that approximately 15,000 Agents would be included in plaintiffs' proposed classes.  Schug Decl., Ex. 15 at ¶ 9.  These Agents reported to several hundred different supervisors.  Argiropoulos Decl., ¶ 5.  Although supervisors consistently approved most manual adjustments, different supervisors gave different levels of scrutiny to the requests.  Decert. Motion at 8, 24.

Not all Agents work on the phone.  *Id.* at 24.  Rather, they may spend most or all of their time on administrative tasks or providing "floor support" to assist other Agents.  *Id.* For many of these Agents, TimeQey does not automatically track their time; they manually enter all time.  *See, e.g.*, Parada Decl. ¶ 9 ("In TimeQey, my hours are tracked manually.  I

---

[4]   All Agent declarations are attached as exhibits to the Morgan Decert. Decl. as Ex. C.

only have to put in the time I begin my shift, the time I leave for lunch, the time I return after lunch, and the time I end my shift."); Peterson Decl. ¶ 4 ("I use a system called TimeQey to record my time for pay purposes.  Every day, I manually enter my start time, end time, and the time I take my lunch."); L. Brown Decl. ¶ 4 ("I manually enter the hours that I work into TimeQey.  TimeQey does not automatically track my hours.").

Because these Agents enter their time into TimeQey manually, even if their computers entered "idle" mode after a period of inactivity, it had no impact whatsoever on the work time recorded or paid.  For example, Agent Tom Peterson testified that "I have never encountered an issue with 'idle time,' because I manually enter my time every day into TimeQey.  Therefore, even if I were to walk away from my computer and it were to 'idle out,' this would not affect my pay at all."  Peterson Decl. ¶ 4.  Similarly, Agent Lasonya Brown stated "I have never had experience with idle time.  TimeQey does not automatically track my hours, so my time entries are unaffected by my computer going to sleep or any change in my status in TimeQey.  My time entries are not linked to my computer activities."  L. Brown Decl. ¶ 5.

**Agents' Offer Letters.**  Before Agents began work at iQor, they signed offer letters from iQor, which reflected certain employment terms.  At inception of employment, many Agents understood they would be compensated with the stated hourly wage—for any productive time.  For example, plaintiff Bell's offer letter provided: "**Salary/Wage**: $15 Per Hour."  Schug Decl., Ex. 23.  Bell testified that when he accepted employment he understood he would be compensated at that rate for productive work time, and would not

be paid for breaks.   Bell Dep. at 87:7-17;[5] *see also* Evenski Dep.[6] at 40:9-24 ("My understanding, when I first started, is they told you that you can take as many breaks as you want, you just do not get paid for any breaks that you take."); McCants Dep. at 56:2-5 ("Q. As far as you recall from the very beginning of your employment you understood you would not get paid for rest breaks; correct?  A.  Correct.").  Nothing in the language of the offer letter contradicted this understanding.  *See* Schug Decl., Ex. 23.[7]

**Minnesota Department of Labor Investigation.**   When iQor launched TimeQey, the Minnesota Department of Labor and Industry ("MDOL") reviewed the system.  As part of that investigation, MDOL raised the issue of whether the TimeQey procedures violated Minnesota Rules § 5200.0120, which defines "hours worked" to include all breaks less than 20 minutes.  In correspondence with the MDOL, iQor explained that the rule simply defines "hours worked" for purposes of determining compliance with minimum wage requirements of the Minnesota Fair Labor Standards Act, Minn. Stat. § 177.21, *et seq.* Argiropoulos Decl., Exs. 1 & 2.  iQor cooperated fully with MDOL, and on March 19, 2013, MDOL completed its investigation.  Schug Decl., Ex. 43.  MDOL noted that Rule 5200.0120 states that "Rest periods of less than 20 minutes may not be deducted from total hours worked," but nevertheless found that "[t]he records showed no evidence of minimum

---

[5]   Morgan Opp. Decl., Ex. 1.

[6]   *Id.*, Ex. 4.

[7]   The offer letters were by no means comprehensive explanations of all material working conditions and terms.  Even as to compensation, the letters did not set forth all terms, including, for example, details of the bonus structures that often constituted a significant compensation component, the vacation policy, and the benefits.  *See* Schug Decl., Ex. 23.  Agents thus had to reasonably assume additional information about compensation specifics would follow.

wage violations" and closed the case. *Id.* Because MDOL closed the case without imposing any repayment obligations after investigating iQor's break policies, iQor reasonably believed its system was compliant.

## ARGUMENT

### I. LEGAL STANDARD

"Rule 23 does not set forth a mere pleading standard" and plaintiffs must offer proof to "affirmatively demonstrate [their] compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rule 23(a) requires plaintiffs to show all threshold requirements are met, subject to a "rigorous analysis" by the trial court. *Id.* at 350-51. To show commonality, the nature of the common contention must be such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. What matters "is not the raising of common 'questions'— even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quotations and citation omitted; emphasis in original). The typicality analysis is similar, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982), however, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006).

Plaintiffs seek predominantly money damages and thus must further satisfy Rule 23(b)(3), which requires that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action

is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Although similar to the commonality requirement in Rule 23(a), "the predominance criterion is far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. "The predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013).

Regarding superiority, plaintiffs must "demonstrate that a class action would be superior to, and not merely as good as, another means of resolving the controversy." *Gardner v. First Am. Title Ins. Co.*, 2003 WL 221844, at *8 (D. Minn. Jan. 27, 2003) (quotations and citation omitted). A class action is not superior when there are many individual issues to adjudicate. *See Avritt v. Reliastar Life Ins. Co.*, 2009 WL 455808, at *7 (D. Minn. Feb. 23, 2009) (class action not superior because "[t]he need for individualized proof . . . would render management of a class action difficult and reduce or eliminate the efficiencies typically associated with class litigation"), *aff'd*, 615 F.3d 1023 (8th Cir. 2010).

## II.   COMMONALITY IS LACKING BECAUSE THE RELEVANT STATE LAWS VARY WITH RESPECT TO AN EMPLOYEE'S RIGHT TO RECOVER STRAIGHT-TIME AND OVERTIME WAGES

Plaintiffs seek straight-time wages under the laws of ***eight*** states—Minnesota, New York, Ohio, Arizona, Colorado, North Carolina, South Carolina, and California—and

overtime wages under the laws of *five* states—New York, Ohio, Colorado, North Carolina, and California.[8]   These states have varying laws with respect to recovery of straight time and overtime.   "No class action is proper unless all litigants are governed by the same legal rules.   Otherwise, the class cannot satisfy the commonality and superiority requirements of [Rule 23]."   *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002).

The states at issue require plaintiffs to show an independent right to straight-time wages above minimum wage because the statutes do not provide such a right on their own. For example, plaintiffs concede this Court has already held that the relevant Minnesota statutory provision (Minnesota Stat. § 181.101) "'governs the timing of payment, not the substantive right to the payment itself.'"   Cert. Motion at 22 (quoting Dkt. 142 at 16). "Instead, an employee must establish an 'independent, substantive legal right' to payment separate from the statute."[9]   *Id.*   So too for the other states.   *See Myers v. Hertz Corp.*, 624 F.3d 537, 545 (2d Cir. 2010) (New York's "Labor Law § 191 by its terms only involves the timeliness of wage payments, and *does not appear to afford to plaintiffs any substantive entitlement to a particular wage*[.]") (emphasis added);[10]   *Lacy v. Reddy Elec. Co.*, 2013 WL 3580309, at *17 (S.D. Ohio July 11, 2013) (The viability of a claim under Ohio's Prompt Pay Act (Ohio Rev. Code § 4113.15(A)) "hinges on the viability of the minimum

---

[8]   Plaintiffs fail in their proposed class definitions for each state to identify whether they seek only straight-time wages or also overtime wages.

[9]   The Court also stated that because violators of Minnesota Stat. § 181.101 "may be subject to civil penalties . . . the statute must be strictly construed."   Dkt. 142 at 18.

[10]   Plaintiffs have previously argued the *Myers* court found only that § 191 was not the appropriate vehicle for recovering overtime wages.   Not so—the Second Circuit expressly concluded Labor Law § 191 "does not appear to afford to plaintiffs any substantive entitlement to a *particular* wage."   *Myers*, 624 F.3d at 545 (emphasis in original).

wage and overtime claims.");[11] *Wood v. TriVita, Inc.*, 2008 WL 6566637, at *3 (D. Ariz. Sept. 18, 2008) (Arizona statutes "only regulate *when* wages due must be paid to the employee," not *whether* pay is due) (emphasis added);[12] *Barnes v. Van Schaack Mortg.*, 787 P.2d 207, 210 (Colo. App. 1990) (Colorado Wage Claim Act (Colo. Rev. Stat. § 8-4-103(1)(a)), creates no substantive right to compensation for work); *Queen v. RHA Health Servs., Inc.*, 2001 U.S. Dist. LEXIS 26118, at *8 (M.D.N.C. Jan. 22, 2001) (relevant North Carolina statute (N.C. Gen. Stat. § 95-25.6) "simply requires employers to pay employees on the regular payday, . . . not payment for disputed work time"); S.C. Code Ann. §§ 41-10-30, 41-10-40, 41-10-80 (providing for recovery of unpaid "wages agreed upon" but providing no statutory right to recover a particular wage); *Earley v. Superior Court*, 79 Cal. App. 4th 1420, 1430 (2000) ("Straight-time wages (above the minimum wage) are a matter of private contract between the employer and employee.").

The state laws differ in meaningful respects.  For example, although other states allow for averaging of wages over a longer period to determine compliance with the

---

[11]   *See also Lutz v. Huntington Bancshares Inc.*, 2014 WL 2890170, at *20 (S.D. Ohio June 25, 2014) (granting employer summary judgment on Ohio Prompt Pay Act claim because it was dependent on plaintiff's failed overtime claim), *aff'd*, 815 F.3d 988 (6th Cir. 2016); *Bahr v. Technical Consumer Prods., Inc.*, 2014 WL 1094426, at *10 & n.6 (N.D. Ohio Mar. 17, 2014) (comparing Ohio to Minnesota and noting both are "timing" statutes, and "wages that an employee has actually earned are defined by the employment contract"), *rev'd on other grounds*, 601 F. App'x 359 (6th Cir. 2015).

[12]   Citing the Court's Order on iQor's Motion for Judgment as a Matter of Law, plaintiffs contend that under Arizona's wage payment statute (Ariz. Rev. Stat. § 23-351), "[n]o independent substantive right is necessary to recover wages under the statute." Cert. Motion at 24.  The Court's Order merely opined that a case cited by iQor did not control and did not decide whether an independent right to payment was actually necessary.  Dkt. 142 at 21-22.  *See also Austin v. City of Chandler*, 2015 WL 5209328, at *3 (Ariz. Ct. App. Sept. 8, 2015) ("[The Arizona Wage Act] does not, however, create an independent right to receive wages in the first instance; rather, the employee must have some other, generally contractual, right to compensation[.]").

minimum wage (*see, e.g.*, *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 466 (E.D.N.Y. 2015) (interpreting New York law as "mandating an average rate of pay on a *per hour* basis: this is calculated by dividing the employee's total remuneration by the total number of hours worked"), California does not.  Cert. Motion at 26.  Thus, determining whether the minimum wage was paid would requiring reviewing each hour of each plaintiff's time during the entire class period.  The minimum wage in California during most of the relevant period was $8 per hour.  *See* https://www.dir.ca.gov/iwc/MinimumWageHistory.htm (California minimum wage $8.00 per hour from 2008 to July 1, 2014, when it increased to $9.00 per hour.).  So if, for example, a plaintiff was actually paid $15.87 per hour (as was Michael Chavez, representative for the California class), but was paid only for productive time, he would have been compensated at or above the minimum wage if he spent 50.41% or more of his work time on productive activities in any particular hour.  Such a plaintiff could take up to 29.75 minutes per hour as an unpaid break and still earn minimum wage.  Further, "California courts recognize a presumption that employees are doing no work while clocked out, which employees have the burden to rebut."  *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 938 (N.D. Cal. 2016).

Other relevant differences exist among the various state laws.  Plaintiffs concede that in Arizona, wages are compensation due "for which the employee has a reasonable expectation to be paid[.]"  Cert. Motion at 24.  Determining Agents' expectations and whether they were reasonable requires individualized inquiries.  Unlike the other states, Minnesota has a regulation bearing on the relation of rest breaks to hours worked

(Minnesota Rule 5200.0120), which plaintiffs contend creates an independent right to wages for breaks under 20 minutes—though it does not.[13]  Plaintiffs cite no similar laws or regulations from the other relevant states.   Moreover, many periods of more than 20 minutes are at issue, so any purported right to payment for breaks under 20 minutes would not provide a right to recover for longer breaks, and would not simplify the need to individually analyze the purpose of each longer break.

Plaintiffs misleadingly attempt to downplay the differences among the state laws and argue that through the FLSA, "federal law sets a floor for defining and paying compensable work hours."  Cert. Motion at 20.  But this floor is not at issue for plaintiffs' straight-time claims because Agents' compensation always exceeded minimum-wage thresholds even if all claimed time were deemed compensable.  *See Roberts v. TJX Cos., Inc.*, 2015 WL 1064765, at *2 (M.D. Fla. Mar. 11, 2015) (compensable time above FLSA's floor can be recovered through state-law contract claim, not under FLSA); *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 51 (1st Cir. 2013) ("The FLSA, for its part, permits employers and employees to contract about certain terms and conditions of employment,

---

[13]   To the extent the Court relied on Minnesota Rule 5200.0120 in its Order regarding iQor's Motion for Judgment on the Pleadings, it did not find the Rule provides an independent right to recover wages but merely that it "provides additional support for plaintiff Shoots' claim under Minnesota law." Dkt. 142 at 34.  The Court's Order primarily relied on the offer letter as providing an independent right (when all facts are construed in favor of plaintiffs at the pleadings stage). *See id.* at 18.  Notably, plaintiffs themselves do not assert a substantive claim under Rule 5200.0120 but only under the Minnesota prompt pay statute, suggesting they too never understood Rule 5200.0120 as providing an independent right to payment.  iQor contends this regulation, deriving its authority from the MFLSA, applies only to minimum wage, as the first sentence of the Rule itself provides.

including the parties' definition of "work," as long as those contractual provisions remain

consistent with the FLSA's provisions and purposes.").

It is settled that "[t]he FLSA does not guarantee that employees are paid for every

hour of work and does not allow for employees to recover more than the statutory minimum

wage." *Avery v. Chariots For Hire*, 748 F. Supp. 2d 492, 501 (D. Md. 2010).  For example,

in *Anderson v. Sara Lee Corp.*, the plaintiffs alleged the employer failed to compensate

workers for donning/doffing as purportedly required under the FLSA, but pleaded claims

only under state law, including breach of contract.  508 F.3d 181, 183-84 (4th Cir. 2007).

The court found the plaintiffs erroneously relied "on the FLSA for their rights, [but] invoke

state law only as the source of remedies[.]"  *Id.* at 193.  Because "the FLSA provides

exclusive remedies for the enforcement of its own provisions," the plaintiffs' contract-

based claims were "precluded under a theory of obstacle preemption."  *Id.* at 194.  Here,

too, attempts to rely on FLSA's compensability provisions (which address minimum wage

and overtime, and in any event, say compensability depends on a benefit analysis) cannot

support a purported right to straight-time wages under state law.[14]

---

[14]   Plaintiffs' state-law overtime claims generally track the FLSA claims because these states define "compensable time" pursuant to the FLSA, and thus should not be certified for the reasons set forth in iQor's Decertification Motion.  *See, e.g.*, *Eads v. Axle Surgeons, Inc.*, 42 Ohio App. 3d 24, 27 (1987) (Ohio overtime claims must be determined pursuant to the FLSA because Ohio labor law follows the FLSA); *Ellis v. Commonwealth Worldwide Chauffuered Transp. of NY, LLC*, 2012 WL 1004848, at *6 (E.D.N.Y. Mar. 23, 2012) (applying the FLSA claim analysis to identical overtime claim under New York state law); 7 Colo. Code Regs. § 1103-1:4 (providing for the calculation of overtime "as provided in the Fair Labor Standards Act"); *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1129 (9th Cir. 2002) (California "state law expressly adopts the FLSA analysis" regarding overtime compensation).

## III.   EACH AGENT'S REASONABLE UNDERSTANDING OF HIS OR HER COMPENSATION ARRANGEMENT IMPLICATES INDIVIDUAL ISSUES PRECLUDING CERTIFICATION

### A.   Meeting of the Minds With Agents

Because the relevant state statutes fail to provide an independent right to a particular wage, plaintiffs rely on offer letters from iQor to establish that right.  Cert. Motion at 31. Plaintiffs contend these letters, which listed their compensation as "Salary/Wage: $[X] Per Hour," created contracts that prohibited iQor from excluding from their compensable work time any time spent during rest breaks.

Regardless whether viewed as a failure of commonality, typicality, predominance, or superiority—any one of which is fatal to Rule 23 certification—plaintiffs' proposed state classes based on this contract theory all suffer the same fundamental defect.  Resolution of each claim depends entirely on the particular facts and circumstances of that individual's situation and each state's differing common-law contract principles.  This is exactly the type of individualized inquiry for which class certification is inappropriate.

As a threshold matter, employees and employers are free to define the scope of compensated work within the minimum wage terms of the FLSA and state law.  *See Lappen v. Genuia Garment Int'l, Inc.*, 2005 WL 348360, at *4-5 (D. Minn. Feb 9, 2005) (employment contract "requires a meeting of the minds concerning its essential elements"); *Brown v. Lululemon Athletica, Inc.*, 2011 WL 741254, at *3 (N.D. Ill. Feb. 24, 2011) (dismissing contract-based wage claim where no evidence the employer agreed to compensate for activities at issue).  Thus, it would be perfectly appropriate for the parties to agree that Agents would be paid for particular tasks: answering and placing phone calls,

waiting for in-bound calls, performing computer work, attending meetings and trainings, and other related duties, while not paying for personal break time in excess of 10 minutes per 8-hour shift (more in some states).  Plaintiffs acknowledge this type of compensation arrangement is permissible.  *See* Cert. Motion at 23 ("Section 190(1) defines wages as 'the earnings of an employee for labor or services rendered, *regardless of whether the amount of earnings is determined on a time, piece, commission or other basis*'") (quoting N.Y. Lab. Law § 190(1)) (emphasis added); *id.* at 25 ("A wage is defined as 'compensation for labor or services rendered by an employee *whether determined on a time, task, piece, job, day, commission, or other basis* of calculation[.]'") (quoting N.C. Gen. Stat. § 95-25.2(16)) (emphasis added).

And that is exactly what happened with numerous Agents who agreed that they would be paid based on a productive hour (e.g. the tasks of answering the phone, waiting for a phone call, working on the computer, attending meetings, training, and computer/network downtime).  For example, even one of the hand-picked named plaintiffs, Jonathan Bell—whose testimony should presumably support the view advanced in plaintiffs' certification motion—instead agreed with iQor's understanding of his compensation arrangement.  Bell fully understood, expected, and agreed when he began work that his $15 hourly rate was to compensate for *productive* work time, and that he would *not* be compensated for break time.  Bell Dep. at 87:7-17;[15] *see also* Evenski Dep. at 40:9-24;[16] McCants Dep. at 56:2-5.  Because plaintiffs contend Bell is "typical" of the

---

[15]   Morgan Opp. Decl., Ex. 1.
[16]   *Id.*, Ex. 4.

class (Cert. Motion at 37), many if not all other Agents presumably shared his understanding of the compensation structure.

Further, despite testifying at deposition that he understood he would *not* be paid for breaks, Bell stated in an interrogatory response that iQor agreed to pay him "the hourly wage stated in [his] employment agreement and pay change documents, and agreed to pay [him] for all of hours worked [sic] as required and defined by law." Morgan Decert. Decl., Ex. E at 4-5. Unlike his deposition testimony, Bell is now claiming that he is entitled to paid breaks. This discrepancy highlights not only a credibility issue with Bell that a jury would have to resolve (which could not be extrapolated to any other Agent) but also why individual testimony will be so critical to a fair trial process here. Plaintiffs offered nearly a hundred cookie-cutter interrogatory responses that parroted Bell's response to this question, which suggests that under live examination, many of these Agents, like Bell, might concede they understood from the outset of their employment that they would be paid only for productive time.

Neither Bell nor any other Agent who understood these terms when he or she accepted employment can now seek payment for purportedly uncompensated break time. *See Beaston v. Scotland School for Veterans' Children*, 693 F. Supp. 234, 240 (M.D. Pa. 1988) (plaintiff house parents could not seek payment for sleeping time because when they began work, "each had a clear understanding that they would not be paid for sleeping," and "by the acceptance of and continuation of employment the plaintiffs impliedly agreed that sleep time was not work time"), *aff'd*, 869 F.2d 587 (3d Cir. 1989); *Gaby v. Omaha Home for Boys*, 1997 WL 406275, at *5-8 (D. Neb. May 9, 1997) (similar), *aff'd*, 140 F.3d 1184

(8th Cir. 1998).  So too for all the Agents who testified they understood from orientations or other training the categories of compensated and uncompensated work activities.

**B.     Even if an Agent Had a Different Understanding of "Per Hour,"**
**Individual Issues Predominate**

The offer letters provided a wage of a certain number of dollars "per hour."  *See, e.g.*, Schug Decl., Ex. 23 (Bell letter providing "**Salary/Wage**: $15 Per Hour").  From iQor's perspective, it meant iQor agreed to pay Agents that hourly rate for every hour Agents spent performing particular tasks.  This includes not only time spent on core activities, such as taking and making calls and computer work, but also time in meetings and trainings, and even time merely waiting to resolve technical issues or power outages. It is unclear precisely what plaintiffs contend "per hour" means.  They state they "have a contractual right to payment for <u>all</u> hours worked" (Cert. Motion at 31), but this begs the question of what constitutes "hours worked."  Plaintiffs contend "per hour" and "hours worked" include breaks, but the agreements themselves say nothing about iQor's policies for meal breaks or rest breaks.  Thus, "per hour" is an ambiguous term.  *See Lindberg v. Fasching*, 667 N.W.2d 481, 487 (Minn. Ct. App. 2003) ("A contract is ambiguous if it is reasonably susceptible of more than one meaning.").

Contrary to plaintiffs' allegation that iQor failed to explain its policies on compensable time and adjustment requests, which the Court credited at the conditional certification stage (Dkt. 142 at 5), the record shows ample evidence this ambiguity was clarified before Agents commenced substantive work or shortly thereafter, as Agents consistently testified they were informed at orientation, trainings, or otherwise understood

which activities would be compensable.  *See, e.g.*, Evenski Dep. at 29:7-14 (paid versus unpaid time was common sense);[17] Bell Dep. at 31:19-32:1, 43:12-44:22 (paid activities were explained at orientation); McCants Dep. at 14:14-19, 22:21-24:25 (understood would be paid for working idle time); Ada Decl. ¶ 4; Agyarey Decl. ¶ 4; Brevard Decl. ¶ 4; Espinoza Decl. ¶ 5; Guillen Decl. ¶ 4; Jones Decl. ¶ 4; McDaniel Decl. ¶ 6; Morris Decl. ¶ 4; Rockwell Decl. ¶ 4; Rojas Decl. ¶ 4; Sanchez Decl. ¶ 4; Sewards Decl. ¶ 4; White Decl. ¶¶ 3-4.

Despite this fact record, some Agents might contend they understood they would be paid for additional time, although there is little record evidence an appreciable number of Agents held this view.  For purposes of this motion, the dispositive issue is that such disputes turn on the reasonable understanding of individual Agents and the evidence supporting or refuting that understanding, which is inherently individualized.

Because the terms of an agreement are based on the parties' mutual understanding, to the extent plaintiffs contend their understanding differed from iQor's, how to interpret "per hour" will necessarily depend on testimony from each employee as to what they understood it to mean when they signed the contract, as well as any other pertinent extrinsic evidence, including what was communicated at orientation and training sessions, what they were told by particular managers, and understandings gleaned from co-workers.  The laws of all eight states permit extrinsic or "parol" evidence to resolve ambiguity in a contract.[18]

---

[17]   Morgan Opp. Decl., Ex. 4.
[18]   *See Lindberg*, 667 N.W.2d at 487 (under Minnesota law, "[w]here a contract is ambiguous, the interpretation of the contract is a question of fact, and extrinsic evidence may be considered");

In other words, whether each putative class member and iQor formed a meeting of the minds as to the circumstances under which break time would be considered compensable cannot be determined on an aggregate basis using common evidence.

### C.   Varied Evidence Regarding Course of Performance Changes At-Will Agreement and Reveals a Lack of Commonality

Further, even if plaintiffs could establish their offer letters suggested an agreement to be paid for break time at the outset, further inquiry would be necessary as to whether that understanding was affected by the parties' course of performance.  Plaintiffs were at-will employees.  *See, e.g.*, Schug Decl., Ex. 23 (Bell letter stating that it "does not constitute an agreement for employment for any specific period of time"); Argiropoulos Decl., Ex. 3 at ¶ 11 (associate acknowledgement during online onboarding process that "[y]ou are

---

*ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 942 (Ariz. Ct. App. 2010) (under Arizona law, "[i]f the contract language is reasonably susceptible to more than one meaning, extrinsic evidence may be admitted to interpret the contract."); *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 114 (2007) (under California law, "[a] court determining whether a contract is ambiguous must first consider extrinsic evidence offered to prove the parties' mutual intention.  If the court determines that the contract is reasonably susceptible of an interpretation supported by extrinsic evidence, the court must admit that evidence for purposes of interpreting the contract."); *Centennial-Aspen II Ltd. P'ship v. City of Aspen*, 852 F. Supp. 1486, 1493 (D. Colo. 1994) (under Colorado law, "[t]he parol evidence rule serves only to exclude evidence of prior or contemporaneous agreements designed to alter the terms of an unambiguous, completely integrated contract"); *Fernandez v. Price*, 53 A.D.3d 672, 675 (2009) (under New York law, when contract language is ambiguous, "extrinsic or parol evidence may then be permitted to determine the parties' intent"); *Mut. Cmty. Sav. Bank, S.S.B. v. Boyd*, 125 N.C. App. 118, 121 (1997) (under North Carolina law, "if the terms of an agreement are equivocal or susceptible of explanation by extrinsic evidence that evidence is admissible to explain the terms of the agreement") (quotations and citations omitted); *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 41 N.E.3d 145, 153 (Ohio Ct. App. 2015) (under Ohio law, "[i]f an ambiguity exists in a contract, then it is proper for a court to consider extrinsic evidence") (quotations and citations omitted); *Progressive Max Ins. Co. v. Floating Caps, Inc.*, 405 S.C. 35, 47 (2013) (under South Carolina law, "[w]hen a written contract is ambiguous, parol and extrinsic evidence may be admitted regarding the parties' intent").

employed as an employee at will, and employment is not for any definite period").  In each relevant state, an employer may unilaterally adjust an at-will employee's compensation and other employment terms at any time.  *See, e.g.*, *Beatty v. N. Cent. Cos.*, 170 F. Supp. 2d 868, 876 (D. Minn. 2001) ("In Minnesota, the compensation of an at-will employee may be adjusted by the employer at any time during employment without the employee's consent"), *aff'd*, 282 F.3d 602 (8th Cir. 2002); *Singh v. Southland Stone, U.S.A., Inc.*, 186 Cal. App. 4th 338, 356 (2010) ("An employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions.") (quotations and citations omitted).[19]  Until the break policy was changed in 2015, Agents continued to work with full knowledge iQor would only pay for five-minute rest breaks every four hours (more in some states) and accepted payroll checks that reflected that policy.  The TimeQey system was "pretty self-

---

[19]  *See also Nichols v. Waterfield Fin. Corp.*, 577 N.E.2d 422, 423 (Ohio Ct. App. 1989) (employer could prospectively change terms and conditions of at-will employment contract, without additional consideration); *Alston v. City of Camden,* 471 S.E.2d 174, 179 (S.C. 1996) (terms of employment "are subject to unilateral modification at any time, provided the employees receive actual notice of the modifications"); *Arndt v. First Union Nat'l Bank,* 613 S.E.2d 274, 280 (N.C. Ct. App. 2005) ("If the employer modifies the terms of an [employee] at will; and, the employee knows of the change, the employee is deemed to have *acquiesced* to the modified terms, if he continues the employment relationship."); *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1384 (Colo. App. 1986) ("A contract for employment terminable at the will of either party may be supplanted by new terms of employment accepted by acquiescence."); *JCS Controls, Inc. v. Stacey*, 57 A.D.3d 1372, 1373 (2008) ("The employer of an at-will employee is entitled to change the terms of the employment agreement only prospectively, subject to [the employee's] right to leave the employment if the new terms [are] unacceptable.") (quotations and citation omitted); *Demasse v. ITT Corp.*, 984 P.2d 1138, 1142-43 (Ariz. 1999) (en banc) (explaining that in an at-will relationship, "before performance is rendered, the offer can be modified by the employer's unilateral withdrawal of the old offer and substitution of a new one: the employer makes a new offer with different terms and the employee again accepts the new offer by performance (such as continued employment)").

explanatory" because the computer would show "the red X when you're not getting paid and the green checkmark when you were getting paid."  Blomquist Dep. at 14:19-15:5.[20] Thus, iQor's payment policy was obvious to Agents.  Agents had the right to leave at any time—that they stayed evidences mutual intent to exclude payment for personal breaks.

Thus, even if plaintiffs could show they were entitled to be paid for breaks initially, if they became aware their employment conditions differed and chose to remain employed, this would evidence acceptance of a change in their compensation terms.  This inquiry must be undertaken on an employee-by-employee basis.  Moreover, the fact that some Agents already worked for iQor when it transitioned to TimeQey, while other Agents were hired via the offer letters, creates two sets of employees who might have formed different understandings about the work that iQor would pay for based on different facts, and therefore are not similarly situated.  *See* Blomquist Dep. at 25:1-13 (compensable work explained at TimeQey implementation meeting); Mejia Dep.[21] at 22:9-27:4 (same); Williams Dep.[22] at 15:14-16:21 (same); Dorsey Dep.[23] at 34:9-35:17 (cannot remember specific training but understood what she was paid for); Mills Decl. ¶ 5 (trained on idle time when TimeQey implemented).

Courts have recognized that where contract ambiguities require extrinsic evidence, individual inquiries render class certification inappropriate.  For example, in *Avritt v. Reliastar Life Insurance Co.*, the Eighth Circuit held the district court properly denied

---

[20]   Morgan Opp. Decl., Ex. 2.
[21]   *Id.*, Ex. 5.
[22]   *Id.*, Ex. 6.
[23]   *Id.*, Ex. 3.

certification, finding "the existence of two or more reasonable interpretations opens the door for extrinsic evidence about what each party intended when it entered the contract. . . . Thus, [defendant's] liability to the entire class for breach of contract cannot be established with common evidence."  615 F.3d 1023, 1030 (8th Cir. 2010); *see Parkhill v. Minnesota Mut. Life Ins. Co.*, 188 F.R.D. 332, 342-43 (D. Minn. 1999) (denying certification where "the breach of contract claim of plaintiff and all other class members rests on a parol contract and extra-contractual promises" and "if certification were granted the court would have to conduct thousands of individual inquiries"), *aff'd*, 286 F.3d 1051 (8th Cir. 2002); *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274, 282 (W.D. Mo. 2000) (denying certification where "plaintiff's claim and those of the proposed class members could probably only be resolved by considering varying types of extrinsic evidence" because "[b]y allowing extrinsic evidence of the parties' dealings, the breach of contract claims become individualized and not reasonably susceptible to class action treatment.").[24]

## IV.   CRITICAL FACTUAL DISTINCTIONS CONCERNING THE CIRCUMSTANCES OF ANY UNPAID TIME SHOW A LACK OF COMMONALITY

### A.   No Common Policy Will Be Determinative

Liability for unpaid straight time or overtime requires proof that plaintiffs performed work for which they were not compensated and iQor management knew or should have

---

[24]   *See also Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1183 (11th Cir. 2010) (certification was abuse of discretion where "the trial court would be required to evaluate significant quantities of individualized extrinsic evidence associated with" defenses to contract claims); *Pastor v. State Farm Mut. Auto Ins. Co.*, 2005 WL 2453900, at *3, 7 (N.D. Ill. Sep. 30, 2005) (denying certification where meaning of "usable" in a contract was "not objectively ascertainable" and the court would therefore "need to perform individualized inquiries to determine whether a class member is entitled to payment"), *aff'd*, 487 F.3d 1042 (7th Cir. 2007).

known they were working without pay. *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975) (An employee must be compensated for duties "before and after scheduled hours . . . if the employer knows or has reason to believe the employee is continuing to work and the duties are an integral and indispensable part of the employee's principal work activity.") (internal quotation marks and citation omitted); *Lopez v. Tyson Foods*, 690 F.3d 869, 874 (8th Cir. 2012); *Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 781 (8th Cir. 2009) (employer can be liable only if it knew or "should have known," not if it *could* have known); *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997).

Here, iQor's policies are facially lawful.  iQor mandates payment for all hours worked and requires Agents to record accurately all hours worked.  Employee-initiated adjustment systems have long been recognized as lawful, and employers may require reasonable cooperation in recording hours worked.  *See, e.g.*, *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (employees reasonably expected to record time worked during meal periods in an "exception log"); *Hertz*, 566 F.3d at 779, 782 (police officers reasonably required to submit overtime slip to be paid for additional time); *Saleen v. Waste Mgmt., Inc.*, 2009 WL 1664451, at *5 (D. Minn. June 15, 2009) (employees reasonably required to apply to reverse the employer's automatic meal period deduction to get paid for lunch breaks not taken); *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1230-31 (10th Cir. 2012).

Critically, courts cannot simply presume that all activities falling between clock punches constitute compensable work. For instance, in *Babineau v. Fed. Express*, 576 F.3d 1183, 1192 (11th Cir. 2009), hourly employees sued Federal Express for off-the-clock

work.  They argued they were entitled to compensation for off-the-clock work measured

by the difference between their manual time punches and paid time, which was based on

scheduled shift times and confirmed through positive time reporting.  In opposing

certification, Federal Express submitted substantial evidence of "non-work related

activities that took place during the gap periods and the various personal reasons" why

employees arrived early and stayed late.  Based on evidence that "employees punched in

at different times and for different reasons" and that non-work activities occurred during

"gap periods," the trial court denied certification and the Eleventh Circuit affirmed, finding

individualized issues predominated.  *Id.* at 1188, 1192; *see also Powell v. Corinthian

Colleges*, 2012 WL 2725121, at *1-2 (N. D. Ill. 2012).

### B. <u>Disparate Factual Issues Will Dominate Liability Determinations</u>

Independent of the inability to establish on a class basis an underlying agreement

upon which prompt payment claims might be based, individual issues concerning alleged

failures to pay compensable time also predominate and render class certification

inappropriate because of the outcome-determinative factual differences among plaintiffs.

Those arguments and record citations are detailed in iQor's Decertification Motion and

will not be repeated in full, but apply equally whether considering the FLSA claim at issue

in that motion or the state-law theories here.  Plaintiffs cannot continue to press the fiction

that iQor maintained a blanket policy prohibiting payment for working idle time when

iQor's express written policies required payment for *all* time worked—including the

specific types of idle activities on which they base their claims—and when the record

shows Agents were routinely paid for such work.  Like the FLSA claims, liability

determinations under state law would require individualized inquiries that include the following issues:

- The reasons "a particular manager on a particular day reject[ed] a specific manual adjustment."  Bell Dep. at 96:2-7; *see also* Evenski Dep. at 89:22-90:13 (to determine why a particular adjustment request was rejected, you would have to ask the particular manager on a day-by-day, request-by-request basis); Gonzalez Dep. at 77:21-25 (determining why a specific request was rejected would necessitate focusing on a specific request on a specific date).  As the record showed, these determinations varied by manager; varied based on the particular Agent making the request; were scrutinized differently based on the length of the break; and varied by the level and nature of the support provided for the request.  Decert. Motion at 12-14.

- Whether an Agent failed to request an adjustment for compensable work time and why (whether it be an outright failure to seek payment; confusion over what activities were compensable; subjective feelings that a particular manager might not approve the request, etc.).  *Id.* at 9-10.  *See Saleen*, 2009 WL 1664451, at *8-9 (class action not proper mechanism to resolve claims regarding employer's automatic deducting for breaks because it would require individualized inquiry as to why employee did not use override mechanism in place).

- Whether iQor managers were aware of and "suffered or permitted" particular instances of improperly uncompensated work.  Decert. Motion at 32-33.

- The nature and purpose of any break.[25]  *Id.* at 16-23.

- As to the overtime claims under the laws of five states (California, Colorado, New York, North Carolina, and Ohio), whether any payment improperly denied according to the above factors actually resulted in a particular employee being placed into an overtime situation in the particular pay period in which the uncompensated periods occurred.  *Id.* at 28-29.

- Credibility determinations concerning the testimony of individual Agents, which have been put directly at issue via contradictory discovery responses and conclusory declarations.  *Id.* at 29-31.

- Differing timekeeping practices by individual Agents that also varied over time.  *Id.* at 25-26.

---

[25]  Four of the eight states—Arizona, North Carolina, Ohio, and South Carolina—do not require breaks.  *See* Arizona State Senate Issue Brief, "Labor Employment Laws" at 5 ("State labor laws do not regulate employee breaks, lunch periods or the number of hours that may be worked, leaving these to the employer's discretion," with some exceptions for minors.) (Aug. 12, 2016), *available at* http://www.azleg.gov/Briefs/Senate/LABOR%20EMPLOYMENT%20LAWS.pdf;  North Carolina Department of Labor, "Breaks—What to Know" ("The North Carolina Wage and Hour Act (WHA) does not require mandatory rest breaks or meal breaks for employees 16 years of age or older."), *available at* http://www.nclabor.com/wh/fact%20sheets/breaks.htm; Nolo, "Ohio Meal and Rest Break Laws" ("In Ohio, no law gives employees the right to time off to eat lunch (or another meal) or the right to take short breaks during the work day."), *available at* http://www.nolo.com/legal-encyclopedia/ohio-meal-rest-break-laws.html;  South  Carolina Department of Labor, Licensing and Regulation, "Frequently Asked Questions" ("There is no requirement under South Carolina law for an employer to provide employees with breaks or a lunch period."), *available at* http://www.llr.state.sc.us/Labor/index.asp?file=wages/faq.htm.  New York requires meal breaks under certain circumstances, but not other rest breaks.  N.Y. Lab. Law § 162 (time allowed for meals); New York State Department of Labor, "Meal and Rest Periods Frequently Asked Questions" ("[T]he Labor Law does not require that employers provide rest periods of short duration[.]"), *available at* https://www.labor.ny.gov/legal/counsel/pdf/meal-and-rest-periods-frequently-asked-questions.pdf.

- Differing workplace environments based on locations, supervisors, project and team assignments, and a host of other factors. *Id.* at 23-24. TimeQey did not operate the same way for all Agents; for many, computer or phone inactivity did not affect their paid status. *Supra* at 7-8.

As demonstrated in the FLSA motion, these myriad individual issues more than suffice to justify decertification of plaintiffs' federal FLSA class; when combined with the threshold contractual-interpretation and course-of-performance issues implicated by plaintiffs' state-law claims, the inquiries required to fairly resolve plaintiffs' claims become exponentially more intractable.[26]   Particularly when assessed under Rule 23(b)(3)'s standard for group treatment, which is more stringent than the FLSA, these claims cannot support certification. *See, e.g.*, *Espenscheid v. DirectSat USA*, 705 F.3d 770, 774 (7th Cir. 2013) (class or collective treatment precluded in part due to the inability to distinguish between plaintiffs who underreported their hours due to company directive versus plaintiffs who underreported their time for personal reasons such as a desire to be

---

[26] Plaintiffs also contend iQor's alleged willfulness can be proven on a class basis, citing a handful of complaints.  To the extent plaintiffs contend Agent complaints put iQor on notice of possible issues, such concerns differed in nature and were raised over time (such as the email opening their brief, which came three years after TimeQey was launched).  Thus iQor's awareness (*i.e.* the scienter required for willfulness) would vary over time.  Similarly, the Minnesota DOL's failure to impose repayment obligations after investigating iQor's break policies in 2013 would represent a point at which a factfinder could conclude iQor had reasonable basis to believe its system was compliant, negating willfulness.  Where facts bearing on scienter evolve over the relevant period, willfulness cannot be litigated classwide. *See, e.g.*, *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 205, 208 (D. Minn. 2003) (certification improper because claim turned on what defendant knew when a defective drug was prescribed, but "[a]s the class members were prescribed Baycol at different times, the issue of Defendants' knowledge will differ from case to case"); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 695 (Tex. 2002) (denying certification because the underlying statute "requires proof that the defendant acted knowingly or intentionally at the time, which appears to raise individual circumstances").

viewed as efficient, get a promotion, or retain employment); *Saleen*, 2009 WL 1664451, at *5 (denying FLSA conditional certification where varying reasons supplied by employees for their failure to report extra time worked undercut allegations of single unlawful policy, decision, or plan).

Plaintiffs' citation to *Cruz v. TMI Hospitality, Inc.*, 2015 WL 6671334 (D. Minn. Oct. 30, 2015) (Nelson, J.) in support of certification (Cert. Motion at 36-37), serves only to highlight the critical record differences here.  There, the court found that plaintiffs satisfied the commonality and predominance elements (under a single state's law) because "all of the [67] proposed class members held the same job (housekeepers), worked at the same location (the Fairfield in Bloomington), and were supervised by the same person (Ms. Ochoa)."  *Id.* at *5, 8.  Here, in contrast, the more than 15,000 putative class members had different job duties (some provided floor support rather than phone work, some placed debt collection calls and some answered pizza orders), worked at many different locations across eight states, and were supervised by hundreds of different managers.  Further, some of them recorded their work in TimeQey manually rather than automatically, and so did not even experience the "idle time" about which plaintiffs complain.  Most significantly, there was no dispute in *Cruz* about whether the particular activities (during a particular break, for each different employee) were in fact properly compensable.  Here, such disputes stand at the core of plaintiffs' claims and serve to intractably compound the multiple additional necessary fact determinations not implicated in *Cruz*, which dooms certification.

## V.   PLAINTIFFS FAIL IN THEIR VARIOUS "SHORTCUT" EFFORTS TO MINIMIZE INDIVIDUAL ISSUES

### A.   The Continuous Workday Rule Does Not Support Plaintiffs' Claims

Plaintiffs invoke the continuous workday doctrine, but it does not apply on the facts here, even with respect to plaintiffs' FLSA claims.[27]   The "continuous workday rule" developed in the context of the Portal-to-Portal Act, which is irrelevant here.   The Portal-to-Portal Act was passed to *exclude* certain activities that might otherwise be found compensable under the FLSA.   *See Lopez*, 690 F.3d at 874.   Specifically, the Act provides that time spent "walking, riding, or traveling to and from" work and on activities which are "preliminary to or postliminary to" one's principal work activity is *not* compensable time, even if it could otherwise be interpreted to constitute "hours worked" for purposes of compensability under the FLSA.   *Id.*   The continuous workday rule does not change what time is compensable under the FLSA.   It simply provides that "[d]uring the continuous workday, the compensability of all activities *that otherwise satisfy* the requirements of the FLSA is not affected by the Portal-to-Portal Act's exceptions."   *Id.* (emphasis added).[28]   Contrary to plaintiffs' assertions, the rule does *not* require that all time (except for *bona fide* meal periods) be compensated simply because it falls in between the start and end of the workday, irrespective how that time is actually spent.

---

[27]   Even if the continuous workday rule were relevant to plaintiffs' FLSA claims, plaintiffs offer no support for their apparent assumption that the rule would have any bearing on the *state-law* claims now at issue, and indeed this assumption is wrong.   *See supra* Section II.

[28]   In other words, the Portal-to-Portal Act provides that, for the typical employee who drives to and from work at the beginning and end of the workday, that time spent driving is not compensable. The continuous workday rule provides, however, that driving time may be compensable (subject to any other restrictions and limitations on compensable time under the FLSA) if the employee, for example, drives from site to site throughout the workday.

Because the Portal-to-Portal Act is not at issue here, plaintiffs' arguments in favor of application of the continuous workday doctrine amount only to a request that the FLSA be applied as it would have been anyway, namely with respect to the determination of what constitutes "hours worked." *Lopez* also provides guidance as to this key question, upholding jury instructions stating that, "under the FLSA, the phrase 'hours worked' includes all time spent by an employee that was primarily for the benefit of the employer or the employer's business." *Id.* at 878-79. Plaintiffs ignore this meaning of "hours worked" under the FLSA and instead seek to rely on an improper bright-line rule that all breaks under 20 minutes are necessarily compensable under the FLSA and under each state law at issue.

Plaintiffs purport to be reflecting a statement in dicta by this Court in its Order on iQor's Motion for Judgment as a Matter of Law (Dkt. 142). But even were this Court's dicta on a substantive issue that had not been briefed in fact binding, it does not support plaintiffs' generalization with respect to all eight state classes. The Order noted only that "rest breaks of under 20 minutes must be counted as hours worked under the ***FLSA*** regulations"[29] and under ***Minnesota state law*** (Dkt. 142 at 27, 33-34) (emphasis added), but made no such finding with respect to any of the remaining states' laws.[30] Nonetheless,

---

[29] As discussed in the Decert. Motion, the FLSA regulations are merely a "practical guide" and the proper test is whether the break was "predominantly for the employer's or employee's benefit." Decert. Motion at 16-19.

[30] Even with respect to Minnesota law, the Court merely found that Minnesota Rule 5200.0120 provides additional support for plaintiffs' claim under Minnesota law, not that it provides a substantive right to recover unpaid wages. *See supra*, n.13.

plaintiffs misleadingly suggest "[t]his Court has already recognized that employees must be paid for breaks lasting 20 minutes or less." Cert. Motion at 34.

Plaintiffs rely on this overgeneralization (and outright misstatement, in some cases) of the law concerning short rest periods to brush past the meaningful differences among class members in the nature and purpose of any break periods, which would affect their compensability under state law. The record shows Agents had flexibility and control over the timing, frequency, and duration—including whether Agents took them at all. *See* Evenski Dep. at 62:11-20 (had ability to take breaks "whenever you wanted to," and observed other employees doing so); *id.* at 76:25-77:11 ("the fact that you could go out on a break whenever you wanted to and engage in personal activities" was "a good thing"); Dorsey Dep. at 32:2-23 (took additional breaks outside the scheduled breaks). Many Agents admit being fully relieved from work duties during breaks. *See, e.g.*, Blomquist Dep. at 75:16-22 (no work during meal and rest breaks); Muwwakkil Dep. at 67:20-68:16 (relieved from work duties during meal and other breaks); Bell Dep. at 73:5-10 (break time had "nothing to do with" work); Evenski Dep. at 57:19-24 (during meal periods, was free from work); Ward Dep. at 65:7-9 (during meal periods, not required to perform iQor work); Gonzalez Dep. at 60:16-21 (during meal breaks, free to do what she wanted). During breaks, Agents frequently went outside to smoke, to a nearby store, caught up on Facebook or other social media, surfed the Internet, made personal calls, and visited with co-workers. *See, e.g.*, Williams Dep. at 46:14-47:21 (would "run up to the store"; never worked during breaks; other Agents did the same); Blomquist Dep. at 76:23-77:8 (break activities included getting snacks, smoking, playing with cell phone, making calls); Evenski Dep. at 70:14-

71:22 (break activities included going outside, talking to co-workers, or looking at cell phone); Gonzalez Dep. at 60:22-61:11, 63:2-8 (would eat, converse with friends, make personal calls); Rose Dep. at 50:16-22, 51:16-21 (would go to Walgreens or bank across the street).[31]

This fact record could support findings that any particular break by any particular employee would not necessarily be compensable under the different standards applicable in each of the eight state groups at issue. *See, e.g.*, *Petty v. Wal-Mart Stores, Inc.*, 148 Ohio App. 3d 348, 356–57 (2002) (holding that individual questions predominated in claim under Ohio law where there were "issues regarding whether each of the managers in the more than one hundred Ohio stores knew that their employees were working off the clock, and whether they knowingly permitted them to do so"); *Harrison v. Wal-Mart Stores, Inc.*, 170 N.C. App. 545, 553 (2005) ("Similar to the breach of contract claims discussed above, the Wage and Hour Act claims would require individual determinations, including which putative class members were subject to the alleged violations and why those putative class members who worked off-the-clock did so, *i.e.,* whether they, for example, missed breaks

---

[31] *See also* Reeves Decl. ¶ 6 ("I was free to do what I wanted which was usually use my phone to talk or text with my mother and daughter."); Sewards Decl. ¶ 5 (was "free to do what [she] wanted" and "could leave the building," including to "do a quick errand"); White Decl. ¶ 5 (on her breaks, she would "mak[e] personal calls to friends or family, do personal business such as check [her] banking accounts, go outside to [her] car, socialize with co-workers in the break room and every so often do a quick errand"); Sanchez Decl. ¶ 5 (she might "go to a convenience store, the CircleK, across the street to get coffee"); Brevard Decl. ¶ 5 (breaks could include "going to the convenience store across the street"); Ada Decl. ¶ 5 ("I was free to do what I wanted, which was usually smoke in a designated area outside the building, occasionally go to a convenience store, the CircleK, across the street, from time to time pick up ordered food or take or make a personal call."); Agyarey Decl. ¶ 5; Bromley Decl. ¶ 5 (May 25, 2017); Guillen Decl. ¶ 5; Erwin Decl. ¶ 5; Jones Decl. ¶ 5; Kravik Decl. ¶ 6; McDaniel Decl. ¶ 10; Rockwell ¶ 5; Rojas Decl. ¶ 5; Worthy Decl. ¶ 16.

in order to leave work early."); *Alix v. Wal-Mart Stores, Inc.*, 16 Misc. 3d 844, 855, 858 (N.Y. Sup. Ct. 2007) (holding that, where "the facts and circumstances surrounding the allegedly unpaid work vary substantially from associate to associate," "[t]he necessity for such particularized consideration of liability and damages precludes a finding of predominance of common questions of law or fact"), *aff'd,* 57 A.D.3d 1044 (N.Y. App. Div. 2008); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 611 (N.D. Cal. 2010) (denying certification under California law when liability would require "fact-intensive inquiries into how individual [employees] performed their job"); *Hubbs v. Big Lots Stores, Inc.*, 2017 WL 2304754, at *11 (C.D. Cal. May 23, 2017) (denying certification under California state law on the grounds that common questions regarding exemption status did not predominate, and stating that "[a]n employer is not liable for denying rest breaks unless it is shown that rest breaks were actually missed by particular employees and that they did not elect to forgo them").

## B.   iQor's Recordkeeping Practices Were Appropriate and Do Not Advance Plaintiffs' Certification Bid

Plaintiffs' effort to eliminate class-defeating issues by pointing to purported deficiencies in iQor's records is also misplaced.  Initially, no private right of action exists for violations of the FLSA's recordkeeping requirements.  *See, e.g.*, *Letrich v. Arizona Wholesale Cleaners LLC*, 2015 WL 12669892, at *2-3 (D. Ariz. Aug. 13, 2015) (collecting cases holding that the FLSA does not authorize employee suits for recordkeeping violations under § 211(c)).  iQor's recordkeeping practices are therefore relevant only to plaintiffs' burden of proof at the damages phase.  *See McGlone v. Contract Callers, Inc.*, 49 F. Supp.

3d 364, 370-71 (S.D.N.Y. 2014) (if employer keeps inaccurate records, plaintiff need only offer a reasonable estimate of damages and then burden shifts to employer to negate reasonableness, but plaintiff must first prove he performed work for which he was improperly compensated); *Le v. Regency Corp.*, 957 F. Supp. 2d 1079, 1090–91 (D. Minn. 2013) (rejecting plaintiffs' efforts "to take their substantive claim that they were not paid overtime, and bootstrap a record-keeping violation into their Complaint."). By arguing that iQor failed to satisfy its recordkeeping duties because it did not track the disputed time (which iQor did not pay), plaintiffs seek to mask their flawed wage claims with allegations that, even if true, would give rise only to a claim *by the government*. This practice is exactly what the *Regency Corp.* court has already rejected.

Moreover, plaintiffs are incorrect in the first instance that defendant's recordkeeping practices were insufficient. *See, e.g., Scott v. City of New York*, 592 F. Supp. 2d 501, 506–07 (S.D.N.Y. 2008) (defendants were not required under § 211(c) to retain records of denials of requests to use compensatory time). Like the defendants in *Regency Corp.* and *Scott*, iQor retains comprehensive records of "wages" and "hours" for the required period, and was not obligated to track time it did *not* pay for (though it did with respect to break time). *Scott*, 592 F. Supp. 2d at 507 ("Nevertheless, DoL regulations do not require that an employer maintain written requests to use compensatory time. Therefore, records concerning requests for use and denials of use are not subject to the FLSA's recordkeeping requirements."). iQor also kept manual adjustment requests and any comments Agents added in them. Argiropoulos Decl. ¶ 6. Such records will need to be examined as to each

allegedly unpaid break to determine the purpose of the time, creating a plethora of individual issues.

Plaintiffs also misinterpret case law concerning delegation of recordkeeping duties, by claiming, for example, that iQor's manual adjustment system was somehow inappropriate.  Cert. Motion at 32.  However, no case plaintiffs cite stands for the proposition that a defendant's records are deficient merely because an employee was responsible for self-reporting some time, and numerous courts in this Circuit and elsewhere have upheld timekeeping protocols that require employees to affirmatively report some or all of their time.  *See, e.g.*, *Lindsay v. Clear Wireless LLC*, 2016 WL 916365, at *2–3 (D. Minn. Mar. 10, 2016) (granting motion to decertify in part because "plaintiffs identif[ied] various reasons for not reporting alleged off-the-clock overtime work"); *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) (refusing to impose a duty to investigate whether time cards were accurate where employees had been instructed not to work unauthorized overtime hours and to take "flex time" for unscheduled hours); *Blevins v. City of Plainview*, 2013 WL 12136539, at *10 (E.D. Ark. Sept. 16, 2013) (denying plaintiffs' motion for partial summary judgment because there was an issue of fact whether employer's records were inaccurate even though "the record indicate[d] that [plaintiff himself] recorded his own time"); *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 322–23 (E.D.N.Y. 2014) (in decertifying conditionally certified FLSA collective, noting that "the FLSA does not prescribe any particular form of recordkeeping" and "there is no specific prohibition against requiring an employee to report having worked in order to receive pay for time worked"); *White*, 699 F.3d at 876

(citation omitted) (when an employer sets up a "reasonable process for an employee to report uncompensated time," it "is not liable for non-payment if the employee fails to follow the established process"); *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 30, 37 (W.D.N.Y. 2014) (granting defendants' motions for summary judgment and to decertify in part because "[plaintiff] did not clock in prior to [occasionally assisting with a crisis prior to the official start of her workday], and did not record her additional time, although she knew her department had an exception log for that purpose"); *Forrester v. Roth's IGA Foodliner, Inc.*, 475 F. Supp. 630, 631 (D. Or. 1979) (refusing to impose a duty to inquire into the accuracy of employees' reported hours), *aff'd*, 646 F.2d 413 (9th Cir. 1981).

Plaintiffs' invocation of *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) is particularly instructive.  In *Tyson*, the Court allowed the plaintiffs to use representative evidence to establish the amount of time required to don and doff protective gear, an activity that was not captured in the time system, holding that the permissibility of representative evidence turns on "the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action."  *Id.* at 1042, 1046-47.  *Tyson* is distinguishable in three key respects.  First, in contrast with *Tyson*, where the time at issue was never recorded in the time system at all, here nearly all time in dispute *was* captured by the system and appears as a "break."  Second, in *Tyson* there was no dispute over what activity the employees were engaged in during the relevant time (donning and doffing); here, by contrast, the critical and diverse factual question is whether each Agent was actually performing otherwise compensable work during each such period or was taking a break primarily for their own benefit, which cannot be determined by representative

evidence.  Donning and doffing the protective gear in *Tyson* was a necessary daily routine for the plaintiffs and was likely to take approximately the same amount of time every day, while the breaks at issue here were highly variable in duration and taken for many different purposes.  Third, in *Tyson* the plaintiff's expert had actually observed plaintiffs during the uncaptured time period and could reasonably testify as to what employees were doing.  *Id.* at 1043.  Here, there is no such evidence.

Where, as here, a plaintiff attempts to use representative evidence "as a means to overcome the absence of a common policy" and the key features that justified *Tyson* were not present, courts within this Circuit have deemed certification improper and rejected use of representative evidence.  *Davenport v. Charter Comms., LLC*, 2017 WL 878029, at *8-9 (E.D. Mo. Mar. 6, 2017) (distinguishing *Tyson* and granting motion to decertify FLSA collective where each plaintiff could succeed on his claim "by testifying regarding his or her own training and supervision, and the manner in which he or she clocked in and loaded and closed tools over various periods of time" because there was "little role for representative evidence"); *Arnold v. DirecTV, LLC*, 2017 WL 1251033, at *2, 4-7, 10 (E.D. Mo. Mar. 31, 2017) (distinguishing *Tyson* and decertifying FLSA overtime class because the "purported unlawful policy impacts Plaintiffs in different and individual ways").

## VI.  **PLAINTIFFS' CLAIMS ARE NOT TYPICAL BECAUSE THEY WILL NOT NECESSARILY RESOLVE THE CLAIMS OF ANY OTHER CLASS MEMBER**

Like the requirement that common issue predominate, the "typicality" prong of Rule 23 ensures it is fair to bind absent class members to the determination made as to the named plaintiffs.  This does not simply mean that the named plaintiff alleges the same *type* of

claim as absent class members, but rather that the *factual* basis for his claim is sufficiently typical. *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 381 (E.D. Mo. 2014) (named plaintiff not typical where his testimony about the challenged policy differed from that of other employees).

Here, the factual basis to resolve each claim will vary from Agent to Agent. The testimony of Jonathan Bell, the only current named plaintiff to be deposed, illustrates why there is no "typical" plaintiff in this dispute. On the issue of his compensation arrangement, Bell testified that he agreed he would be paid only for productive work time and would not be compensated for breaks. Bell Dep. at 87:7-17.[32] If Bell's understanding is truly typical, then the class has no claims; if other Agents differently understood their agreements with iQor, then  Bell cannot stand as a fair proxy. Similarly, as to whether Agents were appropriately paid for time initially recorded in the system as idle, Bell testified that this issue would turn on the reasons "a particular manager on a particular day reject[ed] a specific manual adjustment" (Bell Dep. at 96:2-7), thus conceding there was no common course of conduct that would permit one Agent's experience to stand for all.[33]  *14051 Manchester*, 301 F.R.D. at 381 (plaintiff not typical where he could not speak to the experience of any other purported class member concerning their working conditions). The lack of a common determinative policy, or of shared liability facts as to individual instances of unpaid breaks (detailed more comprehensively in the Decertification Motion), preclude

---

[32]   Morgan Opp. Decl., Ex. 1.
[33]   Plaintiffs concede there is no policy to deny such payments; rather such decisions vary by manager and depend on the exercise of managerial discretion. *See* Third Amended Complaint (Dkt. 294), ¶ 50.

any single Agent from being "typical" in the required sense of serving as a useful and fair representative of other class members.

## VII.  PLAINTIFFS CANNOT SHOW CLASS TREATMENT WOULD BE A SUPERIOR METHOD TO ADJUDICATE THIS CASE

Certification of a litigation class (as opposed to a class certified for purposes of settlement) of this scope appears nearly unprecedented—defendant's research revealed only one wage-and-hour case certifying eight or more state classes in federal court history. To the contrary, courts routinely deny such broad certification attempts in wage and hour cases.  *See Nobles v. State Farm Mut. Auto. Ins. Co.*, 2013 WL 12153517, at *7 (W.D. Mo. June 5, 2013) (denying certification entirely as to 18 proposed classes seeking certification under 12 different state's wage and hour laws); *In re Baycol Prod. Litig.*, 218 F.R.D. 197, 209-10 (D. Minn. 2003) ("Plaintiffs have failed to demonstrate that, given the application of the various state laws, such a class action would be manageable."); *Cruz v. Lawson Software, Inc.*, 2010 WL 890038, at *11 (D. Minn. Jan. 5, 2010) ("The Court concludes that, because the applicable law varies in material ways from state to state, a class action trial is not the superior method for resolving the case.").   In *Nobles*, plaintiffs initially sought to certify classes under the laws of as many as 21 states.  The court declined to certify all but four of them, finding that among other issues, the majority of plaintiffs' state-law classes failed to satisfy the predominance requirement:[34]

---

[34]   Moreover, with respect to the two states for which classes were certified and which are also at issue here—Arizona and Minnesota—the court certified only narrow classes regarding record-keeping violations under state statutory provisions not raised by plaintiffs in this litigation. *Nobles*, 2013 WL 12153517 at *4 ("[T]he Minnesota and Arizona recordkeeping claims are not subject to the same deficiencies, namely the potential for wide variation across states and the necessity of

> Try as Plaintiffs might to construe the state law claims as if they are mere extensions of the FLSA, Plaintiffs have not shown that these states have adopted an understanding of compensable work identical to the understanding that Plaintiffs claim is set forth in the FLSA.  . . . Application of these varying standards in a single case, and the need to resolve disputes as to the correct state law interpretation of many of these standards, would inject intractable case management problems into the case and guarantee that no common issue would predominate.

*Nobles*, 2013 WL 12153517 at *3 (quotations and citation omitted).

The centrality here of contract-interpretation and performance issues further renders this case particularly unsuited to a multi-state class.  *See Brooks v. S. Bell Tel. & Tel. Co.*, 133 F.R.D. 54, 57 (S.D. Fla. 1990) (denying certification of breach of contract case because "the factual variances between the class members, when coupled with at least four different states' laws applicable to the contract formation, limitations, modification, waiver and course of dealing issues, create almost infinite legal issues among the potential class members"); *Majeski v. Balcor Entm't Co.*, 134 F.R.D. 240, 249 (E.D. Wis. 1991) (denying certification of breach of contract claims because claims would be governed by numerous state laws); *Schmidt v. Interstate Fed. Sav. & Loan Ass'n*, 74 F.R.D. 423, 429 (D.D.C. 1977) (denying certification as to proposed common law classes because "it would likely be necessary to apply three separate and possibly inconsistent bodies of law to the breach of contract and unjust enrichment claims"); *McMerty v. Burtness*, 72 F.R.D. 450, 456 (D. Minn. 1976) (denying certification because the court would have to apply different states'

---

multiple complex investigations of state law, that hamper certification of the state wage compensation and overtime claims.  Rather, whether or not State Farm's recordkeeping policy is a facial violation of the Minnesota and Arizona recordkeeping laws is a straightforward inquiry amenable to class certification.").

common laws of contracts and the "question of the appropriate law turns on the facts surrounding the formation of each contract").

Another court denied a class of just 96 plaintiffs given the variations in state contract-law issues.  In *Coca Cola Bottling Co. v. Coca-Cola Co.*, the court found that even though the contracts were "identical in their material parts" and "derived from a common source . . . which may provide a unifying factor not present in [] other cases," denial of certification was warranted for several reasons.  95 F.R.D. 168, 178 (D. Del. 1982).  First, each class member's course of dealing with the company would be relevant in determining their knowledge of contract terms and their acquiescence to any of the policies at issue in the putative class action.  *Id.*  Second, the suit implicated the contract laws of multiple states on topics that included parol evidence, waiver and estoppel, and imputed knowledge in a variety of factual settings.  *Id.*  "The Court recognizes that there is a certain nucleus of facts surrounding the [] litigation which might be common to the class, but believes that these facts would be submerged by the facts surrounding the course of dealing under each individual contract, and the application of different states' laws to each set of facts."  *Id.*[35]

In addition to establishing that common issues predominate, Rule 23(b)(3) requires plaintiffs to prove class treatment would be superior to other methods of adjudicating the controversy.  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"  *Zinser*

---

[35]  As one commentator noted, "regardless of the forum you choose, with the exception of issues preempted by federal law, contract law varies from state to state."   4 Business and Commercial Litigation in Federal Courts § 57.3. (Robert L. Haig, ed. 1998).

*v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir.), *amended on denial of reh'g,* 273 F.3d 1266 (9th Cir. 2001) (citation omitted).  In *Brown v. Federal Express Corp.*, for example, the superiority requirement was not met because "the Court will be mired in over 5,000 mini trials . . . [that would] require individual class members to establish the reason for their missed breaks."  249 F.R.D. 580, 587-88 (C.D. Cal. 2008).

For the same reason, the eight proposed classes here would be completely unmanageable.  The Court would need to oversee thousands of mini-trials regarding each of the discrete issues described above concerning each Agent's understanding of their compensation terms; the circumstances surrounding any denied adjustment requests for compensable idle time or their failure to seek adjustments; and the purpose and nature of any rest breaks.  As in *Brown*, "class members would face many of the same difficulties in motivation and expenditure of resources that they would encounter in separate actions." 249 F.R.D. at 587-88; *see also Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 253 (C.D. Cal. 2006) (concluding in an overtime case that "a class action would be unmanageable because of the individualized inquiries required"); *Lewallen v. Medtronic USA, Inc.*, 2002 WL 31300899, at *6 (N.D. Cal. Aug. 28 2002) ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not superior.").

As these courts recognize, it exceeds the reasonable capabilities of a jury to mindfully apply the subtle yet potentially outcome-determinative distinctions among the laws of multiple jurisdictions to over 15,000 Agents involving hundreds of thousands of individual pay periods that would be at issue here.  Jurors would be confronted with a

hopelessly complicated and confusing special verdict form that would potentially prejudice plaintiffs and defendant alike.

## **CONCLUSION**

For the foregoing reasons, iQor respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.

Dated: September 8, 2017.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*s/ Shon Morgan*
Shon Morgan
Viola Trebicka
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100
shonmorgan@quinnemanuel.com
violatrebicka@quinnemanuel.com

Gina K. Janeiro (#0345337)
Brian T. Benkstein (#0325545)
JACKSON LEWIS P.C.
225 South Sixth Street
Suite 3850
Minneapolis, MN 55402
Tel: 612-341-8131
Fax: 612-341-0609
JaneiroG@jacksonlewis.com
Brian.Benkstein@jacksonlewis.com