# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Paris Shoots, Jonathan Bell, Maxwell Turner, Tammy Hope, Phillipp Ostrovsky, Brenda Brandt, Anissa Sanders, Najai McCutcheon, and Michael Chavez, on behalf of themselves, the Proposed Rule 23 Classes, and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> iQor Holdings US Inc., <br><br> Defendant. | Case No. 15-cv-563 (SRN/SER) <br><br><br> **MEMORANDUM OPINION AND ORDER** <br><br> **(FILED UNDER SEAL)** |

Carl F. Engstrom, Rachhana T. Srey, and Robert L. Schug, Nichols Kaster, PLLP, 80 South Eighth Street, Suite 4600, Minneapolis, Minnesota 55402, Brian T. Rochel, Douglas L. Micko, Marisa C. Katz, and Vildan A. Teske, Teske Micko Katz Kitzer & Rochel, PLLP, 222 South Ninth Street, Suite 4050, Minneapolis, Minnesota 55402, for Plaintiffs.

Brian T. Benkstein, Charles McNeill Elmer, Elizabeth S. Gerling, and Gina K. Janeiro, Jackson Lewis P.C., 150 South Fifth Street, Suite 3500, Minneapolis, Minnesota 55402, Robert James Lee, Shon Morgan, and Viola Trebicka, Quinn Emanuel Urquhart & Sullivan, LLP, 865 South Figueroa Street, Los Angeles, California 90017, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Decertification of the

Conditionally Certified Class under the Fair Labor Standards Act [Doc. No. 347] and

Plaintiffs' Motion for Class Certification Pursuant to Fed. R. Civ. P. 23 [Doc. No. 353]. For the reasons set forth herein, Defendant's Motion is denied in part and granted in part, and Plaintiffs' Motion is denied.

## II.    BACKGROUND

### A.    Procedural Background

This lawsuit arises from Plaintiffs' employment as call center workers, or "contact center agents," ("CCAs" or "agents"), for Defendant iQor Holdings U.S. Inc. ("Defendant" or "iQor"). In their Fourth Amended Class Action Complaint ("FAC") [Doc. No. 336], Plaintiffs Paris Shoots, Jonathan Bell, Maxwell Turner, Tammy Hope, Phillipp Ostrovsky, Brenda Brandt, Anissa Sanders, Najai McCutcheon, and Michael Chavez, all current or former employees of iQor, seek to represent a class and collective of CCAs.[1] In particular, Plaintiffs assert Rule 23 state-law claims under the laws of Minnesota, New York, Ohio, Arizona, Colorado, North Carolina, South Carolina, and California seeking to recover unpaid wages, and a nationwide collective action claim for unpaid overtime wages pursuant to the Fair Labor Standards Act ("the FLSA"), 29 U.S.C. § 201, et. seq. (FAC ¶¶ 121-375.) Plaintiffs also assert a California class action for failure to provide itemized wage statements and for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. (*Id.* ¶¶ 376-89.) Finally,

---

[1]    Plaintiffs state that they have requested a stipulation from iQor to add two additional named plaintiffs: Denise Duffie-McCants for the South Carolina class and Sophie Ward for the Arizona class. (Mem. of Law in Supp. of Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 [Doc. No. 354] ("Pls.' R. 23 Mem."), at 3 n.1.)

Plaintiffs assert a class action for violation of the Fair Credit Reporting Act. (*Id.* ¶¶ 217–26, 344–46.)

In October 2015, the Court granted Plaintiffs' motion to conditionally certify the FLSA collective action and denied Defendant's Motion for Judgment on the Pleadings. (*See* Oct. 19, 2015 Order [Doc. No. 142] ("Conditional Certification Order") Specifically, under the FLSA, the Court conditionally certified a collective for "all current or former iQor contact center agents who used TimeQey for timekeeping purposes at any time during the relevant period," that is, the three years prior to the commencement of the action, (*id.* at 51), and who worked more than 40 hours during any workweek in that period, (Second Amended Class Action Complaint [Doc. No. 121], ¶ 174). Approximately 3,500 individuals opted into the FLSA collective action. (Decl. of Robert L. Schug in Supp. of Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 [Doc. No. 363] ("Schug Decl."), ¶ 2.) The parties have completed fact discovery, and Plaintiffs now move for class certification, while iQor moves to decertify the conditional FLSA collective.

### B.    Defendant's Organization

Defendant provides outsourced customer contact services to companies in a variety of industries across the United States. (Decl. of Shon Morgan in Supp. of Mot. to Decertify the FLSA Class [Doc. No. 351] ("Morgan Decl."), Ex. A [Doc. No. 351-1]

(Argiropoulos Decl. ¶ 4).)[2]  It operates approximately 22 call centers (referred to by iQor as "contact centers") in the United States.  (*Id.*, Ex. D-1 [Doc. No. 351-3] (30(b)(6) Dep. at 64).)  Defendant currently employs more than 8,000 CCAs in its contact centers, and pays them on an hourly basis.  (*Id.*, Ex. A (Argiropoulos Decl. ¶ 5).)  The typical duties of a CCA are to receive incoming calls from customers of iQor's clients, or to make outgoing calls on behalf of iQor's clients, usually to debtors.  (Schug Decl., Ex. 1 (30(b)(6) Dep. at 78–79).)  Some CCAs do not receive or make calls, but instead perform administrative tasks or act as "floor support" for other CCAs.  (*See* Morgan Decl., Ex. C-6 [Doc. No. 351-2] (Decl. of Lasonya Brown at 24, ¶ 3), Ex. C-7 (Decl. of Teshawn Brown at 28, ¶ 5), Ex. C-35 (Decl. of Kimberly Worthy at 151, ¶ 4).)

CCAs begin as Trainees and progress to agent positions as Trainee Agent, Junior Agent, Agent, Senior Agent, and Specialist.  (Schug Decl., Ex. 1 (30(b)(6) Dep. at 78–90).)  Each CCA is placed into a unit of approximately 14 staff, supervised on-site by an Assistant Vice President ("AVP").  (Morgan Decl., Ex. A (Argiropoulos Decl. ¶ 6).)  Each AVP reports to a Managing AVP or to a Vice President.  (*Id.*)  Vice President is a director-level position that may be responsible for an entire client relationship or, for larger clients, a subset of the client relationship.  (Schug Decl., Ex. 1 (30(b)(6) Dep. at 98).)

Before a CCA begins work with iQor, the CCA signs an offer letter describing the basic terms of employment, including the hourly rate of compensation.  (Def.'s Opp'n

---

[2]    Unless otherwise noted, the Court cites to the page numbers, paragraphs, or Bates numbers as they appear in the parties' exhibits.

Mem. to Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 [Doc. No. 398] ("Def.'s R. 23 Opp'n Mem."), at 8–9; Schug Decl., Ex. 1 (30(b)(6) Dep. at 110–11), Sealed Ex. 23 [Doc. No. 372] (Bell Employment Agreement).) The offer letter that Plaintiff Jonathan Bell received, entitled "Employment Agreement," instructed him to "confirm [his] acceptance of this Agreement by clicking on the link below." (Schug Decl., Sealed Ex. 23 (Bell Employment Agreement at IQOR_00000782).) The offer letter set forth the start date, title, function, location, and hourly wage of the CCA position. (*E.g.*, *id.* at IQOR_00000781.) In addition, the offer letter contained a merger clause that provided, "This Agreement represents our mutual complete understanding of your employment terms at iQor and supersedes any prior agreement (oral or written) that you may have, but does not constitute an agreement for employment for any specific period of time." (*E.g.*, *id.* at IQOR_00000781–82.)

Of the approximately 8,000 CCAs that iQor currently employs, fewer than 500 work remotely from their homes. (*Id.*, Ex. 1 (30(b)(6) Dep. at 106).) The majority come to iQor's contact centers for their scheduled shifts. (Morgan Decl., Ex. A-1 (Employee Handbook at 40).) Schedules are set by iQor's project managers, based on anticipated call volume for incoming calls and outcome goals for outgoing calls. (Schug Decl., Ex. 1 (30(b)(6) Dep. at 229–31).) Defendant's employee code of conduct states, "We carefully schedule employee activities, and rely on strict adherence to these schedules to deliver exceptional service to our clients. As such, we expect you to understand your schedule and adhere to it." (Morgan Decl., Ex. A-2 (Code of Conduct at 3).)

### C.    TimeQey

In mid-2008, iQor began developing TimeQey, a proprietary software program to track CCAs' work time.  (Schug Decl., Ex 1 (30(b)(6) Dep. at 113).)    Mason Argiropoulos, iQor's Chief Human Resources Officer, testified that the goals of the program were to reward and retain more productive CCAs by compensating them at a higher rate of pay for all productive time, and to increase profits by reducing the cost to the company of employing less productive CCAs.  (*See id.* at 119–21.)    TimeQey's precise tracking also gave CCAs increased freedom to take unscheduled breaks for personal reasons, subject to manager approval.  (Morgan Decl., Ex. A (Argiropoulos Decl. ¶ 7), Ex. A-3 ("Tracking Your Time" at IQOR_00000196).)

Defendant began implementing TimeQey in its contact centers in 2009.  (Morgan Decl., Ex. A (Argiropoulos Decl. ¶ 7).)  Before that, iQor had tracked CCAs' time using a standard punch-in, punch-out mechanism.  (Schug Decl., Ex. 1 (30(b)(6) Dep. at 122–24).)  Defendant asserts that CCAs were given the information they needed to use the new TimeQey system during the transition, and that CCAs hired after the transition were trained to use it, citing informational hand-outs and presentations.  (See Def.'s Mem. in Supp. of Mot. to Decertify the FLSA Class [Doc. No. 350] ("Def.'s Decert. Mem."), at 8; Morgan Decl., Ex. A (Argiropoulos Decl. ¶¶ 13–14), Ex. A-3 ("Tracking Your Time" at IQOR_00000195–97), Ex. A-4 (TimeQey PowerPoint at 37–42).)  But some CCAs stated that they did not receive training on the TimeQey system before they started using it, and had to learn on their own.  (See Morgan Decl., Ex. D-9 (McCants Dep. at 14), Ex. D-11

(Pryor Dep. at 26–27, 32–33); Decl. of Shon Morgan in Opp'n to Pls.' Mot for Class Certification Pursuant to Fed. R. Civ. P. 23 [Doc. No. 399] ("Morgan Opp'n Decl."), Ex. 3 [Doc. No. 399-1] (Dorsey Dep. at 34–35).)

TimeQey categorized a CCA's time according to the type of work performed on the CCA's work computer.[3]   Time recorded as "core" work—including time spent placing and receiving calls, inputting information from calls, and waiting for calls in "ready" mode—was automatically considered compensable.   (Morgan Decl., Ex. A (Argiropoulos Decl. ¶ 8), Ex. A-3 ("Tracking Your Time" at IQOR_00000195–96).) Other time was recorded as presumptively noncompensable; after two minutes of computer inactivity, or "idle time," the TimeQey system logged the CCA out and began recording the time as an unpaid break.[4]   (Morgan Decl., Ex. A-3 ("Tracking Your Time" at IQOR_00000196–97); Schug Decl., Sealed Ex. 19 [Doc. No. 368] (TimeQey User Tutorial at IQOR_00000117).)   CCAs could request retroactive "manual adjustments" from their supervising AVPs for periods that TimeQey had recorded as noncompensable or "idle" time, but only for certain tasks that iQor categorized as "'Non-Core' Work Time."   (Morgan Decl., Ex. A-3 ("Tracking Your Time" at IQOR_00000195).) Compensable non-core work included meetings, team huddles, training, downtime due to

---

[3]     Defendant continues to use TimeQey for timekeeping.   (*See* Def.'s Answer to FAC ¶ 3 [Doc. No. 339].) This opinion describes TimeQey as it operated between its implementation and the filing of this action in January 2015.
[4]     Starting on January 1, 2015, TimeQey stopped recording computer inactivity as unpaid break time.   (Morgan Decl., Ex. A (Argiropoulos Decl. ¶ 9).)   Plaintiffs filed this suit a few weeks later.

system outages, and work performed off the phone.  (*Id.*; Schug Decl., Sealed Ex. 19 (TimeQey User Tutorial at IQOR_00000117).)

The TimeQey user tutorial instructed CCAs to "include detailed information in reference to why you are requesting time" when submitting requests for manual adjustments to a supervising AVP.  (Schug Decl., Sealed Ex. 19 (TimeQey User Tutorial at IQOR_00000122).)  Defendant told AVPs to make sure that requests for manual adjustments were "valid and accurate" before approving them.  (*Id.* at IQOR_00000137.)  The tutorial also cautioned CCAs that "BREAK time due to *inactivity* is not reimbursable—please do not request to be paid."  (*Id.* at IQOR00000120.)

In addition to categorizing time as core work time or unpaid break time (which might later be adjusted to non-core work time), TimeQey also categorized time spent logging in and logging out of the computer, as well as "not ready" time, which took place after logging in, but before clicking the "ready" button to start calls.  (Schug Decl., Ex. 1 (30(b)(6) Dep. at 180–83), Ex. 15 [Doc. No. 363-15] (Steward Report ¶ 10); Morgan Decl., Ex. A-4 (TimeQey PowerPoint at 38).)  For the first four years of TimeQey's use, iQor did not compensate CCAs for log-in time, although computer problems sometimes caused log-in to take longer than expected.  (Schug Decl., Ex. 1 (30(b)(6) Dep. at 180–83).)  In 2013, after it had observed considerable differences in log-in time depending on a particular CCA's computer applications, iQor began compensating log-in time after the first two minutes.  (*Id.*; Sealed Ex. 19 (TimeQey User Tutorial at IQOR_00000117).)

The typical work day for a CCA during the relevant period included an unpaid 30-minute meal break and two short paid breaks, which were scheduled at particular times. (Schug Decl., Ex. 1 (30(b)(6) Dep. at 204), Ex. 6 [Doc. No. 363-6] (Lehtio Dep. at 16); Morgan Decl., Ex. D-2 (Bell Dep. at 34–37), Ex. D-4 (Dorsey Dep. at 58–61); Ex D-5 (Evenski Dep. at 54–57), Ex. D-6 (Gonzalez Dep. at 50–53).)  In nearly all of iQor's United States contact centers, CCAs received five minutes of paid break time for every four hours worked.[5] (Morgan Decl., Ex. A-3 ("Tracking Your Time" at IQOR_00000196).)  Defendant explained to its CCAs, "[Y]ou can use that paid Break Time [i.e., five minutes, every four hours] for restroom breaks or other activities."  (*Id.*) With the introduction of TimeQey, iQor gave CCAs the ability to request additional unpaid breaks from their supervising AVP.  (*Id.* ("Agents may take as many breaks as they want at any time they wish for as long as they choose, after securing permission from their Supervisor.").)  From their computers, CCAs could request breaks, subject to AVP approval.  (Morgan Decl., Ex. A-4 (TimeQey PowerPoint at 39).)

In actual practice, however, several CCAs testified that iQor discouraged unscheduled breaks.  (Morgan Decl., Ex. D-2 (Bell Dep. at 35–37 ("They expressed to us that they wanted us to take [breaks] at certain times of the day.")), Ex. D-4 (Dorsey Dep. at 33 ("They don't always want you to take the break. . . . Because they want everybody on the phone.")), Ex. D-9 (McCants Dep. at 17 ("[O]ur supervisor is always on us about breaks.")).)  But other CCAs testified that they were routinely allowed to take

---

[5]     In California, CCAs received 20 minutes of paid break time for every five hours worked.  (Morgan Decl., Ex. A-3 ("Tracking Your Time" at IQOR_00000196).)

unscheduled breaks. (*Id.*, Ex. D-5 (Evenski Dep. at 62–63), Ex. D-15 (Williams Dep. at 46–49); *see also* Ex. C (CCA Decls.).) Defendant evaluated CCAs based on adherence to their work schedules, (Schug Decl., Ex. 6 (Lehtio Dep. at 16–21), and scheduling was based, in part, on forecasts of call volume. (*Id.*, Ex. 1 (30(b)(6) Dep. at 229–31.) Typically, CCAs were not allowed to leave the premises except during their meal breaks. (Morgan Decl., Ex. D-2 (Bell Dep. at 72), Ex. D-5 (Evenski Dep. at 71, 75).)

Due to technical problems with TimeQey, time "gaps" sometimes appeared in CCAs' time logs. One such problem occurred if a CCA requested manual adjustment for a period that overlapped with an unpaid break and a paid break in TimeQey, and the AVP then denied the adjustment. (Schug Decl., Ex. 1 (30(b)(6) Dep. at 298–300).) The TimeQey system would cause the overlapping paid time to disappear. (*Id.*) Another technical problem occurred when CCAs switched computers due to technical difficulties, after having already logged in on another computer. (*Id.*, Ex. 5 [Doc. No. 363-5] (Husby Dep. at 44–45).) TimeQey could receive information about the same CCA from both computers, causing time gaps. (*Id.*) Defendant presents evidence that some of these gaps do not reflect compensable time, but were caused by a delay between the end of a CCA's shift and the AVP's approval of manual adjustments for the day. (*See* Morgan Decl., Ex. B-1 (Revised White Rep. at 5–9).)

CCAs routinely requested manual adjustments for work performed away from the computer at trainings, meetings, or team huddles, or when technical difficulties caused downtime. (*E.g. id.*, Ex. D-2 (Bell Dep. at 84 (adjustment for downtime caused by

computer problems)), Ex. D-4 (Dorsey Dep. at 54–56 (adjustment for meeting).)  Many reported that their requests were denied or they were discouraged from submitting requests.  (*See* Schug Decl., Ex. 11 [Doc. No. 363-11] (Selected Pls.' Interrogatory Responses, at ECF p. 10 ("Plaintiff recalls that the response [to adjustment requests] was typically 'no'."), ECF p. 28 ("Plaintiff felt discouraged from submitting requests because they often denied [sic]."), ECF p. 40 ("Plaintiff felt discouraged from making time adjustment requests because some supervisors were more apt than other supervisors to approve time adjustments."), ECF p. 64 ("Plaintiff felt discouraged from requesting time adjustments because her supervisors had a negative attitude regarding these requests.").) Other CCAs testified that the approval or denial of their requests depended upon the supervising AVP for the particular shift.  (*See id.*, Ex. D-2 (Bell Dep. at 2637), Ex. D-11 (Pryor Dep. at 50, 93).)  Some CCAs testified that most or all of their adjustment requests were approved.  (*See id.*, Ex. D-14 (Ward Dep. at 72–73), Ex. D-15 (Williams Dep. at 35).)[6]  Others stated that adjustment requests for short periods, such as a few minutes, were discouraged.  (*Id.*, Ex. D-3 (Blomquist Dep. at 35–36), Ex. D-6 (Gonzalez Dep. at 51).)  But others stated that they could adjust periods as short as one or two minutes.  (*Id.*, Ex. D-2 (Bell Dep. at 60), Ex. D-5 (Evenski Dep. at 79–80).)

---

[6]    *See also, e.g.*, Morgan Decl., Ex. C-1 (Ada Decl. ¶ 9 (adjustment requests were "always granted")), Ex. C-2 (Agyarey Decl. ¶ 8 (same)), Ex. C-3 (Brevard Decl. ¶ 5 (same)), Ex. C-24 (Reeves Decl. ¶ 9 (same)); *id.*, Ex. C-9 (Erwin Decl. ¶ 9 (adjustment requests were "usually granted")), Ex. C-21 (Morris Decl. ¶ 8 (same)); *id.*, Ex. C-14 (Kennedy Decl. ¶ 13 (supervisor never discouraged adjustments)), Ex. C-25 (Resendez Decl. ¶ 9 (same)).

### D.    Plaintiffs' Claims

Plaintiffs claim that iQor unlawfully withheld earned wages using TimeQey.  They assert that FLSA regulations required iQor to compensate CCAs for the entire continuous workday, except for bona fide meal breaks, and to pay them for short rest breaks.  (Pls.' Mem. of Law in Opp'n to iQor's Mot. to Decertify the FLSA Class [Doc. No. 403] (Pls.' Decert. Opp'n Mem.") at 26-27, 30.)  Plaintiffs also argue that iQor's employment offer letters represent employment contracts creating an obligation to compensate CCAs, at the stated rate, for all hours worked.  (Mem. of Law in Supp. of Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 [Doc. No. 354] ("Pls.' R. 23 Mem.") at 31.)

Plaintiffs also claim that iQor has violated the overtime requirements of the FLSA.  Because iQor unlawfully excluded some hours from compensable work time, Plaintiffs assert, CCAs who actually worked more than 40 hours in a week did not receive due overtime wages.  (FAC ¶¶ 334–43.)

Plaintiffs also claim that iQor has unlawfully deprived them of straight-time wages under the laws of seven states, overtime wages under the laws of six states, and minimum wages under California law.  (*Id.* ¶¶ 227–333, 347–71.)  Plaintiffs argue that the offer letters gave CCAs the substantive right to be compensated at the agreed-upon rate for every hour worked, but that TimeQey shaved away parts of those hours in violation of state laws.  (*Id.*; Pls.' R. 23 Mem. at 20–27.)[7]

---

[7]    While Plaintiffs also assert a class action for violation of the Fair Credit Reporting Act, (FAC ¶¶ 344–46), Plaintiffs have not moved for certification of that class, (*see* Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23).

Finally, Plaintiffs claim that iQor's violations were willful because iQor knew that TimeQey was unlawfully depriving CCAs of earned wages. (Pls.' R. 23 Mem. at 18–20, 35–36.) Plaintiffs point to an investigation by the Minnesota Department of Labor and Industry ("Minnesota DOL") which, although finding "no evidence of minimum wage violations," informed iQor as early as 2009 that Minnesota law requires compensation for rest breaks shorter than 20 minutes. (*See* Schug Decl., Sealed Ex. 42 (2009 Minn. DOL Letter), Sealed Ex. 43 (2013 Minn. DOL Letter).) In July 2013, in response to a client request for additional call center work, an iQor Human Resources officer asked Argiropoulos "Is there a reason why we are not paying for breaks? According to Dept[.] of Labor any breaks given under 20 minutes should be paid." (*See id.*, Ex. 29 (July 2013 Email Chain at IQORJL_0016328).) Argiropoulos testified that he could not recall whether this question caused him any concern, nor could he recall whether he even responded to the email. (*Id.*, Ex. 3 (Argiropoulos Dep. at 54–55).) In addition, internal iQor communications among management in January 2015—shortly after iQor discontinued the practice of recording computer inactivity as unpaid break time—state, "Some history: the old way on TimeQey, was less compliant to [sic] labor law." (*See id.*, Sealed Ex. 35 (Jan. 2015 Email Chain at IQORJL_0107705).)

In addition, CCAs and at least one AVP submitted approximately 70 internal complaints about under-reported hours and unpaid break time due to issues with TimeQey. (*See id.*, Sealed Ex. 17 (Complaint Log).) Argiropoulos could not recall receiving the complaints, making any changes to TimeQey or iQor's policies as a result

of the complaints, or initiating any investigation into the employees' complaints. (*Id.*, Ex. 3 (Argiropoulos Dep. at 26–30).)   The following complaints are illustrative of many concerning lost time and possible labor violations:

> We were informed today that we will be converting to a new system in which we will not be paid for our breaks due to we are not "logged into the system."   Please review the statutes set by the Minnesota [DOL] . . . which states that all breaks under 20 minutes must be included in working hours. (Minnesota employee, Feb. 9, 2009) (*Id.*, Sealed Ex. 17 (Complaint Log at 2).)

> [C]ould you please fix the system[?]   [I]nactive mode keeps going out every 1 minute and it's causing us to lose time.   (Arizona employee, August 19, 2009) (*Id.* at 3).

> When I get logged out after 2 min of inactivity and the screen goes black but then log back on within 10 secs[,] does the system not pay me for 10 secs or does it round up to one min[?]   (Minnesota employee, Nov. 18, 2009) (*Id.* at 4.)

> PAY US FOR BREAKS. (Ohio employee, Jan. 18, 2010) (*Id.* at 4).

> The company implemented a new rule regarding paid break time.   We will only get paid for taking a 10 minute break in our 8 hour work day.   So that basically means I have to work steadfast for 7 hours and 50 minutes straight.   (Arizona employee, Jan. 17, 2012) (*Id.* at 9).

> I am following up with a conversation that I had yesterday with my VP/SVP regarding the new [TimeQey].   I checked with the state of Mn yesterday regarding allowed break times—the Dept[.] of Labor in Mn.   The rep at the Dept[.] of Labor read . . . Mn rules Chapter 5200.0120 Sub Part 1. She quoted the following:  Rest periods of less than 20 minutes may not be deducted from total hours (every 4 hours).   I want to make sure that we are doing this legally and not in any violation of state law.   As an AVP, I know I represent the company at a management level and want to make sure that what we are doing is legal and correct.   The rep at the state of Mn indicated that it was illegal and that we could not limit to 5 min breaks for every 4 hours worked.   (Minnesota AVP, Jan. 26, 2012) (*Id.* at 10).

14

The system will log us out even if we are sitting at our computers and charge us unpaid breaks whether or not we get right back in. This caused me to lose 3.36 hours last pay period that I have not found out if I am even getting paid for which is wrong. Secondly, the new "5" min paid breaks are ridiculous. According to state labor laws every 4 hours of work time we are supposed to get "enough time to use the restroom." I am not sure about how you feel[,] but personally[,] 5 min isn't enough time to get to the restroom here and pull my pants down. (Minnesota employee, Feb. 22, 2012) (*Id.* at 11).

Just wishing to send out a heads up about the Charleston, SC iQor. In reading about the corporate policies, I can't help but notice that this location is in violation of rules set for the benefit of the rank and file employees, pertaining to breaks allowed. The allotted time for breaks continues to shrink here. (South Carolina employee, May 21, 2012) (*Id.* at 13).

I am writing to you with a very big concern about Time[Q]ey. I have studied it very closely and it seems as though we are not getting paid the time we are actually working. On an average, we are getting shorted 10 minutes per day. . . . I am very concerned about this and request a formal investigation take place regarding the Time[Q]ey software. (Minnesota employee, Sept. 19, 2012) (*Id.* at 14).

Mr. Merritt, I am asking that the TimeQey be looked at. I write all my hours worked (down to the minute) as well as all my breaks. And every day I lose minutes some up to 14 minutes a day, for no reason that I do not get paid. If you do a census and ask all employees[,] they will say the same thing. . . . I have brought this to my supervisor many times, and I am still losing time worked pay. Something in this system is just not right. (Arizona employee, Dec. 28, 2012) (*Id.* at 15).

I have a concern. The wait break times to log you off are too long. I [am] on medication and the wait becomes too long to where it hurts me. It is not good to hold your inner movements to wait for break to be approved. (Arizona employee, Jan. 16, 2014) (*Id.* at 20).

Aren't short breaks supposed to be paid? Per the FLSA shorter breaks we are provided we are supposed to be paid for our entire breaks that are not lunch breaks. (Ohio employee, Nov. 13, 2014) (*Id.* at 22).

### E.    Named Plaintiffs

Plaintiffs are current and former employees of iQor.  Plaintiff Paris Shoots is a Minnesota resident and former iQor employee.  (FAC ¶ 23.)  He was employed as a CCA in iQor's Plymouth, Minnesota contact center from approximately April 2014 to June 2014.  (Schug Decl., Ex. 10 [Doc. No. 363-10] (Decl. of Paris Shoots ¶ 2).)  Defendant agreed to pay Shoots an hourly wage of $12 per hour.  (Def.'s Am. Answer, Ex. D [Doc. No. 78-1] (Shoots Employment Agreement at 1).)  Shoots states that he was not fully compensated for all hours worked, including overtime, because of TimeQey.  (Schug Decl., Ex. 10 (Shoots Decl. ¶ 9).)  In Count I of the FAC, Shoots, individually and on behalf of a proposed Minnesota Rule 23 class, contends that iQor violated the Minnesota Payment of Wages Act, Minn. Stat. §§ 181.101, 181.13, 181.14, and Minn. R. 5200.0120, subpt. 1, by failing to pay all straight time worked.  (FAC ¶¶ 227-41.)

Plaintiff Jonathan Bell is a resident of New York and former iQor employee.  (FAC ¶ 24.)  Bell was employed as a CCA in iQor's Buffalo, New York call center from approximately July 2011 to May 2014.  (Schug Decl., Ex. 10 [Doc. No. 363-10] (Decl. of Jonathan Bell ¶ 2).)  Defendant agreed to pay Bell an hourly wage of $15 per hour.  (Def.'s Am. Answer, Ex. A [Doc. No. 78-1] (Bell Employment Agreement at 1).)  He states that he was not fully compensated for all hours worked, including overtime, because of TimeQey.  (Schug Decl., Ex. 10 (Bell Decl. ¶ 9).)

Plaintiff Maxwell Turner is a resident of New York and current iQor employee.  (FAC ¶ 25.)  He has been employed as a CCA in iQor's Buffalo, New York contact

center from approximately July 2013 to the present. (Schug Decl., Ex. 10 [Doc. No. 363-10] (Decl. of Maxwell Turner ¶ 2).) Defendant agreed to pay Turner an hourly wage of $9 per hour. (Def.'s Am. Answer, Ex. E [Doc. No. 78-1] (Turner Employment Agreement at 1).) He states that he has not been fully compensated for all hours worked, including overtime, because of TimeQey. (Schug Decl., Ex. 10 (Turner Decl. ¶ 9).)

In Count II of the FAC, Bell and Turner allege, individually and on behalf of the proposed New York Rule 23 class, that iQor violated N.Y. Lab. Law §§ 190, 191, and 29 C.F.R. § 785.18, as adopted by the State of New York, by failing to pay all straight time worked. (FAC ¶¶ 242-51.) In Count III of the FAC, Turner alleges, individually and on behalf of the proposed New York Rule 23 class, that iQor violated N.Y. Comp. Codes R. & Regs. Title 12, § 142-2.2, and 29 C.F.R. §§ 790.6, 785.11, 785.15, and 785.18, as adopted by the State of New York, by failing to pay all overtime wages. (*Id.* ¶¶ 252-62.)

Plaintiff Tammy Hope is an Ohio resident and former iQor employee. (*Id.* ¶ 26.) Hope worked as a CCA at iQor's call center in Columbus, Ohio from approximately November 2011 to November 2013. (Schug Decl., Ex. 10 [Doc. No. 363-10] (Decl. of Tammy Hope ¶ 2).) Defendant agreed to pay Hope an hourly wage of $9 per hour. (Def.'s Am. Answer, Ex. B [Doc. No. 78-1] (Hope Employment Agreement at 1).) She states that she was not fully compensated for all hours worked, including overtime, because of TimeQey. (Schug Decl., Ex. 10 (Hope Decl. ¶ 9).) In Count IV of the FAC, Hope alleges, individually and on behalf of a proposed Ohio Rule 23 class, that iQor violated the Ohio Prompt Pay Act, Ohio Rev. Code § 4113.15, by failing to pay all

17

straight time wages earned.  (FAC ¶¶ 263-71.)  In Count V of the FAC, Hope alleges, on her own behalf and on behalf of a proposed Ohio Rule 23 class, that iQor violated the Ohio Minimum Fair Wage Standards Act, Ohio Rev. Code § 4111.03, by failing to fully pay overtime compensation.  (*Id.* ¶¶ 272-81.)

Plaintiff Phillipp Ostrovsky is a resident of Arizona and former iQor employee. (*Id.* ¶ 27.)  He worked at iQor's Tempe, Arizona call center from approximately August 2014 to October 2014.  (Schug Decl., Ex. 10 [Doc. No. 363-10] (Decl. of Phillipp Ostrovsky ¶ 2).)  Defendant agreed to pay Ostrovsky an hourly wage of $11.50 per hour. (Def.'s Am. Answer, Ex. C [Doc. No. 78-1] (Ostrovsky Employment Agreement at 1).) He states that he was not fully compensated for all hours worked, including overtime, because of TimeQey.  (Schug Decl., Ex. 10 (Ostrovsky Decl. ¶ 9).)  In Count VI of the FAC, Ostrovsky alleges, on his own behalf and on behalf of a proposed Arizona Rule 23 class, that iQor violated Arizona's wage statute, Ariz. Rev. Stat. § 23-351, by failing to pay for all straight time and overtime work.  (FAC ¶¶ 282-93.)

Plaintiff Brenda Brandt is a Colorado resident and former iQor employee.  (*Id.* ¶ 28.)  Brandt worked as a CCA at iQor's call center in Colorado Springs, Colorado from approximately June 2013 to October 2014.  (Schug Decl., Ex. 10 [Doc. No. 363-10] (Decl. of Brenda Brandt ¶ 2).)  Defendant agreed to pay Brandt on an hourly basis.  (*Id.* ¶ 4.)  She states that she was not fully compensated for all hours worked, including overtime, because of TimeQey.  (*Id.* ¶ 9.)  In Count VII of the FAC, Brandt alleges, individually and on behalf of a proposed Colorado Rule 23 class, that iQor violated the

18

Colorado Wage Claim Act, Colo. Rev. Stat. §§ 8-4-103, -109, by failing to pay all straight time wages earned. (FAC ¶¶ 294-306.) In Count VIII of the FAC, Brandt alleges, on her own behalf and on behalf of a proposed Colorado Rule 23 class, that iQor violated the Colorado Minimum Wage Order Number 31, Colo. Code Regs. § 1103-1, by failing to fully pay overtime compensation. (*Id.* ¶¶ 272-81.)

Plaintiff Anissa Sanders is a North Carolina resident and current iQor employee. (*Id.* ¶ 29.) Sanders has worked as a CCA at iQor's call center in Charlotte, North Carolina since approximately January 2006. (Schug Decl., Ex. 10 [Doc. No. 363-10] (Decl. of Anissa Sanders ¶ 2).) Defendant pays Sanders on an hourly basis. (*Id.* ¶ 4.) She states that she was not fully compensated for all hours worked, including overtime, because of TimeQey. (*Id.* ¶ 9.) In Count IX of the FAC, Sanders alleges, individually and on behalf of a proposed North Carolina Rule 23 class, that iQor violated the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et seq., by failing to pay all straight time and overtime wages earned. (FAC ¶¶ 319-33.)

Plaintiff Najai McCutcheon is a South Carolina resident and former iQor employee. (*Id.* ¶ 30.) McCutcheon worked as a CCA at iQor's call center in Charleston, South Carolina from approximately July 2011 to October 2015. (*Id.*) Defendant paid McCutcheon on an hourly basis. (*Id.* ¶ 66) She states that she was not fully compensated for all hours worked, because of TimeQey. (*Id.*) In Count XII of the FAC, McCutcheon alleges, individually and on behalf of a proposed South Carolina Rule 23 class, that iQor

violated the South Carolina Payment of Wages Act, S.C. Code Ann. §§ 41-10-40, -50, by failing to pay all straight time wages earned. (*Id.* ¶¶ 347-56.)

Plaintiff Michael Chavez is a California resident and former iQor employee. (*Id.* ¶ 31.) Chavez worked as a CCA at iQor's call center in Simi Valley, California from approximately September 2009 to November 2014. (Schug Decl., Ex. 10 [Doc. No. 363-10] (Decl. of Michael Gonzalez ¶ 2).) Defendant agreed to pay Chavez on an hourly basis. (*Id.* ¶ 4.) He states that he was not fully compensated for all hours worked, including overtime, because of TimeQey. (*Id.* ¶ 9.) In Count XIII of the FAC, Chavez alleges, individually and on behalf of a proposed California Rule 23 class, that iQor violated the California state labor code, Cal. Lab. Code § 1182.12, by failing to pay the California minimum wage for all hours worked. (FAC ¶¶ 357-364.) In Count XVI of the FAC, Chavez alleges, individually and on behalf of a proposed California Rule 23 class, that iQor violated the California state labor code, Cal. Lab. Code §§ 510, 1194, by failing to pay all overtime wages earned. (*Id.* ¶¶ 365-71.)[8]

Finally, as alleged in Count X of the FAC, Plaintiffs Bell, Turner, Hope, Ostrovsky, Brandt, and Sanders, individually and on behalf of a proposed nationwide FLSA collective, allege that iQor failed to properly pay its employees overtime pay, in violation of the FLSA and related regulations. (*Id.* ¶¶ 334-43.)

---

[8]    In Counts XV through XVII, Chavez also seeks, individually and on behalf of a proposed California Rule 23 class, to recover for iQor's alleged violations of California law requiring prompt payment of wages after discharge, Cal. Lab. Code § 203, requiring itemized wage statements with each paycheck, *Id.* § 226, and prohibiting unfair competition through unfair business acts or practices, Cal. Bus. & Prof. Code §§ 17200 et seq. (FAC ¶¶ 372-89.)

### F.   Parties' Motions

On August 18, 2017 iQor filed the instant motion seeking decertification of the conditionally certified FLSA class, and Plaintiffs filed the instant motion seeking class certification under Fed. R. Civ. P. 23.

In support of its motion for decertification, iQor argues that Plaintiffs cannot show that the members of the conditionally certified FLSA overtime class are "similarly situated," because multiple individual inquiries are required to fairly adjudicate the claims.   (Def.'s Decert. Mem. at 3.)   Whether CCAs were undercompensated, iQor asserts, depends upon what they were doing when TimeQey recorded idle time, whether they made an adjustment request, and why that request was rejected.   (*Id.* at 14–18)   Defendant argues that it was required to compensate CCAs only for the time they spent working, so each plaintiff's claim will turn on what they were doing during each specific period that TimeQey recorded as idle time.   (*Id.* at 18–25.)   Finally, iQor claims that collective action is not tenable because its defenses will require individual evaluation of plaintiffs' credibility and their failure to follow established timekeeping procedures.   (*Id.* at 29–33.)

Plaintiffs move under Rule 23 to certify the state law class actions.   Plaintiffs argue that common questions predominate in these classes, including whether idle time is compensable work, whether iQor failed to maintain required records of time worked, and whether iQor acted willfully and without good faith.   (Pls.' R. 23 Mem. at 29–36.) Plaintiffs further argue that the same essential legal issues unite the multiple state classes,

because "federal law sets a floor for defining and paying compensable work hours." (*Id.* at 20.) Plaintiffs assert that the class action mechanism is superior to other available methods of resolving this dispute because of iQor's nationwide presence and the similarity of the legal issues in each class. (*Id.* at 39.)

## III.    DISCUSSION

### A.    Plaintiffs' Motion for Rule 23 Class Certification

Plaintiffs seek Rule 23 class certification of their state law claims, based on iQor's alleged violations of various wage payment and overtime statutes under the laws of Minnesota, Arizona, California, Colorado, New York, North Carolina, Ohio, and South Carolina. (*See id.* at 2.) And, as noted, they additionally assert claims under California labor law for waiting time penalties, (FAC ¶¶ 372–75), itemized wage statements, (*id.* ¶¶ 376–81), and for violations of the California Unfair Competition Law. (*Id.* ¶¶ 382—89.) They request that the Court appoint them as class representatives and their counsel as class counsel, (*see id.* at 38–39), for the following "classes":

> **Minnesota Class:** All individuals employed by iQor as Contact Center Agents or other similar job titles in Minnesota who used TimeQey for timekeeping purposes at any time from January 21, 2012 to December 31, 2014.
>
> **Arizona Class:** All individuals employed by iQor as Contact Center Agents or other or similar job titles in Arizona who used TimeQey for timekeeping purposes at any time from April 3, 2014 to December 31, 2014.
>
> **California Class:** All individuals employed by iQor as Contact Center Agents or other similar job titles in California who used TimeQey for timekeeping purposes at any time since February 21, 2013 to December 31, 2014.

**Colorado Class:** All individuals employed by iQor as Contact Center Agents or other similar job titles in Colorado who used TimeQey for timekeeping purposes at any time from April 3, 2012 to December 21, 2014.

**New York Class:** All individuals employed by iQor as Contact Center Agents or other similar job titles in New York who used TimeQey for timekeeping purposes at any time from April 3, 2009 to December 31, 2014.

**North Carolina Class:** All individuals employed by iQor as Contact Center Agents or other similar job titles in North Carolina who used TimeQey for timekeeping purposes at any time from April 3, 2013 to December 31, 2014.

**Ohio Class:** All individuals employed by iQor as Contact Center Agents or other similar job titles in Ohio who used TimeQey for timekeeping purposes at any time from April 3, 2007 to December 31, 2014.

**South Carolina Class:** All individuals employed by iQor as Contact Center Agents or other similar job titles in South Carolina who used TimeQey for timekeeping purposes at any time from April 3, 2012 to December 31, 2014.

(*Id.* at 28.)

The Court has broad discretion in determining whether class certification is appropriate, and "[t]his discretion extends to defining the scope of the class." *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir. 1980) (citations omitted). Likewise, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) [of the Federal Rules of Civil Procedure] and must satisfy one of three subsections of Rule 23(b)." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005) (citations omitted). In this case, Plaintiffs

argue that each of the Rule 23(a) requirements, as well as Rule 23(b)(3), is satisfied. (Pls.' Rule 23 Mem. at 28.)

### 1.    Predominance

The Court begins its analysis here under Rule 23(b).  Under this rule, a class action is proper if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The predominance requirement "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 377 (8th Cir. 2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  This inquiry is more demanding than the otherwise rather similar commonality requirement under Rule 23(a) in that, "'[w]hen determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether,

24

if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class.'" *Id.* (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011)). But where the resolution of a common issue "breaks down into an unmanageable variety of individual legal and factual issues," the predominance requirement is not satisfied. *Nobles v. State Farm Mut. Auto. Ins. Co.*, No. 10–04175–CV–C–NKL, 2013 WL 12153517, at *2 (W.D. Mo. June 5, 2013) (citing *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996)).

Plaintiffs assert that iQor deprived them of straight-time wages under the laws of seven states, overtime wages under the laws of six states, and minimum wages under California law. (FAC ¶¶ 227–333, 347–71.) And, again, they also assert claims under California law for waiting time penalties, itemized wage statements, and violations of the California Unfair Competition Law. (*Id.* ¶¶ 372–89.) The Court presumes, for purposes of its analysis here, that although Plaintiffs identify eight separate "classes" for which they request certification, they wish to proceed in a single trial.[9] The eight presumptive "classes," therefore, might be more properly characterized as state-specific subclasses.

In this Court's prior ruling on iQor's Motion for Judgment on the Pleadings, the Court analyzed the wage payment and overtime statutes of four states that were then in

---

[9] The Court recognizes that the parties might wish to ultimately bifurcate issues of liability and damages. But as to liability, the Court's understanding is that Plaintiffs wish to proceed with a single trial. At the hearing on this motion, counsel for iQor referred to "complicated sets of jury instructions for all eight states if Plaintiffs were allowed to proceed with this." (*See* Sept. 29, 2017 Hr'g Tr. at 13.) Counsel for Plaintiffs responded that under "any of the state laws," three main issues were common to "the class"— singular—and nothing would "prevent a jury from deciding those three common issues together." (*Id.* at 37–38.)

question:  Minnesota, New York, Ohio, and Arizona.  (*See* Oct. 19, 2015 Order at 16–38.)  Plaintiffs assert that in that ruling, this Court confirmed the viability of their state law legal theories and found that iQor's employment agreements, combined with state law legal theories, created a right to the payment of wages for all hours worked.  (Pls.' Decert. Opp'n Mem. at 5 [Doc. No. 403].)  That ruling, however, was made in a particular procedural context.  Under the plaintiff-friendly standard of review applicable to that motion, and at that early stage of the proceedings, the Court found that Plaintiffs had alleged *plausible* state law claims sufficient to survive a motion for judgment on the pleadings.  (*See* Oct. 19, 2015 Order at 16–38.)  The ruling was certainly not a ruling on the ultimate merits of Plaintiffs' state law claims.

At this later stage, however, and with the benefit of full discovery, the Court must apply a "rigorous analysis" to determine whether common issues sufficiently predominate so as to allow the state law class action to proceed.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (citation omitted).  The Court first examines the extent to which common evidence and issues exist.  The use of TimeQey as timekeeping software, with its non-payment for "idle-time," was common to all employees at iQor's locations in the eight states at issue during the relevant time periods.  (*See* Morgan Decl., Ex. A (Argiropoulos Decl. ¶¶ 7-8); Schug Decl., Ex. 1 (30(b)(6) Dep. at 65–66, 70–75, 211).)  Plaintiffs also present the common issue of whether unpaid time constitutes compensable work.

26

The eight states' payment of wages statutes all provide for the prompt payment of wages.  (*See* Minn. Stat. § 181.101 (requiring payment of "all wages earned");  N.Y. Lab. Law § 191; *Gordon v. Kaleida Health,* 299 F.R.D. 380, 389 (W.D.N.Y. 2014) (stating that Section 191 "provides for the recovery of wages for all hours worked."); Ohio Rev. Code § 4113.15 (stating that an employer must "pay all its employees the wages earned by them. . . ."); Ariz. Rev. Stat. § 23–351 (requiring payment for "all wages due");  Colo. Rev. Stat. § 8-4-103 (stating that wages or compensation earned by any employee are promptly due); N.C. Gen. Stat. § 95-25.7 (requiring the prompt payment of accrued wages and tips to employees); S.C. Code. Ann. § 41-10-40 (employers shall pay "all wages due"); Cal. Labor Code §§ 510 & 1194 (defining a day's work and providing for a civil action to recover the nonpayment of wages), but do not generally provide an independent right to payment.  *See, e.g., Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 837 (Minn. 2012) (interpreting Minnesota Statutes § 181.13); *Lacy v. Reddy Elec. Co.*, No. 3:11-cv-52, 2013 WL 3580309, at *17 (S.D. Ohio July 11, 2013) (holding that a claim under Ohio's prompt pay act depends upon the minimum wage and overtime statutes); *Barnes v. Van Schaack Mortg.*, 787 P.2d 207, 210 (Colo. App. 1990) (stating that Colo. Rev. Stat. § 8-4-103(1)(a) does not create a substantive right to compensation for work).  To establish a substantive right to payment for all hours worked, Plaintiffs all rely on their respective offer-of-employment letters.  (*See* Pls.' R. 23 Mem. at 31.) During the 2009–2015 period, iQor sent a standard offer letter to all of its new hires. (Schug Decl., Ex. 1 (30(b)(6) Dep. at 110–13).)

Granted, some general common factual and legal issues exist, as noted above. But numerous differences in state law also exist, requiring individualized factual and legal determinations. One such difference is in how "wages" are defined. For example, Colorado defines "wages" as "[a]ll amounts for labor or service performed by employees," Colo. Rev. Stat. § 8-4-101(14)(a)(i), but under Arizona law, "wages" are "nondiscretionary compensation due an employee for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid." Ariz. Rev. Stat. § 23-350(6). As iQor notes, determining CCAs' expectations and whether they were reasonable would involve individualized inquiries with respect to members of the prospective Arizona class.[10]

In addition, Minnesota has a regulation concerning the relationship between rest breaks and hours worked. The regulation provides:

> The minimum wage must be paid for all hours worked. Hours worked include training time, call time, cleaning time, waiting time, or any other time when the employee must be either on the premises of the employer or involved in the performance of duties in connection with his or her employment or must remain on the premises until work is prepared or

---

[10] Although in a slightly different context, in *Luiken v. Domino's Pizza, LLC*, a case in which Domino's Pizza delivery drivers alleged that the delivery charge customers paid to Domino's was a gratuity wrongfully withheld from them, the relevant Minnesota statute defined the term "gratuities" to include "an obligatory charge assessed to customers, guests or patrons which might reasonably be construed by the guest, customer, or patron as being a payment for personal services rendered by an employee." 705 F.3d at 372 (emphasis added) (citation omitted). The Eighth Circuit determined that how a charge is reasonably construed in one transaction is not necessarily indicative of how it is reasonably construed in another, and found that neither Rule 23(a)'s commonality requirement nor Rule 23(b)(3)'s predominance requirement was met. *Id.* at 376–78. Similar individualized inquiries concerning the interpretation of employees' "reasonable expectations" may exist here under the application of Arizona law.

available.  Rest periods of less than 20 minutes may not be deducted from
total hours worked.

Minn. R. 5200.0120, subpt. 1.  None of the other states appear to have similar state regulations addressing rest periods.  In fact, under California law, "courts recognize a presumption that employees are doing no work while clocked out, which employees have a burden to rebut."  *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 938 (N.D. Cal. 2016) (citation omitted).

Additionally, while some states permit an averaging of wages over a longer period of time to assess compliance with the minimum wage requirements, *see, e.g., Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 466 (E.D.N.Y. 2015), it appears that California does not.  *See Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36 (Cal. Ct. App. 2013).  Instead, iQor posits, determining iQor's compliance with respect to the prospective California Plaintiffs, would require a review of each hour of each Plaintiffs' time during the entire class period.  (*See* Def.'s R. 23 Opp'n Mem. at 14.) Moreover, Plaintiffs assert additional claims—unique to the proposed California class— for waiting time penalties and itemized wage statements under California's Labor Code, (FAC ¶¶ 372–81), and violations of California's Unfair Competition Law, which prohibits unlawful business acts or practices.  (*Id.* ¶¶ 382–89).  Plaintiffs do not allege such stand-alone claims for any of the other proposed classes.

Also, Plaintiffs' eight, state-specific proposed classes highlight numerous differences in limitations periods and/or the dates of prospective class members' employment at iQor facilities.  The length of the time periods applicable to the other six

classes vary greatly:  Minnesota has a two-year limitations period for straight-time claims, Minn. Stat. § 181.101, and three years if the violation was willful.  Minn. Stat. § 541.07.  New York has a six-year limitations period for straight-time claims, N.Y. Lab. Law § 198(3), and a three-year period for overtime claims.  N.Y. Lab. Law § 663(3). Ohio has an eight-year limitations period for straight-time claims, Ohio Rev. Code § 2305.06, and a two-year period for overtime claims.  Ohio Rev. Code § 2305.11(A). Arizona has a one-year limitations period.  Ariz. Rev. Stat. § 12-541(3).  Colorado has a two-year limitations period, for straight-time wage claims, extending to three years for willful violations, Colo. Rev. Stat. § 8-4-122, and the same limitations periods for overtime claims.  *See* 7 Colo. Code Regs. § 1103-1:15.  North Carolina has a two-year limitations period for straight and overtime claims, N.C. Gen. Stat. § 95-25.22(f), while South Carolina has a three-year limitations period for straight-time claims.  S.C. Code Ann. § 41-10-80(C).  California has a four-year limitations period for straight and overtime claims.  Cal Bus. & Prof. Code § 17204.

Membership in only two of the proposed classes—those for Colorado and South Carolina—covers the same time period, from April 3, 2012 to December 31, 2014.  (*See* Pls.' Proposed Order at 2 [Doc. No. 361].)  The period for membership in the other proposed classes varies.  For example, the proposed Ohio class spans a seven-year period from April 3, 2007 to December 31, 2014, while the proposed Arizona class covers only an eight-month period from April 3, 2014 to December 31, 2014.  (*See id.*)  While seven of the class periods end on December 31, 2014—consistent with iQor discontinuing the

use of TimeQey to record idle time as of January 1, 2015— the proposed Colorado class ends on December 21, 2014.

Moreover, Plaintiffs' proposed class definitions do not identify whether the classes apply to claims for both straight time and overtime, or straight time only. From the operative complaint, it appears that the Minnesota and South Carolina proposed classes are limited to claims for only straight-time wages, (*see* FAC ¶¶ 227–41; 347–56), but the proposed class definitions are unclear.

Plaintiffs assert that their state-law overtime claims generally track their FLSA claims, defining "compensable time" pursuant to the FLSA. (*See* Pls.' R. 23 Mem. at 20.) For example, they allege that North Carolina relies on the interpretative guidance of the FLSA to determine whether particular activities constitute "work." (FAC ¶ 327). But while North Carolina gives "great weight" to FLSA interpretations and rulings where the state has adopted the language or terminology of the FLSA, 13 N.C. Admin. Code § 12.0103, Plaintiffs have not specifically identified the similarities. Rather the Court agrees with the assessment of its sister court in the Western District of Missouri, which considered the same argument:

> Try as Plaintiffs might to construe the state law claims as if they are mere extensions of the FLSA, Plaintiffs have not shown that these states have adopted an understanding of compensable work identical to the understanding that Plaintiffs claim is set forth in the FLSA. On the contrary, their citations to caselaw from these states show the wide range of state incorporation of the FLSA's standards, from express incorporation to mere musings that the same standards might apply. The many detailed questions of law that would necessarily arise in determining the precise application of Plaintiffs' theory to each state's law would threaten to overwhelm any common issues among the class members. As the Fifth

31

> Circuit has explained, "in a class action governed by the laws of multiple
> states, such as this one, variations in state law may swamp any common
> issues and defeat predominance . . . The party seeking certification of a
> nationwide class must therefore provide an extensive analysis of state law
> variations to reveal whether these pose insuperable obstacles."

*Nobles*, 2013 WL 12153517, at *3 (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d

717, 724 (5th Cir. 2007)) (internal quotes omitted).

While Plaintiffs assert that the decisions of this Court and others support findings

of commonality and predominance, (*see* Pls.' R. 23 Mem. at 36–37), the cases on which

Plaintiffs rely did not involve the application of multiple states' laws. Rather, *Cruz v.*

*TMI Hospitality, Inc.*, No. 14-cv-1128 (SRN/FLN), 2015 WL 6671334, at *1 (D. Minn.

Oct. 30, 2015), involved claims brought under Minnesota statutory and common law, and

*Rai v. Santa Clara Valley Transportation Authority*, 308 F.R.D. 245 (N.D. Cal. 2015),

arose under California state law. More persuasive, the Court finds, is authority in which

plaintiffs have sought Rule 23 certification of claims brought under the laws of multiple

states. Even slight differences in state law "may swamp any common issues and defeat

predominance." *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 208 (D. Minn. 2003) (citing

*Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)). In *In re Prempro*, 230

F.R.D. 555, 563 (E.D. Ark. 2005), our sister court in the Eastern District of Arkansas

examined state law claims for consumer fraud, unfair competition, and unjust enrichment

under the laws of 24 states, finding that, for Rule 23 purposes, "these laws cannot

reasonably be grouped in a comprehensive manner that does not seriously impinge on the

integrity of the law of each state." In *Cruz v. Lawson Software*, this Court declined to

32

certify a class involving the laws of 42 states. *See* 2010 WL 890038, at \*10. This Court observed that attempting to try such a case would "create a trial dominated by individual issues," and because various laws would apply, different jury instructions and different factual inquiries would be required. *Id.*; *see also Barrus v. Dick's Sporting Goods, Inc.*, 732 F. Supp. 2d 243, 252–55 (W.D.N.Y. 2010) (declining to certify a Rule 23 class brought under the wage laws of 36 states, noting that the plaintiffs had not explained how jury instructions and testimony could be compartmentalized to ensure application of the proper law to the evidence for that subclass).

For all of the foregoing reasons, the Court finds that Plaintiffs have not demonstrated predominance as to their state law claims. Proving their claims will involve the application of varying laws of different states, including three California-specific claims unique to a California sub-class. (*See* FAC, Counts XV–XVII.) The Court foresees many manageability problems with the proposed class action, including jury confusion, which would create difficulties in proceeding with Plaintiffs' claims in a unified action. *See* Fed. R. Civ. P. 23(b)(3)(D).[11]

---

[11]     Moreover, although the Court need not rule on this basis, it could appropriately decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. In *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1028–29 (D. Minn. 2007), this Court considered the question of its supplemental jurisdiction over the state labor law claims in the case. The Court observed that courts may decline to exercise jurisdiction under 28 U.S.C. § 1367(c) if the state claims substantially predominate over the claims for which the court has original jurisdiction, such as those arising under the FLSA. *Id.* In considering whether state claims substantially predominate, courts typically consider whether the state claims differ from the federal claims. *Id.* (citing *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 308 (3d Cir. 2003)). Included in the assessment, is consideration of the proportion of state law class members to federal FLSA plaintiffs. *Id.*

2.    **Superiority**

The remaining consideration under Rule 23(b)(3) is whether a class action would be a superior method of adjudicating this controversy.  Plaintiffs contend that a class action is the superior method of adjudication of this matter.  But, as noted above, the Court finds that because the applicable law of the eight states varies, a class action is not the superior method for resolving Plaintiffs' state law claims.  *See Lawson Software*, 2010 WL 890038, at *9 (citing *In re Baycol Prods. Litig.*, 218 F.R.D. at 209–10 ("Plaintiffs have failed to demonstrate that, given the application of the various state laws, such a class action would be manageable.")

---

Where the number of state class members is less than, or similar to, the number of federal plaintiffs, courts typically exercise supplemental jurisdiction.  *Id.*  (citing *Lindsay v. Government Employees Ins. Co.,* 448 F.3d 416, 424–25 & nn. 11, 12 (D.C. Cir. 2006); *Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 485 (E.D. Cal. 2006); *Trezvant v. Fidelity Employer Servs. Corp.,* 434 F. Supp. 2d 40, 57 (D. Mass. 2006)).  Conversely, where the state class members substantially outnumber the federal plaintiffs, courts have exercised their discretion to decline supplemental jurisdiction.  (*Id.*) (citing *De Luna–Guerrero v. North Carolina Growers Ass'n, Inc.*, 338 F. Supp. 2d 649, 652 (E.D. N.C. 2004); *Leuthold v. Destination Am., Inc*., 224 F.R.D. 462, 470 (N.D. Cal. 2004)); *see also De Asencio*, 342 at 308 (declining to exercise supplemental jurisdiction in a case with 4,100 state class members and only 450 federal plaintiffs).

In *Nerland*, this Court found the exercise of supplemental jurisdiction appropriate, noting that the state-law and FLSA claims were substantially similar, and that the number of members was similar:  approximately 150–400 state law class members and 300 FLSA plaintiffs.  564 F. Supp. 2d at 1029.  Here, however, according to the data reviewed by Plaintiffs' expert Dr. Steward, there are approximately 16,020 putative state class members, and 3,483 FLSA members.  (Ex. 15 to Schug Decl. (Steward Report ¶ 9); Ex. 16 to Schug Decl. (Steward Supp'l Report ¶ 4) (revising numbers of Minnesota putative class members).)  This disproportion suggests that the state law claims would substantially predominate over the FLSA claims, making it appropriate to decline the exercise of supplemental jurisdiction, were the Court to rule on this basis.

34

Because the Court finds that the requirements of predominance and superiority under Rule 23(b) are not met, it is unnecessary to address the remaining Rule 23(a) requirements.  *See id.* (citing *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. at 573 ("[A] full analysis of FRCP 23(a) is unnecessary since Plaintiffs failed to meet any of the FRCP 23(b) requirements, which precludes certification.").   For all of the foregoing reasons, Plaintiffs' motion is denied.

## B.    Defendant's Motion to Decertify the Conditional FLSA Class.

As noted, Plaintiffs Bell, Turner, Hope, Ostrovsky, Brandt and Sanders allege that iQor violated the FLSA by failing to pay them overtime compensation for hours worked in excess of 40 hours per week.  (*See* FAC ¶¶ 334–43.)  In October 2015, the Court conditionally certified a FLSA class, which now consists of 3,544 workers.  (*See* Schug Decl. ¶ 2.)  Defendants seek decertification of this class, arguing that the Named FLSA Plaintiffs and the FLSA Opt-In Plaintiffs (collectively, "the FLSA Plaintiffs") are not similarly situated.

Under the FLSA, covered employers must pay non-exempt employees who work over 40 hours in a given work week an overtime rate of one and a half times the employee's regular rate of pay for all hours worked exceeding 40.  29 U.S.C. § 207(a). The FLSA authorizes employees to bring a collective action against employers for violations of FLSA's overtime and minimum wage provisions.  *Id.* § 216(b).  To proceed with a collective action, plaintiffs must demonstrate that they are similarly situated to the proposed class members.  *Brennan v. Qwest Commc'ns Int'l, Inc.*, Civ. No. 07-2024

(ADM/JSM), 2009 WL 1586721, at *2 (D. Minn. June 4, 2009).  Determining whether plaintiffs are similarly situated to the proposed class requires a two-step inquiry.  *See Burch v. Qwest Commc'ns Int'l, Inc.,* 500 F. Supp. 2d 1181, 1186 (D. Minn. 2007) (citations omitted).  "First, the court determines whether the class should be conditionally certified for notification and discovery purposes."  *Id.* (citation and internal quotation marks omitted).  "[T]he plaintiffs need only establish [at that time] a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan."  *Id.* (citation and internal quotation marks omitted).  Unlike a Rule 23 class action, no employee is a party to a FLSA collective action unless he files with the Court a written consent to join the action.  *Smith v. Heartland Auto. Servs., Inc.,* 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) (citation omitted).

If certification is granted, and once discovery has progressed, the party opposing the class action may move to decertify the class.  *See Burch*, 500 F. Supp. 2d at 1186.  "If a class is decertified, opt-in class members are dismissed without prejudice, and the case proceeds only in the putative class representatives' individual capacities."  *Keef v. M.A. Mortenson Co.*, No. 07-CV-3915 (JMR/FLN), 2008 WL 3166302, at *2 (D. Minn. Aug. 4, 2008).  At this stage, a court will again analyze whether the plaintiffs are similarly situated to the proposed FLSA class.  *Nerland*, 564 F. Supp. 2d at 1017.

"Plaintiffs may be similarly situated when they suffer from a single, FLSA–violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *Bouaphakeo v. Tyson Foods, Inc.*, 765

F.3d 791, 796 (8th Cir. 2014), aff'd, 136 S. Ct. 1036 (2016). Courts may consider the following factors: "'(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations.'" *Id.* (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). Although the named plaintiffs bear the burden of establishing that they are similarly situated, "[that] burden is not so rigorous that they must demonstrate their positions are identical to those of the opt-in plaintiffs." *Nerland*, 564 F. Supp. 2d at 1018. "Rather, plaintiffs 'need show only that their positions are similar.'" *Id.* (quoting *Smith*, 404 F. Supp. 2d at 1149). In addition, whether to decertify a collective action under § 216(b) is within the Court's discretion. *Id.*

Defendant asserts that the disparate factual and employment settings of the plaintiffs preclude the continued certification of this action. First, iQor argues that its policy was to pay its employees for all hours worked. (Def.'s Decert. Mem. at 11–16.) While some managers may have refused to adjust CCAs' hours to account for unpaid idle time, this was not a common "policy," iQor argues, pointing to conflicting evidence showing that some managers routinely granted CCAs' requests to adjust their previously unrecorded time. (*Id.*) Furthermore, iQor asserts that some individual CCAs simply failed to seek adjustments for productive time. (*Id.*)

Defendant also contends that the fundamental question of whether rest time is compensable turns on numerous individual factors. (*Id.* at 16.) It first asserts that as a

matter law, compensable work is limited to activity that is performed predominantly or primarily for the employer's benefit. (*Id.* at 17.) And factually, iQor again argues that the record contains conflicting evidence concerning whether CCAs were fully relieved from performing work duties during breaks or were performing tasks primarily for iQor's benefit. (*Id.* at 20.) Moreover, iQor argues that evidence of varying employment settings demonstrates a lack of similarity: members worked in different offices and for different managers, performed different duties, utilized different timekeeping practices, and received different, subjective responses from management to requests for time adjustments. (*Id.* at 23–27.)

The FLSA Plaintiffs, on the other hand, argue that decertification is not appropriate because all of their claims are based on iQor's de facto policy, through the use of the TimeQey system, of denying proper pay for all hours worked. (*See* Pls.' Decert. Opp'n Mem. at 26.) They note that CCAs uniformly used TimeQey to record their time, regardless of geographic location. (*Id.* at 22–23.) They thus assert that they are similarly situated, identifying the following common ways in which their time was under-reported by TimeQey: (1) time spent logging in and out of their computers; (2) idle time that was systematically deducted, by default, as "break time"; (3) short rest breaks; and (4) random gaps of time. (*Id.* at 22.) Moreover, they argue that their proof of liability is not dependent upon the habits of individual CCAs or supervisors. Rather, they assert that iQor sought to underpay its CCAs when it implemented TimeQey, and the

compensability of short rest breaks under the FLSA is not dependent upon individual factors. (Pls.' Decert. Opp'n Mem. at 22–31.)

### 1. Factual and employment settings

The Court finds that consideration of the factual and employment settings factor weighs against granting decertification. As a general matter, the FLSA Plaintiffs, regardless of the call center location, performed the same job of serving iQor's clients, either by providing telephone support for incoming customer calls or making outbound calls for debt resolution purposes. (*See* Schug Decl., Ex. 1 (30(b)(6) Dep. at 78–79) (describing general duties of a CCA). Defendant submits declarations from two CCAs who additionally performed "floor duties" on a periodic basis, and argues that CCAs are not similarly situated because of the distinction between handling inbound calls and outbound calls, (*see* Def.'s Decert. Mem. at 24), but these are insignificant distinctions. Again, the Court focuses here on the similarity between the Named FLSA Plaintiffs and Opt-In Plaintiffs, for whom the factual and employment settings need only be similar, not identical. *See Nerland*, 564 F. Supp. 2d at 1018.

Not only were the FLSA Plaintiffs' jobs substantially similar, they were also subject to iQor's employee code of conduct, which states, "We carefully schedule employee activities, and rely on strict adherence to these schedules to deliver exceptional service to our clients. As such, we expect you to understand your schedule and adhere to it." (Morgan Decl., Ex. A-2 (Code of Conduct at 3).) Also, the manner in which CCAs used TimeQey was the same, with the exception of a relatively short period of training

time that appears to have been common to trainees.  (*See* Schug Decl., Ex. 1 (30(b)(6)

Dep. at 88–89).)  Moreover, iQor's 30(b)(6) witness Argiropoulos testified that regardless

of the client for whom the work was performed, TimeQey essentially worked the same

way in all of iQor's contact centers within the United States.  (*Id.* at 211–12.)

### a.    Common Policy

Defendant asserts that its policy was to pay its employees for all hours worked.

(Morgan Decl., Ex. 1 (Argiropoulos Decl. ¶ 10).)  That some managers failed to make

manual adjustments is not evidence of a common policy, iQor argues.  (Def.'s Decert.

Mem. at 14–18.)  The FLSA Plaintiffs, however, assert that in actuality, iQor's common

"policy"—through the implementation and use of TimeQey—was to violate its official

policy by denying proper pay for all hours worked, leading to the failure to properly

compensate for overtime hours.  (*See* Pls.' Decert. Opp'n Mem. at 26.)

The Court finds that the FLSA Plaintiffs have met their burden, at least at this

stage of the litigation, of demonstrating a "single decision, policy, or plan."  *See Burch*,

500 F. Supp. 2d at 1186 (citations omitted).  As noted, they used the same TimeQey

timekeeping system.  Defendant argues that the actual practices of submitting and

approving requests for retroactive adjustment were highly individual.  (*See* Def.'s Decert.

Mem. at 14–18.) But despite iQor's standardized method by which CCAs could seek

adjustments, (*see* Morgan Decl., Ex. A-3 ("Tracking Your Time" at IQOR_00000195);

*id.*, Sealed Ex. 19 (TimeQey User Tutorial at IQOR_00000122)), the FLSA Plaintiffs

have submitted evidence showing that they were discouraged from making such requests.

(*See* Schug Decl., Ex. 11 (Selected Pls.' Interrogatory Responses at ECF pp. 10, 16, 22, 28, 52, 58, 64, 70, 88, 112, 124, 166, 172, 185, 190, 196, 208, 214, 220, 250, 262, 272, 280, 316, 334, 340, 358, 376, 382, 388, 394, 412, 418, 436, 442, 484, 490, 496, 508, 514, 520, 526, 544, 550).)  That some managers routinely granted some CCAs' requests, as iQor contends, is not the issue here.  Rather, the Court must consider the similarities or differences as to the FLSA Named Plaintiffs and Opt-In Plaintiffs, and the record here sufficiently demonstrates similarities. *See Nerland*, 564 F. Supp. 2d at 1018.  Record evidence also supports the four circumstances under which the purported under-reporting of compensable time took place:  logging in and logging out, idle time deducted by default, short rest breaks deducted, and gaps in coverage.  (*See* Schug Decl., Sealed Ex. 17 (Complaint Log).)

In denying decertification motions, other courts have considered evidence concerning the employer's motive relevant to its knowledge of a "policy to violate the official policy."  For instance, in *Monroe v. FTS USA, LLC*, 860 F.3d 389, 402–03, the Sixth Circuit affirmed the denial of an employer's decertification motion, observing that "[e]vidence of market pressures suggests that [the employer's] executives had a motive to institute a company-wide time-shaving policy."  Here, the FLSA Plaintiffs have also proffered evidence supporting their position that iQor knew or should have known that TimeQey resulted in uncompensated time.  They point to evidence demonstrating that when iQor implemented TimeQey in 2009 and eliminated its standard punch-in, punch-out timekeeping procedure, one of its goals was to increase profits by reducing the cost of

employing less productive CCAs. (Schug Decl., Ex 1 (30(b)(6) Dep. at 119–21.)
Defendant's 30(b)(6) witness explained, "So the way we thought [about] it was that we
said, look, we can pay agents the way we are today, at you know, kind of a fixed rate, you
know, based on kind of just when they're in the building, or we can pay a higher rate but
have that rate be for productive work activity." (*Id.* at 120–21.)

In a similar vein, courts have also considered evidence concerning an employer's
productivity requirements when evaluating whether the plaintiffs and opt-in plaintiffs
were subject to a common policy. In *Brennan v. Qwest Communications*, 2009 WL
1586721, at *2, Qwest sought decertification of a class of network technicians who
claimed that Qwest's productivity expectations forced them to work off the clock before
and after their shifts. Qwest argued that the plaintiffs were not similarly situated due to
various differences in the timing of shifts and when the alleged off-the-clock work was
performed. *Id.* at *3. But the court determined that such discrepancies were
inconsequential, and that "the more important issue in evaluating disparities in the factual
and employment settings is whether or not the named plaintiffs and opt-in plaintiffs are
all subject to the same basic requirements and policies implemented by Qwest." *Id.* at
*3–4. Based on the named and opt-in plaintiffs' declarations stating that they performed
off-the-clock work in order to meet Qwest's productivity requirements, the court
determined that they shared similar factual and employment settings, as they were subject
to the same requirements. *Id.* at *5.

The FLSA Plaintiffs' evidence here, if accepted by the factfinder, also shows that iQor's management sought to ensure that its CCAs worked their scheduled hours in order to meet iQor's profitability and budgeting expectations. (Schug Decl., Ex. 6 (Lehtio Dep. at 20–21).) Senior Vice President Jeff Swedberg testified that CCAs could not simply leave for extended rest breaks, apart from their designated lunch breaks, because the company could not absorb the call volume. (*Id.*, Ex. 8 (Swedberg Dep. 37–39); *see also id.*, Ex. 7 (Praznik Dep. at 26) (stating that iQor encouraged its CCAs to keep their breaks short, other than lunch breaks, in order to maintain staff coverage).) And evidence in the record shows that iQor's management, dissatisfied with performance metrics, recommended that CCAs be required to inform their supervisors "before leaving the floor for ANY reason (scheduled break, restroom breaking, training etc.)," stating, "This nonsense stops now." (Schug Decl., Sealed Ex. 34 (April 14, 2014 Email) (emphasis in original).

In light of these facts, the cases on which iQor relies do not support a different conclusion. In *Davenport v. Charter Communications, LLC*, No. 4:12CV00007 AGF, 2017 WL 878029, at * 8–9 (E.D. Mo. March 6, 2017), the court granted the employer's decertification motion, finding no evidence of a uniform unlawful policy, nor corporate knowledge of the same. To overcome the absence of a common policy, plaintiffs relied on representative proof, as well as anecdotal evidence concerning individual supervisors' actions in requiring off-the-clock work. *Id.* at *9. The court found the evidence highly individualized and insufficient to establish a corporate policy. In *Zulauf v. Amerisave*

43

*Mortgage Corp.*, 911 F. Supp. 2d 1266, 1271–75 (N.D. Ga. 2012), the court found that although the evidence showed that various managers may have known that some employees were working unreported overtime hours, there was insufficient evidence showing that top management created and enforced a company-wide "policy-to-violate-the-policy."

Here, however, Plaintiffs have submitted evidence sufficient to show, at this stage of the litigation, iQor's awareness of the time-shaving effects of TimeQey. At least 70 employees utilized iQor's internal corporate feedback system to complain about TimeQey. (*See* Schug Decl., Ex. 17 (Complaint Log).) Among other things, they complained that they were not paid for short breaks, TimeQey constantly switched to idle mode after one to two minutes of inactivity, and they were not paid for time spent logging in and logging off. (*See id.*) Not only did CCAs report these problems internally, there is also evidence that the Minnesota DOL notified iQor in 2009 that Minnesota law requires compensation for rest breaks of less than 20 minutes, and directed iQor to perform a self-audit and reimburse any employees for short, unpaid breaks. (Schug Decl., Sealed Ex. 42 (2009 Minn. DOL Letter).) In 2013, the Minnesota DOL completed an investigation of iQor, and while it found no minimum wage violations, it again notified iQor of its obligation to pay for all rest breaks of less than 20 minutes. (*Id.*, Sealed Ex. 43 (2013 Minn. DOL Letter).)

In addition, iQor acknowledges that as of January 1, 2015, it modified TimeQey so that periods of computer inactivity would no longer be recorded as unpaid break time.

(Morgan Decl., Ex. A (Argiropoulos Decl. ¶ 9).)  Shortly after doing so, when some of

iQor's management team discussed issues related to TimeQey, one such person stated

that "the old way on TimeQey" was "less compliant" with labor law.  (Schug Decl.,

Sealed Ex. 35 (Jan. 2015 Email Chain at IQORJL_0107705).)

On balance, the Court finds that decertification is not warranted on the grounds

that the FLSA Plaintiffs were not subject to a common policy.

### b.    Variations in CCAs' Requests for TimeQey-Related Adjustments and Approval of Such Requests

Defendant further argues that decertification is warranted due to differences

among CCAs in seeking adjustments for unpaid time, and differences among managers

with respect to the approval or denial of such requests.  (Def.'s Decert. Mem. at 12–16.)

The Court disagrees.

The FLSA Plaintiffs have submitted evidence showing that many CCAs requested

manual time-keeping adjustments.  (*See e.g.,* Schug Decl. Ex. 11 (Selected Pls.'

Interrogatory Responses at ECF pp. 10, 70, 106, 340, 448, 520).)  They have also offered

consistent evidence showing that their managers discouraged them from seeking manual

adjustments.  (*See id.* at pp. 10, 16, 22, 28, 52, 58, 64, 70, 88, 112, 124, 166, 172, 185,

190, 196, 208, 214, 220, 250, 262, 272, 280, 316, 334, 340, 358, 376, 382, 388, 394, 412,

418, 436, 442, 484, 490, 496, 508, 514, 520, 526, 544, 550.)  As one CCA explained:

> I mean, the people were intimidated regarding the TimeQey adjustments.
> Managers did not like to do them because it took them a lot of time.  I
> mean, when they had to go through and adjust every single minute, every
> single time that they had to approve a five-minute block, it would literally
> be a 30-second, you know, click on it.  It would load, and then it would

wait, and then populate the fill form they got to do, and then they click it again, and it loads. You know what I mean? It was a very painstaking process for them to go through.

So there was an effort on all [managers] to make sure that we were limiting our adjustment. They would be upset with a lot of adjustment. . . . [I]f I would have been able to make my adjustment and somebody would have just been able to hit one button and approve it, I think it would have been okay, but that's not what it was. It was painstaking.

(Morgan Decl., Ex. D-3 (Bloomquist Dep. at 35–36).)

The fact that not all CCAs sought adjustments, or that some managers granted some requests, does not warrant decertification here. Rather, "[t]he central question at issue in the decertification motion is whether the named plaintiffs and opt-in plaintiffs are similarly situated, not whether the FLSA was violated." *Brennan*, 2009 WL 1586721, at * 5 (citing *Bouaphakeo*, 564 F. Supp. 2d 870, 893–94). The FLSA Plaintiffs have submitted sufficient evidence showing that they are similarly situated with respect to iQor's alleged FLSA violations through the use of TimeQey. As this Court observed in *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-CV-1018 (PJS/RLE), 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007), the varying practices of supervisors might mean that some employees have fewer damages than others, or perhaps no damages, but it does not mandate decertification. Notably, the court found that such differences did not detract from the plaintiffs' primary argument that Gold'n Plump lacked a policy requiring the payment for donning and doffing time. *Id.* The Court finds the same to be true here.

The facts here are also distinguishable from *Zulauf* and *Davenport*, the authority on which iQor relies. (*See* Def.'s Decert. Mem. at 13–14.) In *Zulauf*, the court found

that "scant direct allegations" of violations resulting from three out of 11 managers failed to show the existence of a FLSA-violating policy. (Def.'s Decert Mem. at 13) (citing 911 F. Supp. 2d at 1274–75). For the reasons previously discussed, the Court finds that the FLSA Plaintiffs have submitted evidence showing the existence of a common policy. And this case is unlike *Davenport*, 2017 WL 878029, at *9, in which employee call center workers did not utilize the same method of clocking in and out of work, and were subject to different compensation systems. The FLSA Plaintiffs here have submitted evidence showing that they were subject to the same time-keeping system and idle-time issues. Nor is the Court persuaded that the factual and employment settings are disparate simply because the alleged time violations arose in different ways such as logging in/off, gap time, or break time. *See Monroe*, 860 F.3d at 403 ("That an employer uses more than one method that implement a company-wide work 'off-the-clock' policy does not prevent employees from being similarly situated for purposes of FLSA protection.") Accordingly, the Court finds that the FLSA Plaintiffs are not disparately situated on this basis.

### c.    Compensability

As to the portion of the FLSA Plaintiffs' overtime claims predicated on failure to pay for rest breaks, iQor argues that compensability turns on individual, fact-intensive inquiries into the purpose of each break, precluding collective resolution of the FLSA claims. (Def.'s Decert. Mem. at 16.)

The FLSA Plaintiffs, however, assert that the compensability of rest breaks is suited to collective resolution. (*See* Sept. 19, 2017 Hr'g Tr. at 48–49 [Doc. No. 424].) They assert that iQor's TimeQey system and related rest break policies were uniformly designed, implemented, and applied. (Pls.' Decert. Opp'n Mem. at 37.) They contend that iQor required CCAs to be on duty and at the workplace during their scheduled shifts, and the CCAs were all subject to specific production and break requirements. (*See* Sept. 19, 2017 Hr'g Tr. at 48–49.)

Moreover, as to breaks of 20 minutes or less, the FLSA Plaintiffs point to the DOL's interpretive regulations, under which short breaks of five to approximately 20 minutes in length count as hours worked. (Pls.' Decert. Opp'n Mem. at 34–36) (citing 29 C.F.R. § 785.18). But iQor argues that courts within the Eighth Circuit have declined to adopt § 785.18 as a bright-line rule. (Def.'s Decert. Mem. at 18) (citing *Benton v. Labels Direct, Inc.*, No. 4:14CV01293 ERW, 2014 WL 4724696, at *7 (E.D. Mo. Sept. 23, 2014)). Instead, iQor asserts that the Eighth Circuit requires consideration of individualized facts to determine whether an employee's rest break was predominantly for the benefit of the employer or for the employee's own benefit. (*Id.*) (citing *Henson v. Pulaski Cnty. Sheriff Dep't*, 6 F.3d 531, 535 (8th Cir. 1993)).

DOL regulations address the compensability of various types of employee breaks under the FLSA, including: (1) "bona fide meal periods" that are non-compensable when the employee is completely relieved from duty, 29 C.F.R. § 785.19; (2) "off duty" time that is non-compensable, *id.* § 785.16; and (3) "rest periods of short duration"—running

from five to approximately 20 minutes—that are compensable, as they "promote the efficiency of the employee." *Id.* § 785.18.

In *Henson,* sheriff's deputies and police officers argued that meal breaks, during which they remained on call in the event of emergencies, were compensable under the FLSA. 6 F.3d at 536. While the Eighth Circuit considered § 785.19, it declined to apply the regulation as the standard for determining the compensability of such breaks. *Id.* at 534. Rather, it found that the compensability of meal breaks depends on the facts of the case, and specifically, whether the breaks are predominantly for the benefit of the employer. *Id.* Although the court acknowledged that agency regulations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," it found that this particular regulation lacked persuasive force. *Id.* at 535 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

When considering the application of regulatory standards, the Eighth Circuit advised courts to examine "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* (quoting *Skidmore*, 323 U.S. at 140). In rejecting § 785.19 as a bright-line standard, the court found it "inconsistent with the Supreme Court's longstanding interpretation of the [FLSA]" in cases involving meal periods and after-hours "on-call" claims. *Id.* Specifically, a bright-line standard "would mandate the application of a rigid rule in the face of the Supreme Court's direction that courts take a practical approach based on the

unique facts of each case." *Id.* Additionally, the court found that the U.S. Department of Labor ("DOL") itself did not consistently follow the regulatory standard. *Id.*

### i.    Short Breaks of 20 Minutes or Less

Although the Eighth Circuit has not yet had occasion to address the standard applicable to alleged pay violations for short rest breaks, district courts within this Circuit have reached differing results, applying either a predominantly-for-the-benefit-of-the-employer standard, or a bright-line regulatory standard. In *Benton,* 2014 WL 4724696, at *1, the court considered on summary judgment whether 15-minute breaks were automatically compensable, as 29 C.F.R. §785.18 provides. However, the parties disputed the fundamental nature of the breaks in question, namely, whether they were bona fide meal breaks or short rest breaks, to which different regulations apply. *Id.* at *7. The court found that inquiry into how the plaintiffs spent their time during the breaks was relevant to determining whether there was a FLSA violation. *Id.* The information would presumably also inform whether the break was a meal period or a rest break. In denying summary judgment, the court rejected the plaintiffs' argument that § 785.18 controlled the question of liability, and stated, without discussion, "the regulations are not controlling law in the Eighth Circuit, and do not stand for the strict rules of application argued by Plaintiffs." *Id.* (citing *Henson*, 6 F.3d at 535).

However, other courts in the Eighth Circuit have simply applied § 785.18 to short breaks of less than 20 minutes. The court in *Petrone v. Werner Enterprises, Inc.,* 121 F. Supp. 3d 860, 866 (D. Neb. 2015), applied the regulation as a bright-line rule, stating,

"Short rest periods of less than 20 minutes 'must be counted as hours worked.'" (quoting 29 C.F.R. § 785.18).  Finding that the employer failed to compensate its employees for breaks of 20 minutes or less, and that it had knowledge or the opportunity to acquire knowledge of non-compensation, the court entered summary judgment for the employees on the question of liability.  *Id.* at 869–70.  Similarly, in *Brown v. L&P Industries, LLC,* No. 5:04-CV-0379-JLH, 2005 WL 3503637, at *6 (E.D. Ark. Dec. 21, 2005), the court did not require a showing of benefit to the employer on the employee's claimed FLSA overtime violations.  Rather, the court applied § 785.18 to short breaks, and found, on summary judgment, that the employee's time clock records failed to reflect all hours worked, including payment for overtime work.  *Id.* at 6–7.

The FLSA Plaintiffs argue that "[a]s an initial matter, the question of whether 29 C.F.R. § 785.18 establishes a bright-line rule on the compensability of short rest breaks is itself a common question that can be resolved on behalf of the entire collective, making decertification inappropriate."  (Pl.'s Decert. Opp'n Mem. at 34.)  Granted, a bright-line rule would apply to all members of the collective.  However, to the extent the FLSA Plaintiffs suggest that resolution of this question is somehow unnecessary at this juncture, the Court disagrees.  A bright-line rule either applies to the short breaks, in which case the FLSA Plaintiffs are similarly situated, or it does not, making the employees less likely to be similarly situated, as individual issues may inform liability.

For several reasons, the Court finds that the compensability of short breaks of 20 minutes or less is an issue amenable to collective resolution.  First, this Court does not

read *Henson* expansively.   *Henson* does not state that a factually-driven analysis is required for *all* determinations of compensability under the FLSA.   Rather, the Eighth Circuit stated in *Henson*, "We conclude that the predominantly-for-the-benefit-of-the employer standard provides the appropriate test *for determining the compensability of meal periods* under the FLSA." 6 F.3d at 534 (emphasis added).[12]   Compensation for meal periods is not at issue here.

Second, when determining how much weight to afford agency rules and opinions, the Eighth Circuit in *Henson* cited the DOL's own inconsistent interpretations of § 785.19—a regulation not at issue here.   *Id.* at 535   In contrast, courts have found that the DOL has consistently interpreted § 785.18—a regulation that is at issue here.   *See Dep't of Labor v. Am. Future Sys., Inc.*, 873 F.3d 420, 427–28 (3d Cir. 2017) (citing 46 years of

---

[12]      Given the specificity of the Eighth Circuit's language, the Court thus disagrees with the broad statement in *Benton* that the DOL's regulations are not controlling law in this Circuit.  *See* 2014 WL 4724696, at *7 (citing *Henson*, 6 F.3d at 535).

Similarly, the Court rejects the statement in *Marti v. Grey Eagle Distributors, Inc.* that "in interpreting the [DOL's] regulations, the Eighth Circuit applies the 'predominantly for the benefit of the employer' test in order to determine the compensability of an employee's time.  937 F. Supp. 845, 852 (E.D. Mo. 1996) (relying on *Henson*, 6 F.3d at 534).  While iQor argues that the Eighth Circuit has adopted this broad proposition by virtue of affirming *Marti*, (*see* Sept. 29, 2017 Hr'g Tr. at 42 [Doc. No. 424]), the Court disagrees.  Nothing in the Eighth Circuit's three paragraph opinion on appeal refers to the applicable standard for determining compensability, nor that it even considered the issue whatsoever.  *See Marti v. Grey Eagle Distributors, Inc.*, 133 F.3d 922 (8th Cir. 1998) (per curiam).  Rather, the Eighth Circuit's ruling merely affirms the district court's decision in granting the defendant's motion for reconsideration of an earlier district court decision that had permitted the plaintiffs to add additional plaintiffs. *Id.*

consistent DOL policy that short breaks constitute "hours worked" under the FLSA) (citations omitted); *Perez v. Am. Future Sys., Inc.*, No. 12-6171, 2015 WL 8973055, at *7 (E.D. Penn. Dec. 16, 2015) ("Section 785.18 is a rule that is both longstanding and unchanging . . . . In addition, the DOL's consistent application and interpretation of this rule spans many decades and is well-documented.") (citations omitted). Thus, one of the primary bases on which the Eighth Circuit rejected the DOL regulation in *Henson* is absent here.

Third, the Court finds § 785.18 persuasive due to the validity of the DOL's reasoning. *See Henson*, 6 F.3d at 534 (citing *Skidmore*, 323 U.S. at 140) (noting that the weight given to an agency ruling, interpretation, or opinion is informed by the validity of its reasoning, among other things). Congress enacted the FLSA to ameliorate labor conditions that are detrimental to the "maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." *American Future Systems*, 873 F.3d at 428 (citing 29 U.S.C. § 202(a)). In *American Future Systems*, the Third Circuit explained that compensation for short rest breaks is consistent with these legislative objectives:

> [I]t is readily apparent that by safeguarding employees from having their wages withheld when they take breaks of twenty minutes or less "to visit the bathroom, stretch their legs, get a cup of coffee, or simply clear their head after a difficult stretch of work, the regulation undoubtedly protects employee health and general well-being by not dissuading employees from taking such breaks when they are needed."

*Id.* at 429 (quoting *Perez,* 2015 WL 8973055, at * 7). This Court agrees. In applying § 785.18 as a bright-line standard, the Third Circuit further cited the decisions of other

courts that had done so. *Id.* at 430, n.56 (citing *Lillehagen v. Alorica, Inc.*, No. 13-0092, 2014 WL 6989230, at *10 (C.D. Cal. Dec. 10, 2014); *Brown*, 2005 WL 3503637, at *6; *Kasten v. Saint-Gobain Perform. Plastics Corp.*, 556 F.Supp.2d 941, 953 (W.D. Wis. 2008); *Martin v. Waldbaum, Inc.*, No. CV 86-0861, 1992 WL 314898, at *1 (E.D.N.Y. Oct. 16, 1992)).

Fourth, in *Henson*, while the Eighth Circuit found that application of a bright-line regulatory standard would be inconsistent with the Supreme Court authority requiring that courts consider the unique facts of each case, the breaks in *Henson*, and the Supreme Court authority on which the Eighth Circuit relied (including *Skidmore*), concerned meal breaks and on-call time. 6 F.3d at 535. The short breaks here are of a different nature.

Granted, there is no Eighth Circuit precedent applying § 785.18 as a bright-line rule. The Court finds, however, consistent with *Henson*'s approach regarding agency deference, that § 785.18 provides persuasive guidance as to the compensability of short breaks. As noted above, the DOL has consistently applied the regulation to short breaks of 20 minutes or less. Moreover, the Court finds the agency's reasoning with respect to § 785.18 to be valid. As expressed in *American Future Systems*, and equally applicable here, "breaks of twenty minutes or less are insufficient to allow for anything other than the kind of activity (or inactivity) that, by definition, primarily benefits the employer. This is certainly true where such short work intervals better prepare the sales representative to deal with the next call." 873 F.3d at 429–30.

Moreover, two courts within the Eighth Circuit have applied § 785.18 as a bright-line rule. *See Petrone,* 121 F. Supp. 3d at 869–70; *Brown,* 2005 WL 3503637, at *6. And, as noted earlier, the Court disagrees with the general reading of *Henson* as stated by the courts in *Benton* and *Marti.* (*See supra* at 52, n.12.) These cases are also factually distinguishable as the parties in *Benton* fundamentally disagreed about the nature of the breaks, *see* 2014 WL 4724696, at * 8, and the breaks in *Marti* were more than 20 minutes long. *See* 937 F. Supp. at 848.

The Court thus finds that decertification is not warranted with respect to the FLSA Plaintiffs' claims based on the failure to compensate for rest periods of 20 minutes or less.

For similar reasons, Court likewise finds that decertification is not warranted as to claims for unpaid gap time and unpaid time due to logging and logging out, provided such periods are 20 minutes or less. The FLSA Plaintiffs have demonstrated that they are sufficiently similar in this regard.

### ii.    Breaks Longer Than 20 Minutes

In *Marti*, the court considered whether a 30-minute break was compensable under the FLSA. *Id.* at 851. It observed that most courts to have considered the issue have found that breaks of at least 30 minutes are not compensable, *id.* at 852 (citing *Donovan v. Bel-Loc Diner*, 780 F.2d 1113 (4th Cir. 1985); *Dole v. Haulaway, Inc.*, 723 F. Supp. 274 (D. N.J. 1989)), whereas breaks of 20 minutes or less have been found compensable. *Id.* (citing *Martin*, 1992 WL 314898, at *2). The court further noted that the DOL

regulations provide "some guidance," and referenced the regulations applicable to short breaks and "off duty" time. *Id.* at 851 (citing 29 C.F.R. §§ 785.18, 785.16).

The "off duty" regulation provides:

Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked. He is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived.

29 U.S.C. § 785.16(a). The regulation further states that a determination of whether the time is long enough for an employee to use it for his or her own purposes "depends upon all of the facts and circumstances of the case." *Id.*

Although the court in *Marti* referenced the off-duty regulation, quoted above, it did not apply it. *See* 937 F. Supp. at 852. Rather, the court applied the predominantly-for-the-benefit-of-the-employer test.[13] *Id.* Under that test, the court found that the plaintiffs presented no credible evidence showing that they had performed any activities for their employer's benefit when they were "on call" during their breaks. *Id.* Nor was there any evidence showing the imposition of restrictions on the employees' time, other than remaining on site. *Id.* The court thus concluded that the 30-minute break periods were non-compensable under the FLSA. *Id.*

Here, the Court need not determine which standard applies to breaks over 20 minutes in length, because either standard dictates the same result with respect to

---

[13]     Regarding the standard used by the court in *Marti*, see the Court's additional discussion, *supra* at 52, n.12.

decertification.  Just as the predominantly-for-the-benefit-of-the-employer" test requires consideration of individualized evidence, § 785.16(a) requires courts to consider "all of the facts and circumstances of the case."  Consideration of this factor warrants decertification of claims seeking compensation for breaks longer than 20 minutes.

### 2.    Available Defenses

Defendant also argues that its individualized defenses to Plaintiffs' claims warrant decertification.  (Def.'s Decert. Mem. at 27–33.)  However, in identifying its primary defense—the "manual adjustment defense"—iQor generally reiterates arguments addressed earlier in this opinion.  For example, it argues that the question of whether any particular manager's awareness that a particular CCA was not being paid, and whether that awareness triggered an overtime obligation for a particular pay period, "cannot possibly be shown on a collective basis." (*Id.* at 32.)  Again, iQor cites the alleged failure of CCAs to follow established procedures for reporting uncompensated time.  (*Id.* at 27.) Additionally, iQor asserts that the question of whether any CCA was wrongly denied payment requires individual assessments of credibility.  (*Id.* at 27–31.)

For the reasons identified earlier in this opinion, the Court finds that these purportedly individualized defenses do not warrant decertification.  As noted, the FLSA Plaintiffs have submitted generalized, representative evidence sufficient to show iQor's awareness that CCAs throughout the country complained to iQor about uncompensated time related to their use of TimeQey, that managers often denied requests for manual adjustments, and that many of the FLSA Plaintiffs were discouraged from seeking

adjustments. This significantly lessens the need for individualized determinations, and will permit the factfinder to collectively adjudicate these FLSA claims. To the extent that there are discrepancies in the evidence, as iQor argues, (*see* Def.'s Decert. Mem. at 29–30), iQor will have the opportunity, in a collective setting, to present its evidence challenging the credibility of Plaintiffs' evidence.

Finally, iQor's manual adjustment defense generally relates to the amount of damages, not liability. These damages issues do not preclude collective adjudication. *See Nerland*, 564 F. Supp. 2d at 1025 (finding that where asserted individualized defenses related to damages, collective adjudication was not precluded). As to damages, Plaintiffs have submitted the opinion of their damages expert, Dwight Steward, Ph.D., who analyzed the TimeQey and pay data for each member of the collective, calculating the number of unpaid hours during the workday that were coded in TimeQey in various categories, including breaks, gaps, and login/logoff. (Schug Decl., Ex. 15 (Steward Report ¶¶ 8-35).) His calculations included offsets for unpaid lunch periods between 30 and 60 minutes, as well as any break time that Defendant paid. (*See id.*, Ex. 16 (Steward Supp'l Report, Tables 2, 5).) Defendant's damages expert, Paul White, Ph.D., similarly submitted a damages report, which ascribes to a similar methodology as the FLSA Plaintiffs' expert. (*See* Schug Decl., Ex. 47 [Doc. No. 402] (White Decl. § V).)

The Court thus concludes that Defendants' purported individualized defenses are questions that either will be resolved on a collective basis or that relate to damages rather than to liability. On balance, this factor does not weigh in favor of decertification.

58

### 3.    Fairness and procedural considerations

Finally, in assessing the fairness and procedural considerations, the Court looks to the purpose of allowing FLSA actions to proceed as collective actions: "'(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct.'" *Lawson Software, Inc.*, 764 F. Supp. 2d at 1063 (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264 (11th Cir. 2008)). "The FLSA is remedial in nature and therefore 'should be given a broad reading, in favor of coverage.'" *Brennan*, 2009 WL 1586721, at *6 (quoting *Nerland*, 564 F. Supp. 2d at 1025). "Although concerns for the remedial nature of the FLSA, alone, are insufficient to justify allowing a case to proceed as a collective action, they do suggest that a close call as to whether the plaintiffs are similarly situated should be resolved in favor of certification." Id. at *7 (citation and internal quotation marks omitted).

Defendant argues that consideration of fairness and procedural concerns demonstrate that this case is inappropriate for collective treatment. (Def.'s Decert. Mem. at 33–35.) They assert that jurors would be overwhelmed by the individualized issues presented by each class member, and that collective adjudication would infringe upon iQor's due process rights. (*Id.* at 33–34.) Plaintiffs, on the other hand, argue that collective resolution is the most efficient means of adjudication. (Pls.' Decert. Opp'n Mem. at 44–47.)

59

The Court agrees with Plaintiffs. As discussed above, the Court has concluded that the main issues in this case are amenable to collective resolution. A collective action to resolve the FLSA Plaintiffs' claims in one proceeding will be a more efficient means of resolution than to proceed with over 3,500 individual trials. This will serve the interests of judicial economy. Moreover, because the FLSA Plaintiffs appear to have relatively small claims, it would be impractical for them to pursue their claims individually and "decertifying the action could have the effect of contravening the remedial nature of the FLSA." *Brennan*, 2009 WL 1586721, at *7. As to fairness, iQor will have ample opportunity to cross examine witnesses and to present its own evidence. Accordingly, this final factor weighs in favor of allowing this case to proceed as a collective action.

Based on its analysis of all three factors, the Court finds that the FLSA Plaintiffs are similarly situated for purposes of pursuing their claims in a collective action, with the exception of claims for breaks over 20 minutes in length, for which decertification is granted. "And to the extent that the question presents a close call, concerns for the purposes of the FLSA as a remedial statute tip the balance decidedly against decertification." *Id.*

## III.   CONCLUSION

The Court thus declines to certify Plaintiffs' state law claims under Rule 23 because the requirements of predominance and superiority are not met. Given the differences in the applicable state laws, the Court finds that resolving these claims in a

single class action would likely present significant case management difficulties. *See* Fed. R. Civ. P. 23(b)(3)(D). And as to iQor's decertification motion, it is generally denied. However, the Court grants iQor's motion in part as to Plaintiffs' claims based on unpaid break time greater than 20 minutes, which are decertified.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Defendant's Motion for Decertification of the Conditionally Certified Class under the Fair Labor Standards Act [Doc. No. 347] is **DENIED in part and GRANTED in part**;

2.  Plaintiffs' Motion for Class Certification Pursuant to Fed. R. Civ. P. 23 [Doc. No. 353] is **DENIED**; and

3.  This Order is filed under seal. **Within fourteen (14) days of the date of this Order, the parties are ORDERED** to **show cause** as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long. The parties will file briefs, under seal, each no longer than seven (7) pages, on this subject. Each party will also file, again under seal, a copy of this Order showing its proposed redactions. If the parties agree on these issues, they may file under seal a joint brief and/or proposed Redacted order.

Dated: March 27, 2018                    Susan Richard Nelson
                                         SUSAN RICHARD NELSON
                                         United States District Judge